## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| **World Shipping Council,** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | 24-1298 |
| | ) | |
| **Federal Maritime Commission;** | ) | |
| **United States of America,** | ) | |
| | ) | |
| **Respondents** | ) | |

### Petition for Review

The World Shipping Council ("Petitioner"), pursuant to 28 U.S.C. §§ 2342(3)(B), 2344, and Rule 15(a) of the Federal Rules of Appellate Procedure, hereby petitions the Court for review of the final rule issued by Respondent Federal Maritime Commission entitled, "Definition of Unreasonable Refusal to Deal or Negotiate with Respect to Vessel Space Accommodations Provided by an Ocean Common Carrier," 89 Fed. Reg. 59648 (July 23, 2024) (the "Final Rule"). A copy of the Final Rule is attached to this petition as **Exhibit A**.

Venue is proper in this Court pursuant to 28 U.S.C. § 2343.

Petitioner challenges the Final Rule on the grounds that it exceeds the Federal Maritime Commission's authority under the U.S. Shipping Act of 1984, as amended, 46 U.S.C. §§ 40101 *et seq.*, and that it is arbitrary, capricious, an abuse

of discretion, and otherwise not in accordance with law.  Petitioner respectfully

petitions this Court for an order vacating the Final Rule.

Respectfully submitted,

Robert K. Magovern (#50634)
Matthew Howell
Rachel Schwartz
Cozen O'Connor
1200 19th Street NW
Washington, DC 20036
(202) 463-2539
rmagovern@cozen.com

*Counsel for Petitioner*

September 13, 2024

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| **World Shipping Council,** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | 24-1298 |
| | ) | |
| **Federal Maritime Commission;** | ) | |
| **United States of America,** | ) | |
| | ) | |
| **Respondents** | ) | |

## <u>Corporate Disclosure Statement</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioner World Shipping Council hereby states that it has no parent company and no publicly held company has a 10 percent or greater ownership interest in it.

Petitioner is a trade association within the meaning of D.C. Circuit Rule 26.1(b).

Respectfully submitted,

Robert K. Magovern (#50634)
Matthew Howell
Rachel Schwartz
Cozen O'Connor
1200 19th Street NW
Washington, DC 20036
(202) 463-2539
rmagovern@cozen.com

*Counsel for Petitioner*

September 13, 2024

## Certificate of Service

Pursuant to Fed. R. App. P. 15(c) and D.C. Circuit Rule 15(a), I hereby certify that on September 13, 2024, I caused the foregoing Petition for Review to be served upon the Office of the General Counsel of the Federal Maritime Commission and on the Attorney General of the United States by email and U.S. mail at the addresses listed below:

Federal Maritime Commission
Office of the General Counsel
800 North Capitol Street NW
Washington, DC 20573
generalcounsel@fmc.gov

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Respectfully submitted,

Robert K. Magovern (#50634)
Cozen O'Connor
1200 19th Street NW
Washington, DC 20036
(202) 463-2539
rmagovern@cozen.com

*Counsel for Petitioner*

# EXHIBIT A

other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

## List of Subjects in 40 CFR Part 180

Environmental protection, Administrative practice and procedure, Agricultural commodities, Pesticides and pests, Reporting and recordkeeping requirements.

Dated: June 24, 2024.

**Edward Messina,**

*Director, Office of Pesticide Programs.*

Therefore, for the reasons stated in the preamble, EPA is amending 40 CFR chapter I as follows:

## PART 180—TOLERANCES AND EXEMPTIONS FOR PESTICIDE CHEMICAL RESIDUES IN FOOD

■ 1. The authority citation for part 180 continues to read as follows:

**Authority:** 21 U.S.C. 321(q), 346a and 371.

■ 2. Add § 180.1409 to subpart D to read as follows:

**§ 180.1409  *Trichoderma atroviride* strain AT10; exemption from the requirement of a tolerance.**

An exemption from the requirement of a tolerance is established for residues of *Trichoderma atroviride* strain AT10 in or on all food commodities when used in accordance with label directions and good agricultural practices.

[FR Doc. 2024–16074 Filed 7–22–24; 8:45 am]

**BILLING CODE 6560–50–P**

## FEDERAL MARITIME COMMISSION

### 46 CFR Part 542

**[Docket No. FMC–2023–0010]**

**RIN 3072–AC92**

### Definition of Unreasonable Refusal To Deal or Negotiate With Respect to Vessel Space Accommodations Provided by an Ocean Common Carrier

**AGENCY:** Federal Maritime Commission.

**ACTION:** Final rule.

**SUMMARY:** The Federal Maritime Commission (FMC or Commission) is issuing regulations to implement the Ocean Shipping Reform Act of 2022's prohibition against unreasonable refusals of cargo space accommodations when available and unreasonable refusals to deal or negotiate with respect to vessel space accommodations by ocean common carriers. This final rule adopts with changes the supplemental notice of proposed rulemaking published on June 14, 2023. This rule establishes the necessary elements for the FMC to apply Federal law with respect to refusals of cargo space accommodations when available. It also establishes the necessary elements for the FMC to apply Federal law with respect to refusals of vessel space accommodations. This rule applies to complaints brought before the FMC by a private party, as well as enforcement cases brought by the Commission.

**DATES:** This final rule is effective on September 23, 2024, except for instruction 2 adding § 542.1(j), and instruction 3 adding § 542.99, which are delayed. The Commission will publish a document in the **Federal Register** announcing the effective date of those amendments.

**ADDRESSES:** To view background documents or comments received, you may use the Federal eRulemaking Portal at *www.regulations.gov* under Docket No. FMC–2023–0010.

**FOR FURTHER INFORMATION CONTACT:** David Eng, Secretary; Phone: (202) 523–5725; Email: *secretary@fmc.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. Background

### A. Procedural History

The Ocean Shipping Reform Act of 2022 (OSRA 2022), Public Law 117–146, was enacted on June 16, 2022. OSRA 2022 amended various statutory provisions contained in part A of subtitle IV of title 46, United States Code. OSRA 2022 made clear that the categorical refusal by an ocean common carrier, alone or in conjunction with another person, directly or indirectly, to accommodate U.S. exports, without demonstrating that the refusal is reasonable, is a violation of the Shipping Act. By definition, not all refusals will necessarily be a violation. Whether a refusal to deal or a refusal to negotiate falls within the scope of section 41104(a)(10), or a refusal of cargo space accommodations falls within the scope of section 41104(a)(3), depends upon the particular circumstances of a given case.

Section 7(d) of OSRA 2022 requires the Commission, in consultation with the United States Coast Guard, to initiate and complete a rulemaking to define the phrase "unreasonable refusal to deal or negotiate with respect to vessel space accommodations" provided by an ocean common carrier to work in conjunction with 46 U.S.C. 41104(a)(10). In response to this

requirement, on September 21, 2022, the FMC issued a notice of proposed rulemaking (NPRM) that proposed adding a new part 542 under title 46 of the Code of Federal Regulations (CFR), which would work in conjunction with 46 U.S.C. 41104(a)(10).[1] The proposal considered the common carriage roots of 46 U.S.C. 41104(a)(10), as well as the overall competition basis of the Commission's authority.[2]

On June 14, 2023, after reviewing the comments received in response to the NPRM, the Commission issued a revised and expanded supplemental notice of proposed rulemaking (SNPRM). In addition to addressing OSRA 2022's amendment to 46 U.S.C. 41104(a)(10), the SNPRM also addressed OSRA 2022's amendment to 46 U.S.C. 41104(a)(3), which prohibits a common carrier from unreasonably refusing cargo space accommodations when available. The restrictions that 46 U.S.C. 41104 (a)(3) and (a)(10) impose on ocean common carriers are distinct but closely related. Both provisions address refusals by ocean common carriers to accommodate shippers' attempts to secure overseas transportation for their cargo. The distinction between the conduct covered by these two provisions is timing, more specifically whether the refusal occurred while the parties were still negotiating and attempting to reach a deal on service terms and conditions (negotiation stage), or after a deal was reached (execution stage). If the refusal occurred at the execution stage, after the parties reached a deal or mutually agreed on service terms and conditions, then 46 U.S.C. 41104(a)(3) applies. If the refusal occurred at the negotiation stage, before the parties reached a deal or mutually agreed on service terms and conditions, then 46 U.S.C. 41104(a)(10) applies. Interpreting these related provisions in a single rulemaking allows the Commission to delineate the types of refusal conduct covered by 46 U.S.C. 41104 (a)(3) and (a)(10) and highlight the differences between them. As discussed in the SNPRM, restricting the rulemaking to refusals to deal or negotiate under 46 U.S.C. 41104(a)(10) would not address the reliability issues that commenters on the NPRM identified as a critical and a driving factor impeding their ability to ship cargo overseas. Shippers impacted by unlawful refusals to accommodate their requests for vessel space accommodations have been able to bring a cause of action against ocean common carriers since the OSRA 2022 amendments took effect immediately in

[1] 87 FR 57674.

[2] 87 FR 57674, 57676.

June 2022. They may find it more difficult, however, to plead and prevail on those claims without implementing regulations from the Commission defining the elements and statutory terms. Parties may also find it more difficult to identify and litigate claims for unreasonable refusals under 46 U.S.C. 41104(a)(3) without a clearer indication from the Commission of what conduct is covered by that provision as distinguished from 46 U.S.C. 41104(a)(10). Clearly delineating these distinctions as part of the current rulemaking lessens the time and resources that shippers, carriers, and the Commission will otherwise need to devote to defining these concepts in individual cases. Defining the elements and terms used in 46 U.S.C. 41104(a)(3) as part of this rulemaking is also important because, in practice, it may be difficult to discern whether a carrier's refusal was at the negotiation or execution stage. Additional guidance from the Commission now may help avoid needless disputes over that issue.

The Commission acknowledges that it has not previously recognized a temporal distinction between (a)(3) and (a)(10). However, as discussed in the SNPRM, reading the conduct governed by 46 U.S.C. 41104(a)(10) to include the same conduct prohibited by 46 U.S.C. 41104(a)(3), as amended by OSRA 2022, would violate the canon of statutory construction against construing language in a manner that renders language superfluous or meaningless. Previously, FMC distinguished (a)(3) from other prohibitions in 41104 based on the shipper's involvement in protected activity.[3] OSRA 2022, however, removed the protected entity and protected activity language from (a)(3).[4] Therefore, there must be some other

means of distinguishing the two provisions.

Consistent with section 7(d) of OSRA 2022, the Commission has consulted with the Coast Guard regarding this rulemaking. The Coast Guard offered no objections to the Commission's approach.

### B. Scope of the Rule

There are two types of common carriers—vessel-operating common carriers (VOCCs) and non-vessel-operating common carriers (NVOCCs).[5] Section 41104 applies generally to both VOCCs and NVOCCs; this rule, however, only applies to VOCCs. The specific prohibition in 46 U.S.C. 41104(a)(10) that is the subject of this rule applies only to VOCCs because "ocean common carrier" is defined as a vessel-operating common carrier in the Shipping Act.[6] Although 46 U.S.C. 41104(a)(3) and 46 U.S.C. 41104(a)(10) apply to both VOCCs and NVOCCs, this rule only applies to VOCCs to mirror the scope of the specific prohibition in 41104(a)(10) added by OSRA 2022.[7] The limitation in scope of this rule to VOCCs does not in any way limit the application of 46 U.S.C. 41104(a)(3) or 46 U.S.C. 41104(a)(10). NVOCCs remain legally liable under 46 U.S.C. 41104(a)(3) and 46 U.S.C. 41104(a)(10) for violations of the Shipping Act.

Similarly, 41104 applies generally to roll-on/roll-off cargo, bulk cargo, and containerized cargo. This rule, however, only applies to containerized cargo because the sorts of issues that arose around container availability during the pandemic do not appear to have been present, or at least not present to the same extent, for roll-on/roll-off cargo or bulk cargo. While this rule is limited to containerized cargo, it does not preclude refusal to deal cases arising in the context of roll-on/roll-off cargo or bulk cargo—the framework in this rule could be applied to such cases.[8]

As noted in the SNPRM, the Commission will address, at a different time, the statutory requirement in section 7(c) of OSRA 2022 to complete a rulemaking defining "unfair or

unjustly discriminatory methods" in 46 U.S.C. 41104(a)(3).

The common carrier prohibitions in 46 U.S.C. 41104 do not distinguish between U.S. exports and imports. This rule applies to both.

### C. Challenges Faced by U.S. Exporters

One basis, but not the only one, for some of the OSRA 2022 provisions were the challenges expressed by U.S. exporters trying to obtain vessel space to ship their products.[9][10]

#### 1. Trade Deficit

As discussed in the NPRM, there is a long-running U.S. trade deficit in goods (approximately $1 trillion in 2023) and an imbalance of imports and exports moving through U.S. ports in international trade.[11]

VOCCs, particularly those on the major east-west trade lanes between the United States and Asia and the United States and Europe, make operational decisions regarding the import and export goods they carry based on both economic and engineering considerations. Export loads are, on average, heavier than import loads. This means that ships that come into U.S. ports largely laden with goods cannot safely load the same number of laden twenty-foot equivalent units (TEUs) when leaving the United States for foreign ports. A higher volume of laden exports will result in a lower vessel utilization rate on the outbound voyage from the United States, resulting in fewer containers returning to where the

---

[3] *See* Federal Maritime Commission, *Statement of the Commission on Retaliation* (Dec. 28, 2021) (available at *https://www2.fmc.gov/readingroom/docs/21-15/21-15_Policy_Retaliation.pdf/*) ("The Commission also acknowledges that § 41104(a)(3) should not be read so expansively that it renders other prohibitions in Chapter 411 of Title 46, for instance, only prohibits specific types of unfair or unjustly discriminatory conduct. Section 41104(a)(3) prohibits a common carrier from "resort[ing] to other unfair or unjustly discriminatory methods . . . for any other reason." The latter does not swallow the other prohibitions, however, because it is not a flat prohibition on all unfair or unjustly discriminatory conduct. A complainant must show that a carrier engaged in prohibited conduct (refusing cargo space accommodations or other unfair or unjustly discriminatory methods), with respect to a protected entity (shipper), because the protected entity engaged in protected activity (patronizing other carriers, filing a complaint, or other activities of the same class." (internal citations omitted)).

[4] The protected activity language did remain with the prohibition on retaliation, now found at 46 U.S.C. 41102(d).

[5] 46 U.S.C. 40102.

[6] 46 U.S.C. 40102(18) (definition of "ocean common carrier").

[7] OSRA 2022 added "including with respect to vessel space accommodations provided by an ocean common carrier" to the general prohibition imposed on all common carriers to not "unreasonably refuse to deal or negotiate." Thus, while the general prohibition of (a)(10) against unreasonably refusing to deal or negotiate applies to all common carriers, the specific prohibition against refusing to deal or negotiate "with respect to vessel space accommodations" is limited to acts by ocean common carriers (*i.e.*, VOCCs).

[8] *See* 87 FR 57674, 57676, FN 14.

[9] OSRA 2022 originated as S.3580 and the bill is partially summarized as: "This bill revises requirements governing ocean shipping to increase the authority of the Federal Maritime Commission (FMC) to promote the growth and development of U.S. exports through an ocean transportation system that is competitive, efficient, and economical." *See* Congress.gov summary for S. 3580 (*https://www.congress.gov/bill/117th-congress/senate-bill/3580?q=%7B%22search%22%3A%22S.+3580%22%7D&s=4&r=1*, accessed July 10, 2022).

[10] The export-focus arguably is also supported by the amendments to the "Purposes" section of the Commission's overall authority contained in 46 U.S.C. 40101. Specifically, 46 U.S.C. 40101(4) ratified the purpose to "promote the growth and development of United States exports through a competitive and efficient system for the carriage of goods by water." Congress further highlighted issues related to U.S. exports and imports in section 9 of OSRA 2022. Section 9 created 46 U.S.C. 41110 and the requirement for ocean common carriers to provide information to the Commission to enable the Commission to publish quarterly statistics on total import and export tonnage and the total loaded and empty 20-foot equivalent units (TEUs) per vessel.

[11] United States Bureau of Economic Analysis, available at *https://www.bea.gov/news/blog/2024-02-07/2023-trade-gap-7734-billion#:~:text=The%20U.S.%20goods%20and%20services,%2456.4%20billion%20to%20%24288.2%20billion* (last visited April 24, 2024).

equipment is in highest demand. The economics of this trade imbalance result in very different revenue returns for import and export markets. U.S. imports feature higher value items on average and the rates that shippers pay to move these goods are historically higher than the rates paid to move U.S. exports. For example, the average rate of a 20-foot dry container moving from Shanghai to the U.S. West Coast was $1,740 in January 2019, $4,270 in January 2021, $8,130 in January 2022, $1,591 in January 2023 and $2,845 in January 2024. The corresponding rate for a 20-foot dry container moving for the U.S. West Coast to Shanghai was $730 in January 2019, $800 in January 2021, $1,220 in January 2022, $978 in January 2023, and $633 in January 2024.[12] Further, the inland destination of import containers is often not located near export customers, which requires equipment repositioning costs as well as the opportunity cost of unused equipment.

Prior to the pandemic, the ratio of import TEUs to export TEUs moving through U.S. ports across all trade lanes was over 50 percent; in April 2019 this ratio was 59 percent.[13] While containerized imports (measured in TEUs) increased steadily from May 2020 through April 2022, imports tapered off in the latter half of 2022 and containerized exports declined over the same period. There was an import-export TEU ratio of 45 percent in April 2023. Approximately 1.8 million TEUs of all U.S. imports moved through U.S. ports in April 2023, versus 1.98 million in April 2019. Total U.S. exports fell from 1.2 million TEUs in April 2019 to 803,673 in April 2023.[14]

Trade on some specific lanes is even more imbalanced. Trade from Asia to U.S. ports was characterized by an import/export TEU ratio of 39 percent in 2019, 36 percent in 2020, 29 percent in 2021, 28 percent in 2022, and 33 percent in 2023. As of January 2024, that number sits at 28 percent. There is no homogeneity among carriers, even within trade lanes. On the Asia to United States trade lane, among the largest carriers, the ratio of exports to imports ranged from 27 percent to 52 percent in 2019, from 23 percent to 44

percent in 2021, and from 27 percent to 57 percent in 2023. Some carriers had very stable export to import ratios throughout the pandemic, though most saw a substantial drop in both the ratio of exports to imports and the absolute number of export containers moved, particularly between 2020 and 2021. This pattern continued into the first quarter of 2022.

2. Operational Decisions

While some export markets have been affected by trade shocks, such as China's ban on solid waste imports and other items, these trade shocks do not fully explain the drop in total exports carried; nor do safety concerns over ship loading. These changes can be best explained by carrier operational decisions based on equipment availability and differential revenues from import and export transportation.[15] Common carriers stated they have seen delays in the movement of export cargo due to a lack of mutual commitment between shippers and common carriers leading to cancellations of vessel space accommodation by either party, sometimes up to the day of sailing. This contributes to uncertainty for both the shippers and common carriers.

In addition to the challenges faced by exporters, there have also been reports of restricted access to equipment and vessel capacity for U.S. importers, particularly in the Trans-Pacific market. Access to import vessel space was impacted by congestion, equipment availability, and VOCC commercial decisions.[16]

## II. Comments

In response to the SNPRM, the Commission received 26 comments from a variety of interested parties. This included comments from freight forwarders, customs brokers, ocean transportation intermediaries (OTIs), chemical manufacturers, importers and exporters and distributors in a range of industries, vessel-operating common carriers (VOCCs), shipper trade associations, ocean carrier and marine terminal operator associations, ocean carrier agreements, shipping industry associations, agricultural exporter coalitions and one federal agency. All comments are available in the docket for

this action (FMC–2023–0010) on *Regulations.gov.*

These comments are addressed in the discussion that follows.

## III. Discussion of Comments

*A. § 542.1(a): Purpose (and Applicability of the Rule)*

1. A Common Carrier's Obligation To Engage in Both Imports and Exports

*Issue:* One comment argued that the Commission's statement in the NPRM that ocean common carriers should offer service in both inbound and outbound trade is incorrect and inconsistent with Commission precedent.[17] The comment asserted that just because a common carrier holds itself out as a common carrier in U.S. imports does not mean that the carrier is obligated to act as a common carrier for U.S. exports.

*FMC response:* In the SNPRM, the Commission stated that ''every ocean common carrier operating in the U.S. market is *presumed* by the Commission—barring the submission of further information to the contrary—to be able to transport both exports and imports.'' [18] Whether or not an entity is an ocean common carrier is determined on a case-by-case basis.[19]

[12] Drewry Container Freight Rate Insight, (last visited April 15, 2024).

[13] PIERS, S&P Global Market Intelligence, available at *https://www.spglobal.com/market intelligence/en/mi/products/piers.html?cq_cmp=19414807564&cq_plac=&cq_net=g&cq_pos=&cq_plt=gp&utm_source=google&utm_medium=cpc&utm_campaign=Data_and_Insights_Maritime_GTA_PIERS_TCS_PIERS_Search_Google_PC1132_16&utm_term=pie* (last visited April 23, 2024).

[14] *Id.*

[15] Ana Swanson, *Crunch at Ports May Mean Crisis for American Farms,* N.Y. Times (Nov. 14, 2021), *https://www.nytimes.com/2021/11/14/business/economy/farm-exports-supply-chain-ports.html.*

[16] Peter S. Goodman, *American Importers Accuse Shipping Giants of Profiteering,* N.Y. Times (May 4, 2022), *https://www.nytimes.com/2022/05/04/business/shipping-container-shortage.html.*

[17] Caribbean Shipowners' Association, FMC Agreement No. 010979/Central America Discussion Agreement, FMC Agreement No. 011075 (FMC–2023–0010–0038) at 3–4.

[18] 88 FR 38789, 38790–91 (emphasis added).

[19] *See e.g., Logfret, Inc., Complainant v. Kirsha, B.V., Leendert Johannes Bergwerff A/k/a Hans Bergwerff, and Linda Sieval, Respondents,* 2019 WL 5088014, 11–12 (''The Commission has long relied on these three factors—holding itself out, assuming responsibility, and transportation by water—to identify a common carrier . . . The most essential factor is whether the carrier holds itself out to accept cargo from whoever offers to the extent of its ability to carry, and the other relevant factors include the variety and type of cargo carried, number of shippers, type of solicitation utilized, regularity of service and port coverage, responsibility of the carrier towards the cargo, issuance of bills of lading or other standardized contracts of carriage, and the method of establishing and charging rates. The absence of solicitation does not determine that a carrier is not a common carrier. Holding out can also be demonstrated by a course of conduct. It is sufficient if an entity 'held out, by a course of conduct, that they would accept goods from whomever offered to the extent of their ability to carry.' Moreover, 'the common carrier status depends on the nature of what the carrier undertakes or holds itself out to undertake to the general public rather than on the nature of the arrangements which it may make for the performance of its undertaken duty.' Addressing the element of holding out to provide transportation by water between the United States and a foreign country for compensation, the Commission stated in Worldwide Relocations (FMC 2012) that an entity may hold out to the public 'by the establishment and maintenance of tariffs, by advertisement and solicitation, and otherwise.''' (internal citations omitted)).

2. Application of the Rule to NVOCCs

*Issue:* World Shipping Council (WSC) argued that 46 U.S.C. 41104(a)(3) applies to all common carriers, including NVOCCs, and that to exempt NVOCCs from application of the Shipping Act, the Commission would need to first provide an opportunity for a hearing in accordance with 46 U.S.C. 40103.[20] WSC further argued that the Commission creates a competitive advantage for NVOCCs by exempting them from liability under 46 U.S.C. 41104(a)(3), while at the same time creating a situation that is "detrimental to commerce" by denying the NVOCC's customer a meaningful remedy for an NVOCC's violation of 41104(a)(3).[21] WSC stated that this would violate 46 U.S.C. 40103(a)'s standard that the Commission may only grant an exemption if it finds that the exemption would not result in substantial reduction in competition or be detrimental to commerce.

WSC also asserted that it is important to include NVOCCs within the scope of the rule as a practical matter as well as a legal matter because NVOCCs control cargo space accommodations.[22] WSC argued that NVOCCs, like VOCCs, can face situations in which the space available to them is exceeded by customer demand or is limited by safety, weight, stability, or other operational factors. WSC said that in such a situation, the NVOCC will have to decide which of its customers' containers are booked on that vessel and which are not.

By contrast, the National Customs Brokers & Forwarders Association of America, Inc. (NCBFAA) supported the rule's exclusion of NVOCCs.[23]

*FMC response:* WSC is correct that 46 U.S.C. 41104(a)(3) applies to both VOCCs and NVOCCs. This rule, however, only applies to VOCCs. The NPRM was limited to the OSRA 2022 amendments to 46 U.S.C. 41104(a)(10), which is statutorily limited in scope to VOCCs because the Shipping Act defines an "ocean common carrier" as a vessel-operating common carrier.[24] The SNPRM adhered to this exclusion, despite the expansion of the proposal to also address 46 U.S.C. 41104(a)(3), to mirror the scope of the affected population of the NPRM. The limitation in scope of this rule to VOCCs, however, does not in any way limit the scope of 46 U.S.C. 41104(a)(3). NVOCCs are legally liable under 46 U.S.C.

41104(a)(3) for unreasonably refusing cargo space accommodations. For additional discussion see I, B of this preamble discussing the scope of this final rule.

3. Application of the Rule to Vehicle Carriers/Ro-Ro Vessels.

*Issue:* World Shipping Council (WSC) asked the Commission to clarify the applicability of the rule to VOCCs that are vehicle carriers.[25]

*FMC response:* This rule does not apply to roll-on/roll-off cargo (or to bulk cargo). The definitions of "cargo space accommodations" and "vessel space accommodations" in this rule are limited to containerized cargo because the sorts of issues that arose around container availability during the pandemic were not present, or at least not present to the same extent, for roll-on/roll-off cargo or bulk cargo vessels. In response to this comment, the FMC has revised § 542.1(a) to clearly state that part 542 is limited to containerized cargo. While this rule defines refusal to deal cases with regards to containerized cargo, it does not preclude refusal to deal cases to which the statute applies, such as cases arising in the context of roll-on/roll-off cargo or bulk cargo. See also I, B of this preamble discussing the scope of this final rule.

*B. § 542.1(b): Definitions*

1. "Blank Sailing"

In response to comments on §§ 542.1 (e)(1) and (j)(1)(i) the Commission has added a definition of "blank sailing" to § 542.1(b). For additional discussion regarding blank sailing, see the discussion regarding 46 CFR 542.1(c) and the request to define "when available".

2. "Cargo Space Accommodations"

(a) Revising the definition to include language regarding whether cargo space accommodations have been confirmed.

*Issue:* The National Industrial Transportation League (NITL) recommended revising the definition of "cargo space accommodations" to "space which has been negotiated for and/or confirmed aboard the vessel . . ."[26] NITL argued that adding "or confirmed" would broaden the definition to instances where space has not been "negotiated" between a carrier and a shipper in the traditional sense— *i.e.*, there have been no "back and forth" communications between the two parties but rather involve a shipper's request for vessel space under an existing service contract or other

arrangements, and a responsive vessel booking confirmation from the carrier.[27] NITL agreed with the Commission that the proposed definition includes situations where the parties may have an existing relationship and already mutually agreed on terms and conditions via a booking confirmation, but that shippers sometimes purchase vessel space without negotiating after reviewing an ocean carrier's tariff by paying the rate quoted in the tariff. NITL argued that the proposed definition does not explicitly contemplate such a situation.[28]

Similarly, the National Association of Chemical Distributors (NACD) supported the adoption of the definition of "cargo space accommodation" proposed in the SNPRM but expressed concern that this definition only covered "negotiated" vessel space.[29] NACD noted that its members have experienced cancelled bookings and unfulfilled agreements when space is confirmed and urged the Commission to include confirmed vessel space in this definition.[30]

*FMC response:* In response to these comments, the Commission has added the language "or confirmed" to the definition of "cargo space accommodations." Using the phrase "or confirmed" rather than the phrase "and/or confirmed" aligns with the Federal Plain Language Guidelines' recommendation to avoid the use of slashes to avoid ambiguity.

(b) Trans-shipment of cargo.

*Issue:* BassTech International (BassTech) suggested removing the clause "from a vessel calling at a U.S. port" from the last line of the definition of "cargo space accommodations".[31] BassTech argued that the services necessary to load or unload cargo at a U.S. port are also necessary to load and unload cargo to a vessel that might not call on a U.S. port but from which the cargo may be trans-shipped onto a vessel that then calls on a U.S. port.[32]

*FMC response:* The Commission declines to make this change. This rulemaking is not intended to address the situation BassTech describes, nor are changes to the definition of "cargo space accommodations" that BassTech suggests likely to resolve the matter. A future rulemaking could address these considerations, if necessary.

(c) Proposed definition is vague and confusing.

---

[20] FMC–2023–0010–0041 at 22.
[21] *Id.* at 4, 23–24.
[22] *Id.* at 23.
[23] FMC–2023–0010–0057 at 2.
[24] 87 FR 57674 at FN 4; 46 U.S.C. 40102(18).

[25] FMC–2023–0010–0041 at 5, FN 5.
[26] FMC–2023–0010–0045 at 6.

[27] *Id.*
[28] *Id.*
[29] FMC–2023–0010–0046 at 3.
[30] *Id.*
[31] FMC–2023–0010–0055 at 2.
[32] *Id.*

*Issue:* Caribbean Shipowners' Association, FMC Agreement No. 010979 and Central America Discussion Agreement, FMC Agreement No. 011075 (the "Agreements") said that the phrase "space which has been negotiated for" within the definition of "cargo space accommodations" is "vague and confusing".[33] The comment stated that the definition of "cargo space accommodation" arguably includes space which was negotiated for but for which no agreement was reached, and that this is inconsistent with the Commission's intent to apply 46 U.S.C. 41104(a)(3) to the execution stage. The Agreements argued that the Commission needs to clarify this definition, and that the clarification should consider the various ways in which carriers and their customers reach agreement: through service contract negotiations, through automated contracting processes, and under tariff rates. As an example, the Agreements asked whether the parties have "negotiated for" space where a shipper tenders cargo to a carrier under a rate the carrier has published in its tariff and when that rate was not agreed upon with the shipper prior to publication.

*FMC response:* As noted above, in accordance with other comments, the Commission has added the phrase "or confirmed" to clarify the definition's scope. This definition remains broad enough to encompass the various methods by which carriers and the customers reach agreements, as this rule is intended to regulate unreasonable refusals to deal rather than whether carriers and their customers reach agreements by way of contract negotiations, automated contracting processes, or under tariff rates.

(d) Whether space onboard a vessel has been agreed to when a booking confirmation is issued.

*Issue:* In the SNPRM, the Commission asked for comments on whether space onboard a vessel has been agreed to at the time of issuance of a booking confirmation.[34] The National Industrial Transportation League (NITL) stated that it believes that a booking confirmation does represent the carrier's commitment and agreement to provide access to vessel space as reflected in the confirmation, since such confirmations are issued after the carrier evaluates the specific request for services.[35] Similarly, the International Federation of Freight Forwarders Associations (FIATA) expressed that a booking confirmation represents the conclusion of a contract

to transport the cargo, and that the booking should be honored such that the shipper is obligated to deliver the container and the carrier to accept it as agreed to in the booking confirmation. FIATA noted that this would apply to NVOCCs as well as beneficial cargo owners (BCOs), since they both rely on VOCCs to adhere to contracted terms regarding space allocations.[36]

By contrast, the National Customs Brokers & Forwarders Association of America, Inc. (NCBFAA) suggested that space accommodations are not agreed to at the time of a booking confirmation.[37] NCBFAA stated that booking confirmations are merely acknowledgments from the ocean carrier that the shipper's request for carriage has been received. NCBFAA noted that booking confirmations typically contain language stating that the confirmation information is subject to change due to vessel space, and that ocean carriers are understood to take shipment bookings six to eight weeks prior to the projected departure date, meaning that not all details are finalized. NCBFAA stated that ocean carriers ultimately determine whether cargo shall be loaded on a particular vessel regardless of whether the shipper has received a booking confirmation and that ocean carriers may ultimately revise the minimum quantity amount by reducing the volume they will accept. Lastly, NCBFAA stated that often shippers are provided little to no notice of these reduced capacities and are given limited recourse. As a result, NCBFAA concluded that space accommodations are merely requested and not necessarily treated as agreed to by the ocean carrier at the time of booking.

*FMC response:* In the SPNRPM, the Commission requested input on whether vessel space has been agreed to at the time of a booking confirmation because the term "cargo space accommodations" concerns situations where the parties have an existing relationship and/or already mutually agreed on terms and conditions via a booking confirmation.[38] As such, in these situations, the Commission presumed that there is some evidence that negotiation for space aboard the vessel has already occurred. In accordance with the input supplied by NITL and FIATA, the Commission will continue to maintain the temporal distinction between 46 U.S.C. 41104(a)(3) and 46 U.S.C. 41104(a)(10) that the SNPRM expressed: claims under 46 U.S.C. 41104(a)(10) will

generally involve those actions occurring prior to a carrier providing a shipper with a booking confirmation to carry that shipper's cargo. When read in conjunction with this provision, to "unreasonably refuse cargo space accommodations" under 46 U.S.C. 41104(a)(3) will involve a set of acts that occur after a booking has been confirmed.

Lastly, the Commission notes that the experiences that NCBFAA describes in its comments are the type of practices that this regulation is meant to change within the industry in order to establish fewer cancelled bookings and more certainty.

### 3. "Documented Export Policy"

*Issue:* One commenter requested clarification of the phrase "practices and procedures" used in the proposed definition of "documented export policy." [39] The commenter said that guidance as to the meaning of this term is needed to better understand what is necessary to include in a documented export policy as the proposed § 541.1(j)(1) did not appear to include anything that could be described as a "practice or procedure." Another commenter suggested that "practices and procedures" be replaced with "reasonable practices and procedures" to emphasize that ocean common carriers may not unreasonably refuse a class of cargo.[40]

*FMC response:* The terms "practices" and "procedures," as used in the definition, have their normal and ordinary meaning.[41] The information required by paragraph (j)(1)—pricing strategies, services offered, strategies for equipment provision, and description of markets served—are clearly practices and procedures as they describe an ocean common carrier's usual way of doing business. The same is true for the effect of blank sailings or other schedule disruptions and alternative remedies in paragraphs (j)(1)(i) and (ii). In this final rule, the Commission has also added a

[33] FMC–2023–0010–0038 at 8–9.
[34] 88 FR 38789, 38803.
[35] FMC–2023–0010–0045 at 6–7.

[36] FMC–2023–0010–0056 at 2–3.
[37] FMC–2023–0010–0057 at 1, 4.
[38] 88 FR 38789, 38803.

[39] Caribbean Shipowners' Association, FMC Agreement No. 010979/Central America Discussion Agreement, FMC Agreement No. 011075 (FMC–2023–0010–0038) at 9.

[40] National Association of Chemical Distributors (FMC–2023–0010–0046) at 4.

[41] a. *E.g.,* "practice." *Merriam-Webster.com.* 2024. *https://www.merriam-webster.com* (April 1, 2024) (noun, "a: actual performance or application; b: a repeated or customary action; c: the usual way of doing something"; "practice."; Black's Law Dictionary (11th ed. 2019) (noun, "4. A customary action or procedure").

b. *E.g.,* "procedure." *Merriam-Webster.com.* 2024. *https://www.merriam-webster.com* (April 1, 2024) (noun, "1a: a particular way of accomplishing something or of acting; 2a: a series of steps followed in a definite order; 3a: a traditional or established way of doing things").

requirement, in (j)(1)(ii), that the documented export policy include the ocean common carrier's rules and practices for the designation and use of sweeper vessels.

FMC declines to add the qualifier "reasonable" to "practices and procedures". Doing so would potentially create a circular analysis as a primary purpose of requiring ocean common carriers to have a documented export policy is to help the agency determine whether a particular refusal was reasonable or unreasonable.

4. "Sweeper Vessel"

*Issue:* BassTech International suggested that "voyage" be inserted between "vessel" and "exclusively designated" to clarify that it is not a ship but a specific voyage of a ship that is designated as "sweeper".[42] MSC Mediterranean Shipping Company (USA) Inc.[43] and World Shipping Council[44] requested that FMC revise the definition of "sweeper vessel" to permit designated sweeper vessels to carry empty containers so that they can also carry export cargo if they have the capacity to do so.

*FMC response:* The FMC declines to revise the definition of "sweeper vessel". The definition, however, is not intended, and should not be used, to prevent carriage of cargo if the vessel has the capacity to do so—even if the primary purpose of a particular voyage may be to reposition empty containers. Rather, the definition of a "sweeper vessel" proposed in the SNPRM and adopted by this final rule ensures that if a vessel carries containerized cargo, even one box of cargo, then the default presumption is that the carriage is undertaken in common carriage and thus subject to the unreasonable refusal to deal or negotiate requirements of 46 U.S.C. 41104(a)(3) and (a)(10). An ocean common carrier should not be excepted from the requirements of 46 U.S.C. 41104(a)(3) and (a)(10) just because they are carrying only a small amount of cargo. An ocean common carrier likewise cannot avoid complying with the provisions of this rule by unreasonably designating a vessel as a "sweeper vessel" for only certain legs of an overall trade route. If a complaint is brought, an ocean common carrier may present relevant information to the Commission to demonstrate why designation as a sweeper vessel in the particular case was reasonable.

5. "Transportation Factors"

(a) Intermodal and landside considerations.

*Issue:* Some commenters requested that the definition of "transportation factors" be expanded to include intermodal considerations, such as train service on through bills of lading[45] and landside considerations such as port operations, rail capacity, scheduling and performance, trucking capacity, and availability of warehouse dock appointments.[46]

*FMC response:* FMC declines to expand the definition to include intermodal or landside considerations. As noted in the SNPRM, "[g]enerally, . . . . transportation factors relate to the characteristics of the vessel . . . ."[47] Because intermodal considerations and landside considerations do not relate to vessel characteristics, it would be inappropriate to expand the definition as requested. FMC notes, however, that such considerations may be considered by the Commission as "other factors relevant in determining whether there was a refusal" under 46 CFR 542.1(d)(4) and (g)(4).

(b) Character of cargo.

*Issue:* Caribbean Shipowners' Association, FMC Agreement No. 010979 and Central America Discussion Agreement, FMC Agreement No. 011075 (the "Agreements") requested that the definition of "transportation factors" be expanded to include more than just vessel-related factors, and specifically requested that the definition be amended to include character of the cargo, competition, and cost of providing services.[48] As an example of why, the Agreements noted that foodstuffs may require specialized, food-safe containers, and that those containers may need to be de-contaminated between loads in order to carry back-to-back food shipments.[49] They noted that this may lead to some carriers opting not to carry foodstuffs on the back half of a haul in those containers.

*FMC response:* FMC declines to expand the definition beyond vessel-related considerations. As noted in the SNPRM, "[g]enerally, . . . . transportation factors relate to the characteristics of the vessel . . . ."[50] FMC notes, however, that such additional considerations as those raised by the commenters may be considered by the Commission as "other factors relevant in determining whether there was a refusal" under 46 CFR 542.1(d)(4) and (g)(4).

(c) Disruptions in carrier networks.

*Issue:* Two commenters also requested that the definition of "transportation factors" be amended to expressly incorporate disruptions in carriers' networks.[51]

*FMC response:* FMC declines to expand the definition to include disruptions in carriers' networks. As noted in the SNPRM, "[g]enerally, . . . . transportation factors relate to the characteristics of the vessel . . . ."[52] Because disruptions to carriers' networks do not relate to vessel characteristics, it would be inappropriate to expand the definition as requested. FMC notes, however, that such considerations can be considered by the Commission as "other factors relevant in determining whether there was a refusal" under 46 CFR 542.1 (d)(4) and (g)(4).

(d) Foreseeability.

*Issue:* Some commenters said that the Commission should narrow the scope of the definition of "transportation factors" to differentiate between factors that are reasonably foreseeable to the carrier under the circumstances and those that are not reasonably foreseeable.[53] In particular, the Retail Industry Leaders Association (RILA) argued that in the majority of circumstances, these factors are reasonably foreseeable and the carrier has a responsibility to its customers to forecast and plan for those factors. RILA stated that the regulation's failure to distinguish between foreseeable and unforeseeable events allows the carriers to make a general assertion, such as "port congestion,"

---

[42] FMC–2023–0010–0055 at 2.

[43] FMC–2023–0010–0036 at 2, 11.

[44] FMC–2023–0010–0041 at 21–22.

[45] MSC Mediterranean Shipping Company (USA) Inc. (FMC–2023–0010–0036) at 3 and 5; National Milk Producers Federation/U.S. Dairy Export Council (FMC–2023–0010–0035) at 2; ZIM Integrated Shipping Services Ltd. (FMC–2023–0010–0042) at 2.

[46] ZIM Integrated Shipping Services Ltd. (FMC–2023–0010–0042) at 2; *see also* MSC Mediterranean Shipping Company (USA) Inc. (FMC–2023–0010–0036) at 2, 4–5.

[47] 88 FR 38789, 38797 (citing *Credit Practices of Sea-land Serv., Inc., & Nedlloyd Lijnen,* B.V., No. 90–07, 1990 WL 427463 (F.M.C. Dec. 20, 1990); *Dep't of Def. v. Matson Navigation Co.,* 19 F.M.C. 503 (1977)).

[48] FMC–2023–0010–0038 at 10.

[49] *Id.*

[50] 88 FR 38789, 38797 (citing *Credit Practices of Sea-land Serv., Inc., & Nedlloyd Lijnen,* B.V., No. 90–07, 1990 WL 427463 (F.M.C. Dec. 20, 1990); *Dep't of Def. v. Matson Navigation Co.,* 19 F.M.C. 503 (1977)).

[51] MSC Mediterranean Shipping Company (USA) Inc. (FMC–2023–0010–0036) at 3; World Shipping Council (FMC–2023–0010–0041) at 3.

[52] 88 FR 38789, 38797 (citing *Credit Practices of Sea-land Serv., Inc., & Nedlloyd Lijnen,* B.V., No. 90–07, 1990 WL 427463 (F.M.C. Dec. 20, 1990); *Dep't of Def. v. Matson Navigation Co.,* 19 F.M.C. 503 (1977)).

[53] Retail Industry Leaders Association (FMC–2023–0010–0049) at 4; American Chemistry Council/National Association of Manufacturers/ American Association of Exporters and Importers (FMC–2023–0010–0050) at 4; International Dairy Foods Association (FMC–2023–0010–0053) at 2–3.

and advance that as a legitimate transportation factor.[54] Other commenters raising this issue made the same arguments.[55] By contrast, Caribbean Shipowners' Association, FMC Agreement No. 010979/Central America Discussion Agreement, FMC Agreement No. 011075 (the "Agreements") said that the definition should include factors within the control of the vessel operator.[56] In particular, the Agreements argued that there are numerous operational situations in which a carrier makes a conscious decision to change its vessel operations in some way, such as to omit a scheduled port of call, or to change the order in which it calls at particular ports for reasons such as weather or because of port closures.[57] The Agreements argued that under proposed § 542.1(e), with the definition of "transportation factors" in the SNPRM, many decisions of this type could be considered unreasonable and that the Commission should make clear that it will consider the impact of any such decision on other customers, ports, and the supply chain as a whole when assessing reasonableness.[58]

*FMC response:* The Commission agrees that it would be beneficial to clarify that the definition of "transportation factors" is not intended to include factors that are reasonably foreseeable by a vessel operator and has amended the regulation accordingly. We also agree with the statement that "[i]f a transportation factor is reasonably foreseeable by the carrier, then the carrier has a responsibility to its customers to find alternative pathways to deliver the cargo and otherwise mitigate the negative impacts of that factor."[59] FMC has modified the definition accordingly in this final rule.

In addition, the Commission believes the Agreements are misinterpreting the proposal. The Commission understands the ever-changing shipping landscape and that it can be affected by a number of items. This rule does not automatically punish a carrier for making decisions in response to changing conditions. To the contrary, the Commission's examination of cases involving a refusal to deal or negotiate

may examine all factors that led a carrier to make that decision, in order to determine whether the decision was reasonable.

(e) Contractual obligations.

*Issue:* Caribbean Shipowners' Association, FMC Agreement No. 010979 and Central America Discussion Agreement, FMC Agreement No. 011075 asserted that the definition of "transportation factors" is unduly narrow and should be amended to account for carriers' minimum service commitments made pursuant to its service contracts.[60]

*FMC response:* Another commenter raised this concern in its input regarding the non-binding considerations when evaluating unreasonable conduct of § 542.1(d). The Commission has addressed this issue under that subsection.

### 6. "Unreasonable"

(a) Proposed definition is too vague and subjective.

*Issue:* Several commenters asserted that the FMC's proposed definition of "unreasonable" in the SNPRM was too vague and subjective and were concerned that any conduct could fit into the definition.[61] Some of these commenters said that the agency had failed to explain a "rational connection between the facts found and the choice made" and that therefore promulgation of the proposed definition into the CFR would be arbitrary and capricious and therefore violate the Administrative Procedure Act (APA).[62]

*FMC response:* FMC disagrees with commenters that the rule's definition of "unreasonable" is too vague and therefore contrary to law. Although commenters referenced the APA, these assertions are better categorized as a Fifth Amendment, Due Process concern. Most of the cases dealing with the Vagueness Doctrine construe statutes as opposed to regulations; however, the

same legal principles apply to both.[63] Due Process does not require mathematical precision; rather, it requires only "boundaries sufficiently distinct for judges and juries fairly to administer the law".[64] Fair notice requirements apply to civil statutes and regulations when penalties or drastic sanctions are at stake;[65] however, courts demand less precision of statutes and regulations that impose only civil penalties because the consequences are less severe.[66]

Paragraphs (a)(3) and (10) of 46 U.S.C. 41104 prohibit ocean common carriers from "unreasonably" refusing cargo space accommodations or refusing to deal or negotiate with respect to vessel space accommodations in specified conditions. Neither OSRA 2022, nor previous amendments to the Shipping Act, define the term "unreasonable". Section 7 of OSRA 2022 mandated the FMC to issue a rulemaking "defining unreasonable refusal to deal or negotiate with respect to vessel space under [46 U.S.C. 41104(a)(10)]."[67] FMC was therefore required to develop a definition of the term as part of meeting this mandate.

The power delegated by Congress to an agency generally does not include the inherent authority to decide whether a particular statute (or regulation) that the agency is charged with enforcing is constitutional.[68] Therefore, the FMC must assume as a starting premise that the legal standard set by Congress of unreasonableness in 46 U.S.C. 41104(a)(3) and (10) is legally valid. Additionally, "reasonable", the inverse of "unreasonable", is a familiar legal standard.[69] Indeed, "reasonable and

---

[54] FMC–2023–0010–0049 at 4.

[55] American Chemistry Council/National Association of Manufacturers/American Association of Exporters and Importers (FMC–2023–0010–0050) at 4; International Dairy Foods Association (FMC–2023–0010–0053) at 2–3.

[56] FMC–2023–0010–0038 at 11.

[57] *Id.*

[58] *Id.*

[59] American Chemistry Council/National Association of Manufacturers/American Association of Exporters and Importers (FMC–2023–0010–0050) at 4.

[60] FMC–2023–0010–0038 at 12.

[61] MSC Mediterranean Shipping Company (USA) Inc. (FMC–2023–0010–0036) at 3; The National Industrial Transportation League (FMC–2023–0010–0045) at 5; National Association of Chemical Distributors (FMC–2023–0010–0046) at 3; Pacific Merchant Shipping Association (FMC–2023–0010–0054) at 1; MAERSK A/S (FMC–2023–0010–0039) at 4; CMA CGM (America) LLC (FMC–2023–0010–0043) at 3; World Shipping Council (FMC–2023–0010–0041) at 3; and OOCL (USA) Inc. (FMC–2023–0010–0052) at 2.

[62] MSC Mediterranean Shipping Company (USA) Inc. (FMC–2023–0010–0036) at 3; National Industrial Transportation League (FMC–2023–0010–0045) at 5; National Association of Chemical Distributors (FMC–2023–0010–0046) at 3; Pacific Merchant Shipping Association (FMC–2023–0010–0054) at 1; MAERSK A/S (FMC–2023–0010–0039) at 4; CMA CGM (America) LLC (FMC–2023–0010–0043) at 3.

[63] *Bokum Res. Corp.* v. *New Mexico Water Quality Control Comm'n,* 1979–NMSC–090, 12, 93 N.M. 546, 549, 603 P.2d 285, 288.

[64] *E.g. Roth* v. *United States,* 354 U.S. 476, 491 (1957); *see also Ward* v. *Rock Against Racism,* 491 U.S. 781, 794 (1989) ("perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity").

[65] Albert C. Lin, *Refining Fair Notice Doctrine: What Notice is Required of Civil Regulations?,* 55 Baylor L. Rev. 991, 995 (Fall 2003) (internal citations omitted).

[66] 16B Am. Jur. 2d Constitutional Law § 962.

[67] Section 7, paragraph (d), Public Law 117–146 (June 16, 2022).

[68] *See Motor and Equipment Mfrs. Ass'n, Inc.* v. *EPA,* 627 F.2d 1095 n.42 (D.C. Cir. 1979) ("administrative agencies generally have no jurisdiction to consider the constitutionality of their organic statutes"); Am. Jur. 2d Admin. Law § 68 (May 2023 update) ("The power delegated by the legislature to an agency generally does not include the inherent authority to decide whether a particular statute or regulation that the agency is charged with enforcing is constitutional.").

[69] *United States* v. *Leal-Matos,* No. CR 21–150 (SCC), 2022 WL 476094, at 1 (D.P.R. Feb. 15, 2022) (citing *United States* v. *Hunter,* 663 F.3d 1136, 1142 (10th Cir. 2011) ("[I]dentical or very similar 'reasonable and prudent' standard statutes are

prudent'' standard statutes are ubiquitous throughout the United States and have been uniformly upheld against constitutional challenges.[70] Because the underlying conduct—unreasonable refusal—is not unconstitutionally vague, neither is the FMC's implementing regulation defining the term.[71]

The definition of ''unreasonable'' proposed in the SNRPM, and adopted in this final rule, is not arbitrary or capricious under the APA. As discussed in depth in the NRPM reasonableness is necessarily a case-by-case determination.[72] The definition of ''unreasonable'' proposed in the SNPRM and adopted by this final rule takes that into account, while providing an overarching definition, in line with the purposes of OSRA 2022 and the Shipping Act, as amended, as a whole, that is applicable in both 46 U.S.C. 41104(a)(3) and 41104(a)(10) claims.[73] Furthermore, FMC has provided notice and opportunity to comment on both the original NPRM and, later, in the SNRPM, regarding the best interpretation of the term ''unreasonable'', and how, in future enforcement, FMC intends to evaluate unreasonable behavior with respect to refusal of cargo space accommodations and refusal to negotiate with respect to vessel space accommodations. The promulgation of this rule through notice-and-comment procedures reduces vagueness concerns by providing fair notice of the definition of ''unreasonable'' and elements for a

claim under 46 U.S.C. 41104(a)(3) and 41104(a)(10).

(b) Meaning of ''meaningfully access''.

*Issue:* Two commenters requested guidance on how the Commission will interpret the phrase ''meaningfully access'' in the definition of ''unreasonable''.[74] One of the commenters noted that clarification of the term ''would be helpful especially in the context of the spot market and common carriage arrangements.''[75]

*FMC response:* FMC declines to define the phrase ''meaningfully access'' at this time. Determinations of what ''meaningfully access'' means are better decided on a case-by-case basis.

(c) Suggested changes.

*Issue:* The National Industrial Transportation League (NITL) and BassTech International suggested including ''from the ocean common carrier'' at the end of the definition of ''unreasonable'' to clarify that a carrier cannot escape liability for an ''unreasonable refusal'' by asserting that alternative market choices and service options from other carriers were available.[76]

World Shipping Council (WSC) and MSC Mediterranean Shipping Company (USA) Inc. (MSC) asserted that in accordance with Commission precedent, the regulatory text should be amended to clarify that the appropriate standard for interpreting conduct under (a)(3) and (a)(10) is one of commercial reasonableness.[77]

*FMC response:* FMC agrees with NITL and BassTech and has added the suggested language, ''from the ocean common carrier'' at the end of the definition. FMC declines to amend the rule, in the definition of ''unreasonable'', or elsewhere, to re-frame the standard as whether it was ''commercially unreasonable'' as requested by WSC and MSC. As discussed in the SNPRM, ''profit and business factors may be present in negotiations [or execution], but these factors . . . have to be considered alongside other factors presented when the Commission is determining what the true driving factor is for refusing to deal in a given case and whether that driving factor is reasonable.''[78] The Commission re-emphasizes that the rule

allows the Commission to consider *any* relevant factor in determining whether a refusal to deal or negotiate was unreasonable.

7. ''Vessel Space Accommodations''

FMC did not receive any comments that expressed concern regarding the proposed definition of ''vessel space accommodations''. The agency is implementing the definition in this final rule without change from the SNPRM.

8. Proposed Additional Definition

*Issue:* The Retail Industry Leaders Association (RILA) and the International Dairy Foods Association (IDFA) requested that FMC amend 46 CFR 542.1(b) to add a definition of ''legitimate,'' as is used in §§ 542.1 (d)(3) and (g)(3) when it modifies ''transportation factors.''[79] According to the commenters, lack of a definition could lead to a wide variety of interpretations and substantial disagreements. The commenters proposed that the term be defined as ''a transportation factor that was not reasonably foreseeable by an ocean common carrier under the circumstances.''[80]

*FMC response:* The Commission declines to define ''legitimate'' as part of this rulemaking. The agency believes that changes made to the definition ''transportation factors'' in this final rule to address similar concerns about foreseeability sufficiently address these commenters' concerns.

## C. § 542.1(c): Elements for Claims for Unreasonable Refusal of Cargo Space Accommodations Under 46 U.S.C. 41104(a)(3)

1. Revising the Proposed Rule To Strengthen Carrier Obligations To Ensure That Cargo Accommodations Remain Available

*Issue:* The International Dairy Foods Association (IDFA) argued that an ocean common carrier's refusal of cargo space is the crux of the problem faced by shippers, especially small and medium-sized shippers, because ocean carriers effectively control shippers' access to their existing and potential customers in overseas markets.[81] IDFA stated that carriers' failure to honor the terms of a contract and provide the cargo space that has been contracted for has negative repercussions for U.S. dairy exporters who, in some cases, have been forced to absorb the high cost of air freighting

---

ubiquitous throughout the United States and have been uniformly upheld against constitutional challenges.''); *cf. United States* v. *Phillipos,* 849 F.3d 464, 477 (1st Cir. 2017) (holding that ''materiality'' is not vague merely because it ''is not mathematically precise'' and noting that it is a familiar standard in the law). Its imprecision ''simply build[s] in needed flexibility while incorporating a comprehensible, normative standard easily understood by the ordinary [person].'' *Hunter,* 663 F.3d at 1142; *see also Roth* v. *United States,* 354 U.S. 476, 491 (1957) (explaining that due process requires only ''boundaries sufficiently distinct for judges and juries fairly to administer the law'').

[70] *United States* v. *Leal-Matos,* No. CR 21–150 (SCC), 2022 WL 476094, at *1 (D.P.R. Feb. 15, 2022) (internal citations omitted).

[71] *Paredes* v. *Garland,* No. CV 20–1255 (EGS), 2023 WL 8648830, at *16 (D.D.C. Dec. 14, 2023) (''Here, the underlying conduct proscribed by statute that rendered Mr. [ ] Paredes inadmissible was his commission of a 'crime involving moral turpitude,' . . . a term which the Supreme Court has already analyzed and determined is not unconstitutionally vague, . . . Accordingly, since the underlying conduct—the grounds of inadmissibility themselves—are not unconstitutionally vague, neither can it be determined that the guiding standard in [the regulation] is unconstitutionally vague. . . .'').

[72] 87 FR 57674, 57676–77 (Sept. 21, 2022).

[73] 88 FR 38789, 38803–04 (June 14, 2023).

[74] The National Industrial Transportation League (FMC–2023–0010–0045) at 5; National Association of Chemical Distributors (FMC–2023–0010–0046) at 3.

[75] The National Industrial Transportation League (FMC–2023–0010–0045) at 5.

[76] *Id.* at 5; BassTech International (FMC–2023–0010–0055) at 2.

[77] MSC Mediterranean Shipping Company (USA) Inc. (FMC–2023–0010–0036) at 2 and 3–4; World Shipping Council (FMC–2023–0010–0041) at 6–7.

[78] 88 FR 38789, 38797.

[79] Retail Industry Leaders Association (FMC–2023–0010–0049) at 4; International Dairy Foods Association (FMC–2023–0010–0053) at 3.

[80] *Id.*

[81] FMC–2023–0010–0053 at 3.

their goods to their customers in order to meet their contract deadlines, or risk losing those customers to suppliers in other markets.[82] To help address this issue, IDFA recommends that the Commission strengthen the regulatory text to clarify that an ocean carrier needs to be proactive in ensuring that cargo space is available when it has been contracted for.[83]

Specifically, IDFA points to the second element for a successful claim under § 542.1(c)—namely, that "[t]he respondent refuses or refused cargo space accommodations when available." IDFA argued that it cannot be the case that a carrier, facing reasonably foreseeable factors, can take no action to ensure that cargo space that has been contracted for is available to its customers, and then be allowed to assert that cargo space accommodations are not "available." IDFA argued that such an interpretation would unfairly absolve a carrier from its commitments to a shipper.

IDFA also argued that the carrier has exclusive control of information regarding space availability, and that as such, it is unfair for a private party or the Commission to bear the burden of proving that space was available before the reasonableness discussion under § 541.2(c)(3) can begin. IDFA argued that the Commission should revise § 541.2(c) to address this issue by inserting a provision to clarify that the Commission's determination of whether cargo space accommodations were "available" for purposes of § 542.1(c)(2) will not be determined solely on a carrier's assertion of unavailability, but that the Commission will also base its determination on: (1) whether availability issues were reasonably foreseeable under the circumstances; and (2) if so, what actions, if any, the carrier took to ensure that the cargo space the shipper had contracted for would be available or, in the alternative, to find other cargo space accommodations.

*FMC response:* In response to this comment and others received in response to the SNPRM, the Commission has added language to the definition of "transportation factors" in § 542.1(b) to address whether the factors at issue were reasonably foreseeable by the carrier. The Commission has also added language to the definition of "unreasonable" in § 542.1(b) to clarify that it means conduct that unduly restricts the ability of shippers to meaningfully access ocean carriage service "from that ocean common

carrier." The Commission believes this language is broad enough that, if a refusal to deal case is brought before the Commission, the Commission can examine what actions the carrier took to ensure that cargo space the shipper had contracted for would be available or, in the alternative, to find other cargo space accommodations.

2. Meaning of the Phrase "When Available" Under 46 U.S.C. 41104(a)(3) and 46 CFR 542.1(c)(2) in Association With Blank Sailings

*Issue:* Both MSC Mediterranean Shipping Company (USA) Inc., (MSC)[84] and World Shipping Council (WSC)[85] requested that the Commission provide an interpretation of the phrase "when available" as it appears in 46 U.S.C. 41104(a)(3) and 46 CFR 542.1(c)(2). These commenters assert that "when available" is an important qualifier because it narrows when the Commission can say a carrier has unreasonably refused cargo space accommodations to occasions on which the space can reasonably be considered available. These commenters also asserted that the meaning of "when available" is directly relevant to the Commission's treatment of blank sailings, which the Commission discusses in the context of the proposed export policy requirement and in the example in proposed § 542.1(e)(1).

Next, these commenters argue that by not addressing the meaning of the statutory phrase "when available," the Commission ignores the point that when a vessel call is cancelled or delayed, by definition, there is no space available on that vessel on its originally scheduled call date. The commenters further argue that under a statutory provision that is limited to situations in which vessel space is available, it is logically incoherent to impose regulations that apply to situations in which the vessel is not even present. The statutory language indicates that Congress only intended to address the situation that arises when a vessel is at the port and has useable space, but the carrier unreasonably denies loading of cargo. The commenters argue that instead of following this mandate, the Commission has ignored the "when available" limitation, and in so doing, has opened up an almost limitless universe of possible Shipping Act claims never contemplated or authorized by OSRA 2022.[86]

Lastly, the commenters argue that the Commission cannot ignore "when

available" in defining what it means to be an unreasonable refusal to provide cargo space, because, under the "whole text" canon of statutory interpretation, the Commission must consider all instructions given by Congress. Because OSRA requires the Commission to define "unfair or unjustly discriminatory methods" and "unreasonable refusal [of] cargo space accommodations when available" is a subcategory of those methods, the Commission must consider "when available" when defining this element.[87]

*FMC response:* The Commission declines to add a definition of "when available." Determinations of what "when available" means are necessarily made based on the individual set of facts and circumstances of each case. This is consistent with the Commission's case-by-case approach, which was explained in both the NPRM and the SNPRM.

*D. § 542.1(d): Non-Binding Considerations When Evaluating Unreasonable Conduct Under 46 U.S.C. 41104(a)(3)*

1. Business Decisions

*Issue:* The SNPRM removed "business decisions" as an explicit factor that the Commission would be required to consider in determining whether there was an unreasonable refusal to deal.[88] However, the preamble to the SNPRM made clear that the change would still allow the Commission to consider any relevant factor in determining whether a refusal to deal or negotiate was unreasonable.[89] A number of comments advocated for reincorporating business decisions explicitly back into the regulatory text in the final rule.[90]

MSC Mediterranean Shipping Company, (USA) Inc. (MSC) and World Shipping Council (WSC) argued that by expressly removing business decisions from the regulatory text, the Commission is effectively saying, despite its assurances in the SNPRM's preamble, that business factors will no longer be considered in evaluating reasonableness.[91] They assert that the explanation the Commission offered for

---

[82] *Id.*
[83] *Id.*

[84] FMC–2023–0010–0036 at 2 and 9.
[85] FMC–2023–0010–0041 at 4, 17–18.
[86] *E.g.,* FMC–2023–0010–0036 at 9.

[87] *Id.*
[88] *See* 87 FR 57674, 57679 NPRM-draft 46 CFR 542.1(b)(2)(ii) ("Whether the ocean common carrier engaged in good-faith negotiations, and made business decisions that were subsequently applied in a fair and consistent manner").
[89] 88 FR 38789, 38797.
[90] *E.g.,* MSC Mediterranean Shipping Company (USA) Inc. (FMC–2023–0010–0036) at 2, 4; World Shipping Council (FMC–2023–0010–0041) at 3, 7–8.
[91] MSC Mediterranean Shipping Company (USA) Inc. (FMC–2023–0010–0036) at 4; World Shipping Council (FMC–2023–0010–0041) at 3, 7–8.

this removal—that business factors are too important to be included in the regulation—is directly contrary to the Commission's claim that all legitimate factors will be considered.[92] As a result, they argued that FMC must explicitly reincorporate business decisions into the list of factors to be considered by the Commission when adjudicating a claim.[93] WSC argued that removing business decisions from the regulatory text is a conscious and systematic refusal by the Commission to consider what it has itself identified as an important part of the analysis, and thus constitutes a failure to consider a critical part of the issue under the Administrative Procedure Act (APA), 5 U.S.C. 706.[94]

Hapag-Lloyd (America) LLC (Hapag-Lloyd) argued that business factors are necessary considerations to ensure the safety of personnel and the operational success of a voyage.[95] It stated that a carrier's non-vessel-based personnel and operations can have a direct impact on the operational success of a voyage and the safety of all personnel involved. Hapag-Lloyd argued that customer conduct can become disruptive in other ways, including customer harassment or misconduct towards an ocean carrier's employees, which can have detrimental effects on the well-being of the workforce and the overall work environment.

Hapag-Lloyd disagrees with the Commission's reluctance to use profitability as a factor for determining reasonableness, given that it is a for-profit company, and profit is important to ensuring a competitive and sustainable service. Hapag-Lloyd asserted that customers' consistent fraudulent behavior and non-payment for services can affect the company's bottom line, and that in such instances, an ocean carrier should be allowed to refuse dealing with the offending customers.[96]

ZIM Integrated Shipping Services Ltd. (ZIM) argued that removal of business decisions from the factors goes against Commission regulations and precedent. In particular, ZIM argued that Commission regulations define ocean common carriers as "hold[ing] [themselves] out to the general public to provide transportation by water of passengers or cargo between the United States and a foreign country for

*compensation.*"[97] Furthermore, citing *Docking & Lease Agreement By & Between City of Portland, ME & Scotia Princess Cruises, Ltd.,* ZIM argued that the Commission recognized that decisions "connected to a *legitimate business decision* or motivated by legitimate transportation factors" are presumptively reasonable.[98]

In addition, ZIM argued that while the Commission's focus on the potential for business decisions to overwhelm the rest of the factors may be legitimate, it does not justify disregarding critical factors in the equation or eliminate the duty to determine if a refusal to deal was in violation of the Shipping Act. Instead, it requires the finder of fact to consider the various operational factors within the carrier's control, as well as factors such as profit, cargo type, customer balance and other factors that fall within the definition of legitimate business factors.[99]

CMA CGM argued that exporters and importers would be penalized by the Commission's failure to recognize carriers' legitimate business considerations as "legitimate transportation factors," because it is not viable for carriers to offer services to customers who present risks such as non-payment, mis-declaring cargo, improperly packaging hazardous cargo and/or causing "fall down" by placing bookings for vessel space which they failed to fulfill. CMA CGM asserts that continued service to customers, as well as the viability of the supply chain, depends on carriers being able to exercise legitimate business discretion.

OOCL argued that while it is clear that business decisions are being removed under the premise that these would become a core factor for carriers to refuse space or equipment to support customer's ability to ship cargo, this bears no resemblance to the ability of any business to effectively manage its operations. OOCL argued that business factors will always be part of any consideration—and should remain so in any free market economy.[100]

*FMC response:* The Commission declines to explicitly re-insert business decisions into the regulatory text. The rule, however, explicitly allows the Commission to consider *any* relevant factor in determining whether a refusal to deal or negotiate was

unreasonable.[101] This includes non-transportation factors, such as business decisions (which includes profit considerations). The Commission has made clear that information on business decisions relevant to establishing a reasonable refusal to deal would still be relevant to the Commission's analysis.[102] Therefore, the Commission has not refused to consider an important part of the analysis. The Commission, however, must look at the totality of circumstances relevant to each case to determine whether or not an ocean common carrier has acted unreasonably. For this reason, the Commission has removed business factors from being specifically listed as a requirement the Commission must consider to something that the Commission "may" consider, and is not precluded from doing so.

(a) Internal inconsistency within the regulation.

*Issue:* Caribbean Shipowners' Association, FMC Agreement No. 010979/Central America Discussion Agreement, FMC Agreement No. 011075 (the "Agreements") noted that one element the rule would require to be included in a documented export policy is pricing strategies, and that the Commission indicated that certain business decisions should be justified in the documented export policy.[103] At the same time, the Commission has proposed excluding legitimate business factors from the reasonableness factors. The Agreements argue that these two positions are inconsistent. In addition, the Agreements question the veracity of the Commission's informal statement that business decisions would still be relevant to its analysis of reasonableness is of no comfort to the Agreements, given the position taken by the Commission in its brief in *Evergreen* v. *United States*.[104] There, the Agreements assert, the Commission argued it is not required to consider factors that are not expressly included in the regulations. As a result, the Agreements argue that if legitimate business considerations will be considered, the regulations should so state.[105]

*FMC response:* One reason the Commission is requiring a documented export policy is to determine whether a carrier's decisions adhere to that policy.

[92] *Id.*

[93] MSC Mediterranean Shipping Company (USA) Inc. (FMC–2023–0010–0036) at 2, 4.

[94] FMC–2023–0010–0041 at 3.

[95] FMC–2023–0010–0040 at 2–4.

[96] *Id.* at 2–4.

[97] FMC–2023–0010–0042 at 2 (citing 46 CFR 515.2(e) (emphasis in the original)).

[98] FMC–2023–0010–0042 at 2 (citing *Docking & Lease Agreement By & Between City of Portland, ME & Scotia Princess Cruises, Ltd.,* 30 S.R.R. 377, 379 (F.M.C. 2004) (emphasis in original)).

[99] FMC–2023–0010–0042 at 3.

[100] FMC–2023–0010–0052 at 2.

[101] Final rule at §§ 542.1 (d)(4) and (g)(4).

[102] *E.g.,* 88 FR 38789, 38797.

[103] FMC–2023–0010–0038 at 5 (citing 88 FR 38789, 38797).

[104] FMC–2023–0010–0038 at 5 (citing *Evergreen* v. *United States,* (D.C. Cir. 2023) Case No. 23–1052 Brief for Respondents Federal Maritime Commission and United States, Docket. No. 2005698 at 10].

[105] FMC–2023–0010–0038 at 5.

The degree of divergence from that policy will be one factor that the Commission may consider in a refusal to deal or negotiate case. In doing so, the Commission is not making any statements on pricing strategy as a business factor. As such, requiring pricing strategy to be part of the documented export policy is consistent with removing business factors from being explicitly stated in the rule.

The key difference is between regulations that state that the Commission *must* do something, and situations in which the Commission is not precluded from doing something.[106] In the present matter, the Commission has removed business factors from being specifically listed as a requirement the Commission must consider under transportation factors. The Commission is moving them from a position that it "must" consider these factors to a position that the Commission "may" consider them and is not precluded from doing so. As such, we find no inconsistency in this position.

(b) Parties' prior dealings as a consideration when evaluating unreasonable conduct.

*Issue:* Retail Industry Leaders Association (RILA) argued that the parties' prior course of dealings should be explicitly added to the final rule as a consideration for the Commission in evaluating unreasonable conduct. RILA argued that it is "critical to evaluate past business actions in the context of allegations to refuse the provision of service." [107] Hapag-Lloyd (America) LLC (Hapag-Lloyd) made similar arguments against the Commission's removal of legitimate business factors, as discussed above.[108]

*FMC response:* The Commission declines to explicitly add this factor into the regulatory text of the final rule. However, the Commission maintains that in the course of deciding these matters on a case-by-case basis, the parties' prior relationship and conduct may be one of the factors it examines in determining whether an ocean common carrier's conduct is unreasonable. In these cases, the Commission will continue to examine the totality of the circumstances and is not precluded from examining the parties' prior dealings simply because this factor is

not explicitly stated as a consideration in the final rule. As noted in the SNPRM, it would be impossible for the Commission to predict every situation. As such, maintaining the flexibility of a case-by-case determination in these situations remains the Commission's best path.

(c) Cargo perishability as a nonbinding consideration in evaluating unreasonable conduct under §§ 542.1 (d) and (g).

*Issue:* The Retail Industry Leaders Association (RILA) recommends adding whether the goods at issue are perishable as a non-binding consideration when evaluating whether carrier conduct is unreasonable under §§ 542.1(d) and (g) of the final rule.[109] This would include goods such as food and medical products. Citing the SNPRM's preamble, RILA noted that the Commission recognized that the goods' perishability could be a factor in determining unreasonable conduct but decided not to put specific time limits on these, opting instead for analyzing them on a case-by-case basis.[110] RILA argued that perishability is a factor that has a bearing on the reasonableness analysis in specific circumstances, thereby requiring expedited decision-making on cargo movement in those cases. As a result, RILA argued that the Commission should include perishability as a factor in the regulatory text.

Similarly, the International Dairy Foods Association (IDFA) argued that the Commission should add the consideration of whether the goods are perishable to the list of considerations of § 542.1(d), and also cites to the same SNPRM language that RILA cited.[111] IDFA argued that the longer it takes for perishable goods to reach their ultimate destination, the less valuable those goods become, as shelf life dwindles and eventually expires. Such goods are also more expensive to maintain in storage than most non-perishable goods. As a result, IDFA argued that the Commission should insert perishability into the list of non-binding considerations to be evaluated "as appropriate" as part of its "case-by-case approach" to determining whether the conduct of an ocean common carrier is unreasonable.

*FMC response:* The Commission declines to make this change. Consistent with the approach articulated in the SNPRM, the Commission will continue to make decisions on a case-by-case

basis. The perishability of the goods, and the time pressure that this adds to getting the goods to their final destination, can remain one factor that the Commission may examine in the course of deciding each case that comes before it. This allows the Commission to retain flexibility in its decision-making, while also examining the totality of the circumstances in each case.

(d) Safety and the carriage of hazardous or dangerous goods.

*Issue:* Some VOCCs argue that the rule should account for considerations within the vessel operator's control that also serve legitimate purposes, such as safety. ZIM Integrated Shipping Services (ZIM) argued that refusing to accept and carry a particular class of Dangerous Goods because of a prior commitment to carry incompatible cargoes or the absence of equipment necessary for those cargoes are both elements that fall within a carrier's control. ZIM also argued that a carrier's calculation of vessel stability or compliance with safety regulations may require refusal to load a consignment, and that each of these decisions should be presumed to be reasonable.[112] Similarly, CMA CGM (America) LLC argued that it is not viable for carriers to offer services to customers who present risks such as mis-declaring cargo or improperly packaging hazardous cargo, because it could result in violations of regulatory requirements and significant safety risks for vessels, crew, and cargo. Rather, such circumstances, present valid customer-centric considerations that are entirely reasonable.[113]

On the other side of the argument, another commenter, whose members produce and export a wide variety of chemicals, polymers, and related products, asks the Commission to add the consideration of whether the goods are properly tendered hazardous cargo to §§ 542.1(d) and 542.1(g).[114] These commenters argue that including this factor in the list of non-binding considerations would be an appropriate part of the Commission's case by-case approach to determining whether an ocean common carrier's conduct is unreasonable, and would act as a deterrent against carriers that unreasonably refuse to transport such cargo.

---

[106] *See Evergreen* v. *United States,* (D.C. Cir. 2023) Case No. 23–1052 Brief for Respondents Federal Maritime Commission and United States, Docket. No. 2005698 at 10 (*comparing* 46 CFR 545.5(c)(1) with 46 CFR 545.5(c)(2)(iii), 545.5(d), and 545.5(e), *and citing* 85 FR 29638, 29641 (May 18, 2020)).

[107] FMC–2023–0010–0049 at 2.

[108] FMC–2023–0010–0040 at 2–4.

[109] FMC–2023–0010–0049 at 3.

[110] *Id.* (citing 88 FR 38789, 38799).

[111] FMC–2023–0010–0053 at 4–5.

[112] FMC–2023–0010–0042 at 2.

[113] FMC–2023–0010–0043 at 2.

[114] American Chemistry Council/National Association of Manufacturers/American Association of Exporters and Importers (FMC–2023–0010–0050) at 5.

*FMC response:* The definition of "transportation factors" in § 542.1(b) includes vessel safety. A carrier can reasonably refuse hazardous cargo if there is a legitimate safety risk. This includes there being a real safety risk presented by the specific cargo load on a particular vessel (in particular weather conditions, for example). However, in accordance with 46 U.S.C. 41104(a)(4)(B) and (5), a carrier cannot categorically deny all hazardous materials.

(e) Carriers must be able to meet their obligations under minimum quantity commitments.

*Issue:* OOCL USA, Inc. (OOCL) argued that as part of the service contract negotiation, the parties agree to a minimum quantity commitment.[115] This is a commitment from the carriers to support and fulfill the agreement—with an understanding that the shipping party operates under the same consideration. OOCL argued that in cases where contracts are implemented and shipments cover the entire period of the contracts, carriers need to ensure space is available to allow the carrier to fulfill its obligation. To this end, carriers ensure that an allocation is reserved to protects carriers' ability to support both U.S. and foreign exporters. OOCL argued that this could mean that space appears to be available when a shipper tries to book cargo, but the carrier may not actually have that space available as part of its legal obligation under its contractual agreement. OOCL argued that if the carrier undermines this legal obligation it could be subject to complaints before the Commission, as well as legal action related to breach of contract, that there is nothing in the SNPRM that indicates how the Commission would classify this situation if a complaint were raised.

*FMC response:* This rulemaking is not intended to interfere with the parties' contractual obligations. If a minimum quantity commitment pursuant to a service contract is a factor in a carrier's decision to allocate vessel or cargo space, the carrier may raise that argument before the Commission if a complaint is filed. The Commission may then consider this factor in deciding the case. As noted in the NPRM and SNPRM, the Commission will consider these cases on a case-by-case basis, and we continue to adhere to that position in this final rule.

(f) Carriers must be able to consider a number of factors when accepting cargo bookings.

*Issue:* OOCL argued that vessel space is not the only factor in a carrier's

decision to accept a cargo booking, and that many other factors play a role in the decision. One example that OOCL noted is if a customer were looking to move cargo to a port that was not directly serviced by the ocean common carrier, there may be limitations or gaps in services between the carrier's port of discharge and the port to which the customer wants its cargo delivered even if the carrier has adequate space aboard the intended vessel. OOCL also argued that most carriers look at "round trip" movement of cargo to ensure effective support of all customers in moving cargo.[116]

*FMC response:* This rulemaking is not intended to cover every factor that affects the ocean borne carriage of goods. The examples of unreasonable conduct listed in the rule are just that—examples. In examining complaints of unreasonable refusals to deal, the Commission will be looking at the totality of the circumstances surrounding a complaint on a case-by-case basis.

(g) Carrier retaliation as a factor in evaluating unreasonable conduct under §§ 542.1(d) and (g).

*Issue:* In a joint comment submitted by the American Chemistry Council (ACC), the National Association of Manufacturers (NAM), and the American Association of Exporters and Importers (AAEI), these entities argue that the Commission should amend §§ 542.1(d) and (g) to take into account whether the carrier's conduct was preceded by the shipper raising concerns about a carrier's performance on a contract.[117] ACC, NAM and AAEI argue that, based on the circumstances of a particular case, the Commission may be able to infer from the nature and timing of a carrier's conduct that there is a link between the shipper communicating their concerns and the alleged unreasonable conduct by the carrier.

*FMC response:* The Commission declines to make this change. The timing of the conduct may not, by itself, indicate that it is unreasonable. Instead, the Commission would need to examine the timing of the conduct in the context of the rest of the factors presented by the case to determine whether it contributes to a determination that the carrier's conduct was unreasonable.

2. Expressly Excluding Certain Classes of Cargo

*Issue:* The American Cotton Shippers Association (ACSA) argued that the rule should expressly state that excluding

certain classes or types of cargo, such as a specific type of agricultural commodity, may constitute an unreasonable refusal to deal or negotiate in the absence of a demonstration that such refusal is reasonable.[118] The ACSA believes this should apply regardless of whether the VOCC's conduct is at the negotiation stage or the execution stage, and that it should apply even where other U.S. exports may be accepted by the carrier. The ACSA also stated that the Commission should consider whether such categorial exclusions constitute "unfair or unjustly discriminatory methods."

*FMC response:* Sections 41104(a)(4)(B) and 41104(a)(5) of title 46 of the United States Code prohibit common carriers from engaging in any unfair or unjustly discriminatory practice regarding cargo classification. This includes refusing to carry certain classes of goods, such as agricultural goods. Additionally, as noted in the SNPRM, the Commission will address the statutory requirement in section 7(c) of OSRA 2022 to complete a rulemaking defining unfair or unjustly discriminatory methods in a separate rulemaking.

*E. § 542.1(e): Non-Binding Examples of Unreasonable Conduct Under 46 U.S.C. 41104(a)(3)*

1. § 542.1(e)(1) Blank Sailings/ Insufficient Notice of Scheduling Changes

(a) Whether blank sailings are commercially reasonable.

*Issue:* MSC requested that the Commission provide clarification as to whether blank sailings are commercially reasonable, and to update the text of § 542.1(c)(2) accordingly.[119]

*FMC response:* The Commission declines to make this change. While there may be instances in which legitimate transportation factors necessitate a blank sailing, the Commission is unwilling to make a general finding that blank sailings will always be reasonable in every single case. Instead, the Commission will adhere to deciding reasonableness on the case-by-case basis put forth in both the NPRM and SNPRM.

(b) Advance notice.

*Issue:* MSC Mediterranean Shipping Company (USA) Inc. (MSC) argued that the Commission's use of lack of advance notice or insufficient advance notice as an example of unreasonable conduct under 46 U.S.C. 41104(a)(3) is an improper attempt to rewrite service

---

[115] FMC–2023–0010–0052 at 2.

[116] *Id.*

[117] FMC–2023–0010–0050 at 4.

[118] FMC–2023–0010–0047 at 5.

[119] FMC–2023–0010–0036 at 2.

contracts and should be withdrawn.[120] MSC agrees with the Commission's statement, in the preamble of the SNPRM, that blank sailings are reasonable when they are based upon decreased demand, port congestion, weather, force majeure, vessel mechanical failure, or changes in service by a vessel sharing partner. MSC argued, however, that the Commission's example of "blank sailing or schedule changes with no advance notice or with insufficient advance notice" as an example of unreasonable conduct under 46 U.S.C 41104(a)(3) goes against the standard of commercial reasonableness. MSC argued that in most cases, a service contract or a carrier's tariff offering does not guarantee that a booking will be loaded on a particular ship or sailing and it is therefore reasonable not to give notice that a given container will not go on a given vessel. As a result, MSC argued that the Commission's proposal amounts to it rewriting the service contract or the carrier's tariff, and the Commission's rewrite is asymmetrical because it provides strict liability against carriers but no corresponding responsibility on the part of shippers or remedy for carriers. Lastly, MSC argued that if the Commission implements the rule as proposed, it must explain what provisions of the Shipping Act authorizes it to place Shipping Act liability on a carrier whenever it misses a scheduled port call without giving "sufficient," but undefined, notice.[121] World Shipping Council (WSC) also objects to this advance notice provision for the same reasons.[122]

Similarly, OOCL (USA) Inc. (OOCL) argued against blank sailings being an example of an unreasonable refusal to deal.[123] OOCL stated that it is inconceivable that a business does not have the ability to make best use of its assets to ensure service continuity and capability to supply services based on demand. OOCL further noted that there is no definition as to what would be construed as lack of advance notice or insufficient advance notice, and therefore argued that this provision should be removed. OOCL also argued that even under service contract terms, there is no guarantee made that cargo will be shipped on any specific vessel— only that the carrier will commit to shipping its minimum quantity commitment (MQC) within the period of the contract. Similarly, OOCL argued that the Bill of Lading's terms also provide that there is no guarantee that

cargo will ship on any specific vessel, and that while the company tries to ensure that all cargo is loaded onto the intended and booked vessel, extenuating issues outside of the carrier's control could impact that capability. Lastly, OOCL stated that, in all cases where blank sailings are involved, OOCL always offers alternative options to accommodate the shipper's requirements and there is no attempt to refuse to deal.

*FMC response:* The Commission declines to remove lack of or insufficient advance notice of blank sailings or schedule changes as a non-binding example of unreasonable conduct. Contrary to OOCL's comments, blank sailings themselves are not being deemed unreasonable here; it is the lack of advance notice or insufficient notice that is relevant to the reasonableness analysis. The Commission recognizes that blank sailings or schedule changes may be reasonable depending on the circumstances, but is of the opinion that the lack of adequate notice cannot be justified by legitimate transportation factors. Carriers' ability to communicate with its customers is not hindered by the type of events that might cause a blank sailing or a schedule change. Shippers are impacted by these changes and deserve notice when they take place in order to make their own business decisions regarding their cargo. The Commission also declines to specifically define how much notice is required— that, too, depends on the circumstances, including when the carrier itself determines that a blank sailing or schedule change is necessary, and how much time elapses between that determination and the notice it gives the shippers. Whether the carrier offers alternative options to accommodate the shipper's requirements when a blank sailing occurs, as OOCL stated it does, will be another factor that the Commission can consider when examining a refusal to deal case in front of it.

### 2. § 542.1(e)(2) Vessel Capacity Limitations Not Justified by Legitimate Transportation Factors

The Commission did not receive any negative comments on this specific section of the rule. As such, we are adopting the language from the SNPRM in the final rule.

### 3. § 542.1(e)(3) Alerting Shippers With Confirmed Bookings

*Issue:* Caribbean Shipowners' Association, FMC Agreement No. 010979/Central America Discussion Agreement, FMC Agreement No. 011075 (the "Agreements") suggested that the

Commission clarify what types of events VOCCs need to notify or alert shippers with confirmed bookings of in 46 CFR 542.1(e)(3).[124] In addition, the National Industrial Transportation League (NITL) suggested that Commission add the word "timely" before the phrase "alert or notify shippers." [125] NITL argued that this change is necessary because shippers need adequate notice from ocean carriers so they can ship on time, and that giving a shipper a booking confirmation one day before the vessel sails is akin to a constructive refusal to provide cargo space.[126]

*FMC response:* The Commission has added language to 46 CFR 541.1(e)(3) to clarify the paragraph. This provision now reads: "failing to alert or notify shippers with confirmed bookings of any other changes to the sailing that will affect when their cargo arrives at its destination port." The Commission declines to add the word "timely," as what it means to be "timely" can vary according to circumstances and must be evaluated on a case-by-case basis. Paragraph (e)(3) is a non-binding example. Exclusion of the word "timely" does not preclude complainants from presenting evidence that notice was not adequate, including for reasons of timing.

### 4. § 542.1(e)(4) Insufficient Loading Time

(a) Removing insufficient time for vessel loading as an example of unreasonable ocean carrier conduct from the rule.

*Issue:* MSC Mediterranean Shipping Company (USA) Inc. (MSC) argued that the Commission's use of scheduling insufficient time for vessel loading so that cargo is constructively refused as a non-binding example of unreasonable conduct in § 542.1(e)(4) is improperly directed at ocean carriers. MSC argued that vessel loading times are controlled by maritime terminal operations and ports, not ocean carriers, and that as such, the Commission should withdraw this provision.[127] Similarly, OOCL (USA) Inc. (OOCL) argued that scheduling of "insufficient time" for vessel loading, is not a valid carrier issue. OOCL stated that in almost all cases where vessels do not allow "sufficient" time, it is because of port operations or port requirements that determine when vessels can berth and when they need to vacate that berth. OOCL argued that carriers do not purposely depart early and leave cargo

---

[120] *Id.* at 2, 10.

[121] *Id.* at 10.

[122] FMC–2023–0010–0041 at 18–19.

[123] FMC–2023–0010–0052 at 4–5.

[124] FMC–2023–0010–0038 at 12–13.

[125] FMC–2023–0010–0045 at 9.

[126] *Id.*

[127] FMC–2023–0010–0036 at 3.

behind, and that when this happens it is because the port has asked the vessel operator to leave. As such, OOCL also requested that this provision be removed.[128] World Shipping Council (WSC) made the same arguments regarding this provision.[129]

*FMC response:* The Commission declines to remove this provision from the rule. While factors such as port congestion may play a role in when a vessel gets a berth and can begin loading and unloading containers, it is the VOCC that determines its initial schedule of which ports it will visit on which days. Thus, the VOCC sets a certain amount of time in each port, a decision that contributes to whether there is sufficient time to load cargo onto the vessel. As such, it remains the VOCC's responsibility in the first instance to schedule sufficient time to load cargo. Such considerations can be reviewed by the Commission as "other factors relevant in determining whether there was a refusal" under 46 CFR 542.1(d)(4) and (g)(4).

(b) Distinguishing between vessel loading time and cargo loading time.

*Issue:* The National Industrial Transportation League (NITL) argued that the Commission should replace the words "vessel loading" in § 542.1(e)(4) with "container loading and tender of cargo."[130] NITL expressed concern that this subsection was focused on vessel loading, as vessel loading is what occurs when the ocean carrier loads the vessel. According to NITL, container loading is what happens when shippers load the container at their facility and then tender the container to the carrier. Shippers need sufficient time to load and transport containers to the port where they will be loaded onto the vessels.

Similarly, BassTech International (BassTech) argued that § 542.1(e)(4) should be amended by inserting "cargo tendering or" between "time for" and "vessel loading." BassTech argued that when shippers refer to the impediment of "inadequate loading times," they are usually referring to the limited time provided by the ocean common carriers for the shipper to collect an empty container, bring it to their facility to load the container with their cargo, and then tender the laden container to the carrier.[131] BassTech noted that the "insufficient time" of § 542.1(e)(4) is meant to address the problematic timelines surrounding cargo receiving dates that inhibit shippers from

tendering laden containers to the carriers, and suggests the additional language at issue to identify cargo loading time as distinct from vessel loading time.

*FMC response:* In accordance with these comments, the Commission has added the phrase "cargo tendering" to § 542.1(e)(4), such that this subsection will now read "scheduling insufficient time for cargo tendering or vessel loading so that cargo is constructively refused." As BassTech noted, § 542.1(e) focuses on conduct by the VOCC that is unreasonable with respect to cargo accommodations and § 542.1(e)(4) looks to ensure sufficient time for loading laden containers onto the vessel. Adding the phrase "cargo tendering," while also retaining the phrase "vessel loading", ensures sufficient time for shippers to load and return their containers to the vessel for loading instead of limiting this provision to circumstances where the carrier may be the one loading the cargo onto the vessel.

### 5. § 542.1(e)(5) Inaccurate or Unreliable Vessel Information

The Retail Industry Leaders Association (RILA) and the International Dairy Foods Association (IDFA) supported the inclusion of the provision of inaccurate or unreliable vessel information as a non-binding example of unreasonable conduct under 46 U.S.C. 41104(a)(3). Both commenters noted that the American Society for Testing and Materials (ASTM International) and other organizations who develop standards are working to develop standards on the sharing and use of digital information in the supply chain. RILA also noted the related work of Commissioner Bentzel with the Maritime Transportation Data Initiative.[132]

The Commission has decided to retain this factor as part of its analysis.

### 6. § 542.1(e)(6) Categorical or Systematic Exclusion of Exports

*Issue:* The International Dairy Foods Association (IDFA) supported the inclusion of the concept of systematically excluding exports in providing cargo space accommodations section. IDFA said that in its experience, "de facto exclusionary tactics are more likely to be employed by carriers than employing a categorical prohibition, which would be easier to spot."[133]

Conversely, CMA CGM argued that carriers must have discretion to carry, or

not carry, any particular product.[134] The company argued that it should not be required to export categories of goods that go against its policies, and that it should be able to exercise independent business discretion to refuse certain shipments without concerns that these decisions will be deemed unreasonable.

*FMC response:* Common carriers are prohibited from unfairly or unjustly discriminating against a commodity group or type of shipment under 46 U.S.C. 41104(a)(4)(B) and (a)(5). The example in subsection (e)(6) was not intended to mirror the prohibitions in these provisions. Rather, the example is intended to reference the wholesale refusal by a VOCC of all exports. This confusion appears to result from our use of "categorical" in the example. Our use of the term in this example was not intended to refer to categories of commodities, but rather to the de facto, absolute exclusion of all exports by a VOCC. In response to this question, FMC has revised the example to read: "The de facto, absolute, or systematic exclusion of exports in providing cargo space accommodations." The Commission notes that it may consider an unfair or unjustly discriminatory practice, such as the unfair or unjust discrimination against a commodity group, as "any other factor" in accordance with 46 CFR 542.1(d)(4) and (g)(4) in determining whether there was an unreasonable refusal under 46 U.S.C. 41104(a)(3) or (a)(10).

### 7. § 542.1(e)(7) Any Other Conduct the Commission Finds Unreasonable

*Issue:* Caribbean Shipowners' Association, FMC Agreement No. 010979 and Central America Discussion Agreement, FMC Agreement No. 011075 (the Agreements") objected to the proposed § 542.1(e)(7) because it is not a true example.[135] They said that it would instead be preferrable to state the intent that this is a non-exhaustive list more explicitly.[136]

*FMC response:* In response to these comments, the Commission has removed proposed § 542.1(e)(7) from the final rule. The commenter correctly pointed out that this subsection of the regulatory text did not actually provide an example of unreasonable conduct. No additional revisions were made as the header for the paragraph clearly designates these as "non-binding examples".

---

[128] FMC–2023–0010–0052 at 5.

[129] FMC–2023–0010–0041 at 19.

[130] FMC–2023–0010–0045 at 10.

[131] FMC–2023–0010–0055 at 2.

[132] RILA (FMC–2023–0010–0049) at 4; IDFA (FMC–2023–0010–0053) at 5.

[133] FMC–2023–0010–0053 at 5.

[134] FMC–2023–0010–0043 at 2–3.

[135] FMC–2023–0010–0038 at 12; information on the Maritime Transportation Data Initiative is available at *https://www.fmc.gov/fmc-maritime-transportation-data-initiative/.*

[136] FMC–2023–0010–0038 at 12.

8. Requests for Additional Examples

*Issue:* The International Dairy Foods Association (IDFA) proposed the inclusion of an additional example in paragraph (e): "Not providing contracted-for cargo space accommodations where a shipper has raised frequent and urgent concerns with the carrier's documented failure to perform on the contract and/or threatened to litigate against the carrier for alleged non-performance and/or switch service providers due to the carrier's failure to perform." [137] According to the commenter, it is unlikely that there will be future situations where retaliatory conduct is documented by carriers, so the Commission needs to focus on retaliation through the lens of unreasonable conduct "whether one can prove retaliation through incriminating email traffic or not".[138]

*FMC response:* FMC declines to add this as a specific example in the regulation. However, we do note that this is an important issue and is something that can be considered by the agency under § 542.1(d)(4). FMC emphasizes the lists of examples in the rules are non-binding examples.

*F. § 542.1(f): Elements for Claims Under 46 U.S.C. 41104(a)(10)*

In response to the SNPRM, the Commission received no comments regarding § 541.2(f), which sets out the elements necessary to establish a successful private party or enforcement claim under 46 U.S.C. 41104(a)(10). These elements will be included in the final rule as proposed.

*G. § 542.1(g): Non-Binding Considerations When Evaluating Unreasonable Conduct Under 46 U.S.C. 41104(a)(10)*

Many of the comments the Commission received regarding the non-binding considerations when evaluating unreasonable conduct explicitly stated that they applied to both sections 542.1(d) and 541.2(g). The comments that did not cite to either section contained arguments applicable to both sections. As a result, all of these comments are analyzed above, in the section for § 542.1(d).

*H. § 542.1(h): Non-Binding Examples of Unreasonable Conduct Under 46 U.S.C. 41104(a)(10)*

1. § 542.1(h)(1): Quotes Above Current Market Rates

(a) Commission's authority to promulgate this requirement.

*Issue:* Mediterranean Shipping Company (USA) Inc. (MSC) and World Shipping Council (WSC) argue that the Commission has no authority to regulate prices, and the proposal to use "so far above current market rates" as a standard is vague and unworkable.[139] OOCL (USA) Inc. (OOCL) also argued that the Commission does not regulate rates, and that this provision eliminates the carrier's and shipper's ability to negotiate, which is part of the basis of a free market economy.[140] OOCL further argued that this provision is vague and provides no basis to determine whether the quoted rates exceed the required rate from the customer or the market, which is problematic in a market where rates fluctuate wildly due to external forces.[141] The Pacific Merchant Shipping Association (PMSA) also argued that the Commission has no authority to set rates or determine whether a rate is "so high" that it is unreasonable.[142] PMSA further noted that the Commission has not explained how it would apply any such analysis, which it is required to do.[143]

*FMC response:* In response, the Commission emphasizes that this is a non-binding example rather than a bright line rule. In addition, the Commission is not regulating or setting specific rates with this provision. It is simply providing a comparison point between rates a carrier offers in negotiation, and rates that the rest of the market is charging for that space. Contrary to the commenters' assertions, the Commission is letting the market work here because it is allowing the market to set the rates and is then examining whether the rates that any carrier puts forth in negotiations is so far above those market rates as to be unreasonable. While the Commission declines to set a bright line to determine how far above the market rate is unreasonable, it disagrees with the commenters that this makes for a vague rule. Some leeway in prices offered during negotiations is permissible and even encouraged by the market itself. As

such, the Commission will retain this factor as written in the final rule. With regards to the assertions of vagueness, see the discussion concerning the definition of "unreasonable".

(b) Shipper's significantly below-market rate proposal.

*Issue:* Caribbean Shipowners' Association, FMC Agreement No. 010979/Central America Discussion Agreement, FMC Agreement No. 011075 argued that proposed § 542.1(h)(1) should be revised to make clear that a carrier does not engage in unreasonable conduct when it rejects a customer proposal that is so low that it cannot be considered a real offer or an attempt at good faith negotiations.[144]

*FMC response:* The FMC declines to make the requested change. In parallel to the language of 46 U.S.C. 41104, the focus on the definition of reasonableness in this rule, and the related non-binding examples, is on the conduct of the ocean common carrier, rather than the conduct of, or impact on, the shipper. However, the rule does not prohibit the Commission from considering any relevant evidence.

2. § 542.1(h)(2): Categorically or Systematically Excluding Exports

The Commission received no comments on this regulatory text. As such, the Commission adopts this language without further changes in the final rule. However, for the same reasons discussed in relation to subsection (e)(6), the Commission has revised the example to read: "The de facto, absolute, or systematic exclusion of exports in providing vessel space accommodations."

3. § 542.1(h)(3): Any Other Unreasonable Conduct

*Issue:* Caribbean Shipowners' Association, FMC Agreement No. 010979 and Central America Discussion Agreement, FMC Agreement No. 011075 (the "Agreements") objected to the proposed § 542.1(h)(3) because it is not a true example.[145] They said that it would instead be preferable to state the intent that this is a non-exhaustive list more explicitly.

*FMC response:* In response to this comment the Commission has removed proposed § 542.1(h)(3) from the final rule. The commenter correctly pointed out that this subsection of the regulatory text did not actually provide an example. No additional revisions were made as the header for the paragraph clearly designates these as "non-binding examples".

---

[137] FMC–2023–0053 at 6.
[138] *Id.*

[139] MSC Mediterranean Shipping Company (USA) Inc. (FMC–2023–0010–0036) at 3, 10–11; World Shipping Council (FMC–2023–0010–0041) at 19–20.
[140] FMC–2023–0010–0052 at 6.
[141] *Id.*
[142] FMC–2023–0010–0054 at 2.
[143] *Id.*

[144] FMC–2023–0010–0038 at 13.
[145] *Id.* at 12.

*I. § 542.1(i): Use of Sweeper Vessels*

*Issue:* MSC Mediterranean Shipping Company USA, Inc. (MSC) and World Shipping Council (WSC) requested that the Commission amend the regulatory text of paragraph (i) to include the SNPRM preamble's language that nothing in the rule is meant to restrict the ability of ocean common carriers to reposition empty containers.[146]

*FMC response:* FMC has amended the regulatory text as requested. However, as noted in the discussion above regarding the definition of ''sweeper vessel,'' the Commission's position is that an ocean common carrier carrying even a single container of cargo should meet the same standards under 46 U.S.C. 41104(a) (3) and (10) as a vessel fully loaded with containerized cargo. Therefore, the Commission has also amended the regulatory text to make it clear that the designation of a sweeper is subject to Commission review to determine whether the designation results in an unreasonable refusal of ocean carriage services.

*J. § 542.1(j): Documented Export Policy*

1. Confidentiality

*Issue:* The Commission stated in the SNPRM that documented export policies filed by ocean common carriers would remain confidential.[147] Some commenters argued that instead these reports should be made public, either in whole or in a redacted version.[148] Other commenters stated that if documented export policies are required, the regulations should state expressly that such policies are confidential and exempt from disclosure under the Freedom of Information Act.[149]

*FMC response:* The documented export policies filed with the Commission shall remain confidential

in accordance with 46 U.S.C. 40306. With certain limited exceptions, section 40306 prohibits the disclosure of information and documents filed with the FMC. In response to comments received, the Commission has amended the regulatory text to clearly state that documented export policies and information therein is not disclosable, in whole or in part, including in response to requests under the Freedom of Information Act. This provision is located at 46 CFR 542.2(j)(3) in the final rule. As noted in the SNPRM, aggregate data may be provided by the Commission in annual reports submitted to Congress or compiled for other purposes but will not reveal confidential information provided by or about individual carriers.

2. The Commission's Legal Authority To Impose the Obligation

*Issue:* Several commenters asserted that there is no authority in OSRA 2022 or elsewhere in the Shipping Act to impose a requirement on ocean common carriers to file a documented export policy with the FMC, or for the FMC to use such a document as a factor in determining whether an ocean common carrier has acted unreasonably.[150] Commenters asserted that 46 U.S.C. 40104 only provides FMC authority to collect information or an accounting of events that have already taken place and does not authorize ''the Commission to direct the development and submission of a forward-looking policy or strategy aiming document.''[151]

Commenters also asserted that the FMC's active involvement in the day to day operations of ocean carriers as contemplated by the rule contravenes the Shipping Act's stated purpose to establish a non-discriminatory regulatory process for common carriage of goods by water in the foreign commerce of the United Sates with a minimum of government intervention and regulatory costs (46 U.S.C. 40101(1)).[152]

World Shipping Council (WSC) asserted that the proposed requirement for ocean common carriers to file documented export policies was in violation of the Paperwork Reduction Act (PRA), 44 U.S.C. 3501–3521, ''because the Commission has failed to show how its proposal to require an export policy will have any utility to the agency, either in benchmarking

unreasonable action, or for use in litigation.''[153]

Finally, one commenter argued that the regulation, as proposed, is too broad and should be more narrowly tailored to reduce unnecessary burden.[154] This commenter argued that not all carriers should be required to file a documented export policy because concerns about refusals to provide export cargo space does not apply to all trade routes.[155]

*FMC response:* Section 40104 of title 46 of the United States Code provides the FMC with clear authority to require ocean common carriers to file documented export policies as directed by this final rule. The statute unambiguously states on its face that the agency may require a common carrier to file with the Commission a periodical, special report, or memorandum of facts and transactions related to the business of the common carrier.[156] An ocean common carrier's general policies concerning their export operations are facts related to the business of the common carrier. Contrary to the commenters' assertions, the statute does not restrict the Commission to only gathering information about past actions. In accordance with 46 U.S.C. 40104(a)(3), this rule is limited in scope to fulfill its objective and provides a reasonable period for respondents to respond based upon their capabilities and scope of the order. In accordance with 44 U.S.C. 3508 and implementing guidance from the Office of Management and Budget, the Commission has explained the purpose, need, and practical utility of the collection of this information. These reports are an important part of monitoring the industry for unreasonable behavior vis-á-vis exports. The information provided will help the Commission determine whether an ocean common carrier's conduct in a specific matter aligns with their general policies and whether the ocean common carrier thus acted reasonably. Requiring common carriers to submit this information does not involve the Commission in the day-to-day operations of ocean common carriers

---

[146] MSC Mediterranean Shipping Company USA, Inc. (FMC–2023–0010–0036 at 2–3); World Shipping Council (FMC–2023–0010–0041 at 22); 88 FR 38789, 38790 (''The Commission also notes that nothing in the previous proposed rule or in this SNPRM is meant to restrict the ability of ocean common carriers to reposition empty containers. The repositing of empty containers can include the use of sweeper vessel.'').

[147] 88 FR 38789, 38805 (June 14, 2023).

[148] American Chemistry Council/National Association of Manufacturers/American Association of Exporters and Importers (FMC–2023–0010–0050) at 6; The National Industrial Transportation League (FMC–2023–0010–0045) at 7; Retail Industry Leaders Association (FMC–2023–0010–0049) at 6; U.S. Dairy Export Council/National Milk Producers Federation (FMC–2023–0010–0053) at 4.

[149] Caribbean Shipowners' Association, FMC Agreement No. 010979/Central America Discussion Agreement, FMC Agreement No. 011075 (FMC–2023–0010–0038) at 6; *see also* MSC Mediterranean Shipping Company USA) Inc. (FMC–2023–0010–0036) at 4.

[150] MSC Mediterranean Shipping Company (USA) Inc. (FMC–2023–0010–0036) at 3, 5–8; ZIM American Integrated Shipping Services Co. LLC (FMC–2023–0010–0042) 3–4; World Shipping Council (FMC–2023–0010–0041) at 3, 10–11.

[151] *Id.*

[152] *Id.*

[153] World Shipping Council (FMC–2023–0010–0041) at 16; *see also* Mediterranean Shipping Company (USA) Inc. (MSC) (FMC–2023–0010–0036) at 3 (arguing that the use of confidential export policy in litigation has no precedential value for carriers, shippers, or finders of fact because the basis of the decision will be confidential).

[154] Caribbean Shipowners' Association, FMC Agreement No. 010979/Central America Discussion Agreement, FMC Agreement No. 011075 (FMC–2023–0010–0038) at 2–3.

[155] *Id.*

[156] 46 U.S.C. 40104(a)(1).

and does not impose unnecessary or unreasonable burdens on carriers.

The commenter is correct that not all trade routes currently demonstrate the same concerns about refusals to provide export services on vessels departing from the United States. However, the shipping industry is a dynamic one that is constantly responding to changing conditions; as such, it is reasonable to assume that these conditions, which are present today on some routes, may present on different trade routes in the future. In drafting this rule, the Commission is considering not only present conditions, but those that may realistically develop in the future. Having this information from all carriers allows the Commission to monitor all trade routes and engage in enforcement actions as issues are identified in a particular route.

### 3. Import Policy

*Issue:* Two commenters suggested that the Commission should also require a documented import policy as import policies cannot be de-coupled from export policies.[157] In a similar vein, another commenter noted that the ocean transportation system is one continuous loop, with no separate import and export systems.[158] Other commenters, while they do not advocate for an import policy, would not object to the requirement.[159]

*FMC response:* At this time, the Commission declines to mandate that ocean common carriers file a documented import policy. While there have been reports of restricted access to equipment and vessel capacity for U.S. importers, particularly in the Trans-Pacific market, there are few carriers who would need to rely on such a document to provide evidence that they intend to serve the U.S. markets when their ships are already visiting U.S. ports.[160] As noted in the SNPRM, if an ocean common carrier wants to provide an import policy to help establish how a refusal is reasonable, the Commission would consider that information.[161]

### 4. Miscellaneous Concerns

(a) Deviating from a Documented Export Policy.

*Issue:* One commenter said that if an export policy is required to be filed, the Commission should explicitly recognize that a deviation from that policy is not necessarily unreasonable or a violation of the Shipping Act.[162] The mere following of a documented export policy by a carrier should not justify the carrier's refusal to accept cargo on a vessel.[163] Another commenter said that the text should be amended to add ''with deviations as may be appropriate'' to enable efficient movement of export cargo.[164]

*FMC response:* In response to these comments, the Commission has amended § 542.1(j) to state that the ocean common carrier must file the document with the Commission, not that the ocean common carrier must follow the document. This change aligns with the Commission's intent, as articulated in § 542.1 (d)(1) and (g)(1) that whether the ocean common carrier followed a documented export policy is one, non-binding consideration that the Commission may consider in determining whether unreasonable conduct has occurred.

(b) Timely movement of cargo.

*Issue:* One commenter suggested that the text of the export policy considerations could be clarified by requiring ''the *timely* and efficient movement of export cargo.''[165]

*FMC response:* The Commission agrees and has incorporated the suggestion into the regulatory text. The original proposed language was written to mirror 46 U.S.C. 40104, which includes the descriptor ''efficient'', but not ''timely''. While section 40104 does not include ''timely'', its inclusion here comports with the goals of the OSRA 2022 generally. Many exports, particularly agricultural exports, must be loaded and transported to their destinations in a timely manner in order for exporters to fulfill contract obligations.

(c) Stagnant document in a dynamic market.

*Issue:* Some commenters expressed concern with the documented export policy being a stagnant document when the commercial reality is that an ocean common carrier's export strategy is constantly evolving, adjusting to market realities. Commenters also said that being bound to a stagnant policy would stifle innovation and negatively impact customers.[166]

*FMC response:* The Commission acknowledged in the SNPRM that export strategies are constantly evolving as the nature of international trade changes.[167] For this reason the rule does not define an exhaustive list of items that must be included in an export policy, but instead identifies certain elements that would be helpful in determining reasonableness.[168] The documented export strategy is intended to be a long-term document,[169] and therefore the Commission is only requiring that it be filed once a year. If an ocean common carrier, however, believes that it is necessary to do so, they may file an amended or revised report anytime throughout the year. The Commission may also revisit, in the future, whether it should require documented export policy reports to be filed more frequently.

(d) Narrowly tailoring the requirements of the documented export policy.

*Issue:* One commenter said that § 542.1(j)(1) appears to be overly broad, requiring information not essential to implementation of the rule.[170]

*FMC response:* FMC disagrees with the commenter's assertion that the requirements in § 542.1(j)(1) are overly broad. FMC has determined, based on its subject-matter expertise and role as regulator, the key information necessary for the Commission to have to monitor the industry for unreasonable conduct. According to comments received on the NPRM, many of the elements of the documented export policy are elements that ocean common carriers already include or monitor as part of export strategies. As such, providing this information to the Commission should not pose an unreasonable burden on VOCCs. Furthermore, as noted elsewhere in this preamble, one reason the Commission is requiring the documented export policy is to determine the extent to which ocean common carriers comply with their own policies. To the extent that a VOCC's conduct diverges from its own policies, the Commission may take that into account in determining whether an unreasonable refusal has taken place.

---

[157] Retail Industry Leaders Association (FMC–2023–0010–0049) at 5; North American Meat Institute (FMC–2023–0010–0037) at 2–3.

[158] MSC Mediterranean Shipping Company (USA) Inc. (FMC–2023–0010–0036) at 6.

[159] American Chemistry Council/National Association of Manufacturers/American Association of Exporters and Importers (FMC–2023–0010–0050) at 7.

[160] 88 FR 38789, 38790 and 38796.

[161] 88 FR 38789, 38796.

[162] Caribbean Shipowners' Association, FMC Agreement No. 010979/Central America Discussion Agreement, FMC Agreement No. 011075 (FMC–2023–0010–0038) at 6.

[163] The National Industrial Transportation League (FMC–2023–0010–0045) at 9.

[164] BassTech International (FMC–2023–0010–0055) at 2.

[165] The National Industrial Transportation League (FMC–2023–0010–0045) at 9.

[166] Hapag-Lloyd (America) LLC (FMC–2023–0010–0040) at 5; CMA CGM (America) LLC (FMC–2023–0010–0043) at 1–2.

[167] 88 FR 38789, 38796.

[168] *Id.*

[169] *Id.*

[170] Agriculture Transportation Coalition (FMC–2023–0010–0048) at 4.

5. Suggested Changes to the Text Wording

(a) Clarifying the export policy to show that it covers exports from the United States.

*Issue:* One commenter argued that the export policy requirement should add "U.S." to show that the document is not intended to include a carrier's export policies and practices from other countries to the United States.[171]

*FMC response:* The Commission declines to adopt this change. The definition of documented export policy in paragraph (b) makes clear that this document pertains to practices and procedures for U.S. outbound services.

(b) Requiring the suggested elements of the documented export policy.

*Issue:* The American Chemistry Council, National Association of Manufacturers and American Association of Exporters and Importers argued that the regulatory text should be revised to require carriers to submit the information contained in the proposed § 542.1(j)(1)(i)–(ii).[172]

*FMC response:* The Commission declines to make this change. As discussed in the SNPRM, the Commission is aware that export strategies are constantly evolving as the nature of international trade changes and for this reason has not defined an exhaustive list of items that must be included in an export policy, but in addition to certain mandatory elements, has identified certain elements that would be helpful in determining reasonableness.

*K. § 542.1(k): Shifting the Burden of Production*

1. Clarifying the Burden Shifting Process To Explicitly State That It Is the Burden of Production That Shifts, Not the Burden of Proof

*Issue:* MSC Mediterranean Shipping Company (USA) Inc. (MSC) argued that the Commission's intent with respect to the respective burdens of the parties in the adjudication process is clear, but that the wording of the regulation is not. Citing the language of the SNPRM, MSC stated the Commission made clear in the preamble that the burden that shifts to the carrier is the burden of production, not the ultimate burden of persuasion. In order to make the final rule consistent with the Commission's intent and with the header in § 542.1(k), MSC requested that the Commission insert the words "of production" in § 542.2(k)(2) between "burden" and

"shifts."[173] World Shipping Council (WSC) made the same arguments.[174]

*FMC response:* The Commission declines to make this change. The burden-shifting regime was discussed at length in the SNPRM.[175] After reexamining this discussion in light of these comments, the Commission believes it remains a strong system whose goals and parameters were well-expressed in the SNPRM. The shifting of the burden of production, whether that uses the words "production of evidence," as the SNPRM does, or the "burden of proof" for which MSC and WSC advocate, has the same meaning in this context. Changing the language will not clarify or change the process.

2. The Current Language Is a Deterrent to Small- and Medium-Sized Shippers

*Issue:* The North American Meat Institute (NAMI) cautions against the adoption of § 542.1(k)(3), which places the ultimate burden of persuasion on the complainant or the Commission's Bureau of Enforcement, Investigations, and Compliance. NAMI believes that it is clear that a complainant would have to set forth a prima facie case of a violation and supports the burden shift to the ocean common carrier to justify its actions were reasonable. Nonetheless, NAMI remains concerned that the language specifying the ultimate burden of persuasion will preclude small- and medium-sized shippers from availing themselves of the protections provided in this rule.[176]

*FMC response:* The Commission declines to make this change. As noted in the SNPRM, the process spelled out in § 541.2(l) is the process that is followed in cases arising under the Administrative Procedure Act (APA). While the Commission recognizes and appreciates that this process might present more of a burden for small- and medium-sized shippers than for large shippers, it also noted that the Commission's Bureau of Enforcement, Investigations, and Compliance may also bring a case for a violation under this section. As such, there are multiple avenues for complaints to be brought before the Commission under this section.

3. Setting Forth a Prima Facie Case

(a) Meaning of "prima facie case" is vague.

*Issue:* MSC Mediterranean Shipping Company (USA) Inc. (MSC) argued that the use of "prima facie case" is so vague

that any conduct could fit into the Commission's definition of unreasonableness. MSC argued that the Commission should revise the description of when a shipper or the Bureau of Enforcement, Investigations, and Compliance (BEIC) has set forth a prima facie case to provide clarity and regulatory certainty to carriers, shippers, and finders of fact as to what actions the Commission believes constitute reasonable or unreasonable behavior.

MSC[177] and World Shipping Council (WSC)[178] also argue that the Commission should revise the text to make clear that the standard for reasonable behavior is one of commercial reasonableness, as consistent with Commission's precedent.

*FMC response:* The Commission declines to make these changes. The term "unreasonable" is defined in § 542.1(b). Sections 542.1(c) and (f) set forth the discrete elements necessary to establish successful claims under 46 U.S.C. 41104(a)(3) and (a)(10), respectively. Sections 542.1(e) and (h) provide examples of unreasonable conduct and sections 542.1(d) and (h) list considerations when evaluating unreasonable conduct. These sections provide significant insight into what the Commission believes constitutes unreasonable conduct, as well as a clear roadmap to establishing a prima facie case. The Commission's reasons for not incorporating the "commercial reasonableness" standard for which MSC advocates has been discussed in earlier sections of this preamble.

(b) Carrier response to a prima facie claim.

*Issue:* Maersk A/S (Maersk) argued that the Commission should consider that, if in response to a shipper's prima facie case, the ocean carrier provides evidence that the ocean carrier either provided an opportunity for a two-way commitment (with respect to 46 U.S.C. 41104(a)(10)) or entered into a contract with a two-way commitment (with respect to 46 U.S.C. 41104(a)(3)), then that fact in itself should shift the burden of persuasion to the shipper. In this scenario, Maersk argued that it should then be up to the shipper to make a case as to why its refusal was unreasonable in light of opportunities it failed to take or contractual remedies that it failed to pursue.[179]

*FMC response:* The Commission declines to make this change, as it adds an extra, and unnecessary, step to the process. If it allows this step, the

---

[171] BassTech International (FMC–2023–0010–0055) at 2.

[172] FMC–2023–0010–0050 at 6.

[173] FMC–2023–0010–0036 at 3, 11.

[174] FMC–2023–0010–0041 at 20–21.

[175] 88 FR 38799.

[176] FMC–2023–0010–0037 at 4.

[177] FMC–2023–0010–0036 at 2.

[178] FMC–2023–0010–0041 at 6–7.

[179] FMC–2023–0010–0039 at 4.

Commission can readily predict a scenario where the burden continually shifts back and forth, allowing each party to present an ever-increasing amount of evidence. This is contrary to the streamlined process that the Commission has proposed. Under § 542.1(l), the ocean common carrier may present evidence it deems necessary to justify its actions as reasonable, including evidence of a two-way commitment and evidence of opportunities or contractual remedies it believes the shipper failed to take. In accordance with this process, and mindful of the burden of persuasion that remains in § 542.1(l)(3), the Commission will consider this evidence when formulating its decision in each case.

(c) Documents created by carriers.

*Issue:* Malmo Limited (Malmo) argued that carriers' self-created documents supporting its basis for refusing to deal or negotiate should be reviewed with skepticism, as giving them weight would encourage carriers to document its pretexts and not the true reasons for cutting off a shipper. Malmo stated that the last thing the Commission should do is provide a roadmap for carriers on how to avoid liability by creating pretext evidence ''to justify that its actions were reasonable.'' As an example, Malmo stated that a carrier, knowing that it planned to refuse to deal or negotiate with a shipper, could create evidence by sending internal emails with self-serving pretexts, or communicating to the shipper supposed legitimate reasons for not dealing when, in reality, the carrier had no such justifications. As such, Malmo argued that these communications should be given less weight than a complainant's prima facie evidence establishing a violation.[180]

*FMC response:* In creating the standards established in § 542.1(l), the Commission has been mindful of creating a scheme that is not weighted towards one side or the other. The system must allow a carrier to present evidence on its own behalf to rebut a claim of unreasonable refusal to deal, and a presumption that carrier-created documents are pretexts would undermine that the fair approach of the final rule. The Commission will weigh all of the evidence presented and decide each case on a case-by-case basis.

*L. Miscellaneous Comments*

1. Penalties/Reparations

*Issue:* Malmo Limited (Malmo) argued that an overlooked issue in the rule is the massive damage that an

unreasonable refusal to deal or negotiate can inflict on a shipper. Malmo argued that this harm needs to be properly redressed by the Commission, and that when a carrier cuts off a shipper during negotiations, the last deal terms discussed should be held against the carrier when determining appropriate reparations.[181] In support of this, Malmo noted that carriers receive an advantage when refusing to deal in that they cause uncertainty with respect to the shipper's damages because the deal or negotiation often is not finalized in a written agreement before the unlawful refusal takes place.[182] Citing further Commission precedent and Supreme Court case law, Malmo argued that uncertainty caused by a carrier should not be held against the complainant.[183]

As such, Malmo argued that the rule should implement reparations that are not limited by the uncertainty caused by the timing of a carriers' unlawful conduct. Instead, reparations should be based on the last deal terms discussed by the parties before the illegal refusal to deal. If not implemented, the carriers will have a strong incentive to refuse to deal before final deal terms are fully executed.[184]

*FMC response:* The Commission declines to make this change. Violations under 46 U.S.C. 41104(a)(3) already carry the possibility of up to double reparations under 46 U.S.C. 41305(c). The Commission will address the issue of penalties or reparations for refusal to deal in each case as necessary. The Commission recognizes that penalties for unreasonable refusal to deal may be appropriate, depending on the circumstances of each case. Given that the Commission is maintaining its posture on deciding each complaint on a case-by-case basis, however, the Commission declines to mandate penalties in the rule.

2. The Relationship Between the Prohibition on a Refusal to Deal and Breach of Service Contracts

*Issue:* In the SNPRM, the Commission assumed that in those instances where a service contract already exists between an ocean common carrier and a shipper, a refusal to deal or negotiate would be addressed within the context of the provisions of the agreement and the remedies afforded when there is a breach of contract. Noting, however,

that it is possible for a contract to be silent in such situations, the Commission requested comments identifying how those situations would be remedied.[185]

In response, BassTech International (BassTech) stated that while it is not impossible for a service contract to be silent on this issue, it seems odd that it would not address the remedies for failure of a party to honor their obligations, which is something that is typically addressed through liquidated damages. BassTech noted that this became problematic during the demand surge of recent years, because liquidated damages did little to remedy a shipper's inability to access space that had been committed under a service contract given the enormous increases in freight rates during that time. This dynamic made payment of liquidated damages less of a deterrent for the offender and less compensatory for the aggrieved. BassTech argued that while that situation could hardly have been predicted or written into a service contract, ocean common carriers are unlikely to agree to future contract provisions that allow regulations to prevail over specific contract terms. As a result, BassTech argued that, given shippers' inferior negotiating power with respect to carriers, it would help to have some guardrails to prevent pressure on shippers to agree to service contract terms that excuse the carrier from their regulatory obligations, such as refusal to deal.[186]

The National Industrial Transportation League (NITL) argued that a carrier should not be able to operate contrary to the Shipping Act notwithstanding the existence of a service contract. In other words, a shipper should not lose access to claims arising under the Shipping Act if a carrier may be in violation of the Act simply because it negotiated a contract with the carrier.[187] Similarly, the National Association of Chemical Distributors (NACD) argued that although contract breaches are reserved for the courts, under the Shipping Act, where a contract is silent on remedies and a carrier's conduct constitutes an unreasonable refusal to deal, both remedies should be available for an aggrieved shipper.[188]

By contrast, Caribbean Shipowners' Association, FMC Agreement No. 010979/Central America Discussion Agreement, FMC Agreement No. 011075 (the ''Agreements'') argue that the

---

[180] FMC–2023–0010–0044 at 1–2.

[181] *Id.* at 2.

[182] *Id.*

[183] *Id.* at 3 (*citing California Shipping Line, Inc.* v. *Yangming Marine Transport Corp.,* FMC Docket No. 88–15, 25 S.R.R. 1213, 1990 WL 427466, at 23 (Oct. 19, 1990) (*citing Bigelow* v. *RKO Radio Pictures,* 327 U.S. 251, 264–65 (1946)).

[184] *Id.* at 4.

[185] 88 FR 38789, 38802.

[186] FMC–2023–0010–0055 at 5.

[187] FMC–2023–0010–0045 at 10–11.

[188] FMC–2023–0010–0046 at 5.

Commission fails to address the relationship between 46 U.S.C. 41104(a)(3) and 46 U.S.C. 40502(f), the latter of which provides that the exclusive remedy for breach of a service contract is an action in an appropriate court.[189] The Agreements argued that under the proposed rule, if a carrier refuses to provide space to a customer with whom it has entered into a service contract, the carrier is potentially in violation of 41104(a)(3) as well as being in breach of a service contract. The Agreements state that if the rule is adopted as proposed, the line between Shipping Act claims and breach of contract claims will be blurred even further.

The National Customs Brokers & Forwarders Association of America, Inc. (NCBFAA) stated that its service contracts contain shortfall (or "dead freight") provisions to penalize either the shipper or the ocean carrier for nonperformance of the service contract, as well as arbitration provisions to address any unresolved disputes.[190] NCBFAA noted, however, that shippers dealing with ocean carriers in these scenarios are typically obliged to accept any remedies offered and do not have any specific remedies or avenue for relief with respect to an ocean carrier's refusal to deal or negotiate with respect to vessel space accommodations. Given that service contracts do not specifically provide for disputes regarding vessel space, NCBFAA requested the Commission consider whether current regulations may be further revised to afford greater protections to shippers.

*FMC response:* The Commission's request for comments on this issue arose out of comments asking the Commission to strengthen the rule's protections against refusals to deal in the context of existing service contract relationships, as a way of addressing conduct that is already occurring in the industry.[191] Given that it seems possible for contracts to remain silent on remedies for refusal to deal, and that there are some situations where a contract's specified remedies do not have the intended effects of remedying the breach or deterring behavior, the Commission reiterates its position that regardless of contract status, an ocean common carrier may not effectively bar a shipper, including one without a service contract, from having direct access to ocean common carriage by unreasonably refusing to deal or negotiate the terms of such carriage. This is consistent with the position the

Commission took in the SNPRM.[192] As also stated in the SNPRM, the Commission remains "[f]ully cognizant of the privilege that private parties may enter into their own service contracts," [193] and nothing in this rule prevents parties from entering service contracts.

### 3. This Rule Should Be Narrowly Tailored To Target Unusual Behavior That Is Contrary to Traditional Market Practices

*Issue:* Maersk A/S (Maersk) supported the Commission's objective of addressing systemic, chronic, or outlying ocean carrier policies that unreasonably restrict space, but opposes resetting the efficient commercial market for vessel space and equipment.[194] Maersk argued that the Commission needs to narrowly tailor this rule to target unusual positions that are contrary to traditional market practices—a good example of which is the SNPRM's example of an ocean carrier that only transports loaded imports, refuses all loaded exports, and uses its vessels departing U.S. ports solely to reposition empty containers. Maersk argued that if the Commission issues a final regulation that is too ambiguous and broad, it could jeopardize the market mechanisms that have, for decades, made containerization a boon for U.S. importers and exporters in terms of reduced transportation costs and diversity of services. Maersk opines that the final rule should not transform the Shipping Act into a loaded gun pointed at carriers for each difficult negotiation with individual customers about vessel space in a tight market. Maersk noted that no comments submitted to OSRA 2022's legislative record or this rule's proceedings identified shipper-ocean carrier contract practices as unreasonable and the root cause of shipper capacity problems.

*FMC response:* The Commission initiated this rulemaking for one of the same reasons that OSRA 2022 was passed: to counteract the specified problem in the market of American exporters being shut out of cargo accommodations and vessel space by carriers' refusal to deal. To this end, the SNPRM noted that "the focus of the definition of reasonableness, however, is on the ocean common carrier's conduct rather than the impact on the shipper." [195] This is a problem that had become chronic, systemic, and

widespread. Through the extended process of an NPRM, SNPRM, and this final rule, the Commission has adjusted this rule so that it is as narrowly tailored as possible to address this issue. As such, the Commission disagrees with Maersk's assessment that this rule is a broadly construed attack on ocean common carriers.

### 4. Freight Forwarders

*Issue:* International Federation of Freight Forwarders Associations (FIATA) recognizes that the Commission's focus for this rule is eliminating impediments to accessing space on vessels, but noted that many shippers, especially small and medium-sized enterprises (SMEs) or those exporting or importing cargo, often seek the services of specialized freight forwarders. FIATA argued that to uphold the intention of this rulemaking, the Commission should add "shippers and/or their authorized representatives" to the regulatory text to ensure that the authorized representatives of shippers, or a forwarder acting in their own name, such as an NVOCC, all have the same rights accorded to beneficial cargo owners (BCOs) to secure access to vessel and cargo space and related services defined in this rulemaking.[196]

*FMC response:* The Commission declines to make this change. First, as noted in the NPRM and expanded upon in the SNPRM, this rule does not apply to NVOCCs.[197] Secondly, as noted in response to other comments above, this rule focuses on the behavior of the ocean common carrier rather than shipper. Nothing in this rule prevents a freight forwarder from acting on behalf of a shipper or bringing a claim against a shipper for refusal to deal.

### 5. Preference Cargo

*Issue:* USA Maritime and the U.S. Department of Defense's United States Transportation Command both expressed concern that the SNPRM had not adequately accounted for U.S. cargo preference requirements.[198] Cargo preference is a framework of U.S. laws, regulations, and policies that require the use of U.S.-flag vessels in the movement of cargo that is owned, procured, furnished, or financed by the U.S. Government.[199] It also includes cargo that is being shipped under an

---

[189] FMC–2023–0010–0038 at 6–8.
[190] FMC–2023–0010–0057 at 3.
[191] 88 FR 38789, 38802.

[192] *Id.* at 38797–38798.
[193] *Id.* at 38797.
[194] FMC–2023–0010–0039 at 2–3.
[195] 88 FR 38789, 38797.

[196] FMC–2023–0010–0056 at 2.
[197] 87 FR 57674 at n. 4; 88 FR 38789, 38798.
[198] USA Maritime (FMC–2023–0010–0034) at 2–3; Department of Defense, United States Transportation Command (FMC–2023–0010–0059) at 2–3.
[199] *See https://www.maritime.dot.gov/ports/ cargo-preference/cargo-preference* (last visited April 4, 2024).

agreement of the U.S. Government, or as part of a Government program.[200]

*FMC response:* The Commission recognizes and appreciates the importance of this issue, and the importance of cargo preference, particularly to national security and U.S. military activities. However, the Commission cannot exempt preference cargo from Shipping Act requirements by this final rule. While 46 U.S.C. 40103 allows exemptions to the Shipping Act by Commission order or regulation, FMC regulations (46 CFR 502.92) require a formal petition to be filed with the Commission and notification in the **Federal Register** to give the opportunity for public comment.[201] The Commission is open to considering a petition for exemption for preference cargo filed in accordance with 46 CFR 502.92.

## IV. Summary of Final Rule and Changes From SNPRM

This final rule describes how the Commission will consider private party adjudications and agency-initiated enforcement cases in which violations of 46 U.S.C. 41104(a)(3) and (a)(10) are alleged relating to unreasonable refusal to provide cargo space accommodations and/or refusals to deal by ocean common carriers. It considers the common carriage roots in the Shipping Act, as well as the overall competition basis of the Commission's authority. Future cases that allege violations of 46 U.S.C. 41104(a)(3) or (a)(10) will be factually driven and determined on a case-by-case basis. The framework established by this final rule is taken from Commission precedent on refusal to deal cases generally and on suggestions offered by commenters on the NPRM and SNPRM. This rule ensures that shippers can readily discern when a carrier has acted outside the bounds of reasonableness and know what type of claim, 46 U.S.C. 41104(a)(3) or 46 U.S.C. 41104(a)(10), to bring before the Commission.

### A. § 542.1(a) Purpose

While 46 U.S.C. 41104 applies generally to both VOCCs and NVOCCs, this rule only applies to VOCCs. The specific prohibition in 46 U.S.C. 41104(a)(10) that is the subject of this rule applies only to VOCCs because "ocean common carrier" is defined as a vessel-operating common carrier in the Shipping Act.[202] Although section 41104(a)(3) applies to both VOCCs and NVOCCs, this rule only applies to VOCCs to mirror the scope of the

affected population of the NPRM. Importantly, however, this rule does not limit the application of 46 U.S.C. 41104(a)(3) or the rest of 46 U.S.C. 41104(a)(10) to VOCCs. Rather, NVOCCs remain legally liable under 41104(a)(3) and 41104(a)(10) for violations of the Shipping Act.

Similarly, section 41104 applies generally to roll-on/roll-off cargo, bulk cargo, and containerized cargo. This rule, however, only applies to containerized cargo because the issues arising from container availability during the pandemic were not present, or at least not present to the same extent, for roll-on/roll-off cargo or bulk cargo vessels. While this rule is limited to containerized cargo, it does not preclude refusal to deal claims arising in the context of roll-on/roll-off cargo or bulk cargo. FMC has amended § 542.1(a) to clarify that the rule is limited in scope to containerized cargo.

### B. § 542.1(b) Definitions

This paragraph sets out terms defined for part 542. FMC has: (1) added a definition of the term "blank sailing"; and (2) amended the definitions of "cargo space accommodations, "sweeper vessel," "transportation factors", "unreasonable" and "vessel space accommodations". The paragraphing structure has also been amended to allow for easier amendment in the future if needed.

FMC has revised the definition of "cargo space accommodations" by changing "negotiated for" to "negotiated for or confirmed". This change broadens the definition to instances where space has not been "negotiated" between a carrier and a shipper in the traditional sense—*i.e.,* there have been no "back and forth" communications between the two parties, but rather involve a shipper's request for vessel space under an existing service contract or other arrangements, and a responsive vessel booking confirmation from the carrier.

FMC has amended the definition of "transportation factors" by adding "and not reasonably foreseeable" to the end of the definition to clarify that the term is not intended to include factors that are reasonably foreseeable by a vessel operator and has amended the regulation accordingly. If a transportation factor is reasonably foreseeable by the carrier, then the carrier has a responsibility to its customers to find alternative pathways to deliver the cargo and otherwise mitigate the negative impacts of that factor. Transportation factors are not justifications for a carrier to refuse to carry entire classes of cargo, like properly tendered hazardous cargo,

heavier products, or inland shipments. Instead, legitimate transportation factors must exist and be outside the vessel operator's control.[203]

FMC has amended the definition of "unreasonable" by adding "from that ocean common carrier" at the end of the definition to clarify that the purpose of paragraph (b) is to mean conduct that unduly restricts the ability of shippers to meaningfully access ocean carriage services from the ocean common carrier.

FMC has amended the definition of "vessel space accommodations" by changing "necessary to access or book vessel space accommodations" to "necessary to book or access vessel space accommodations". This is a technical correction that reflects that booking occurs before access.

### C. § 542.1(c) Elements for Claim Under 46 U.S.C. 41104(a)(3)

Paragraph (c) sets out the elements of a claim under 46 U.S.C. 41104(a)(3) for the unreasonable refusal of cargo space accommodations when available. Section 41104(a)(3) claims focus on those refusals that occur at the execution stage, after the parties have reached a deal or mutually agreed on service terms and conditions via a booking confirmation.

FMC has amended the paragraph by adding "with respect to refusals of cargo space accommodations when available" at the end of the introductory sentence. This change clarifies the scope of the rule and aligns § 542.1(c) with § 542.1(a). Section 41104(a)(3)'s prohibition on unfair or unjustly discriminatory methods will be addressed in a separate rulemaking.

### D. § 542.1(d) Non-Binding Considerations When Evaluating Unreasonable Conduct Under 46 U.S.C. 41104(a)(3)

Paragraph (d) sets out a list of non-binding factors the Commission may consider in evaluating whether a particular ocean common carrier's conduct was unreasonable under 46 U.S.C. 41104(a)(3). The factors listed may help to establish an ocean common carrier's bona fide attempts and interest in fulfilling its previously made commitment to a shipper to take its cargo. The list, however, is not exhaustive.

FMC has amended paragraphs (d)(1) and (d)(4) from the SNPRM proposal. FMC has amended paragraph (d)(1) by changing "the efficient movement of export cargo" to "the timely and efficient movement of export cargo". While section 40104 does not include

---

[200] *Id.*

[201] 46 CFR 502.92.

[202] 46 U.S.C. 40102(18).

[203] 88 FR 38789, 38803.

"timely", its inclusion here comports with the goals of the OSRA 2022 generally. Many exports, particularly agricultural exports, must be loaded and transported to their destinations in a timely manner in order for exporters to fulfill contract obligations. Additionally, FMC has re-written paragraph (d)(4), to simplify the language and better conform with Plain Language. No substantive change is intended by the re-write.

*E. § 542.1(e) Non-Binding Examples of Unreasonable Conduct Under 46 U.S.C. 41104(a)(3)*

Paragraph (e) sets out non-binding examples of the kinds of conduct that may be considered unreasonable under 46 U.S.C. 41104(a)(3) when linked to a refusal to provide cargo space accommodations. The list is not exhaustive.

FMC has amended examples (3), (4), and (6) and removed proposed example (7). In paragraph (e)(3) FMC has added to the end: "of any other changes to the sailing that will affect when their cargo arrives at its destination port". This change was added in response to a request for clarification of what a carrier needed to alert or notify shippers about. In paragraph (e)(4) FMC has changed "for vessel loading" to "for cargo tendering or vessel loading". Adding the phrase "cargo tendering," while also retaining the phrase "vessel loading", ensures that sufficient time instead of narrowing this provision to circumstances where the carrier may be the one loading the cargo onto the vessel. FMC has revised the example in subsection (e)(6) to read: "The de facto, absolute, or systematic exclusion of exports in providing cargo space accommodations" in order to remove ambiguity regarding the term "categorically." FMC has also removed proposed paragraph (e)(7) as it was not a true example.

*F. § 542.1(f) Elements for Claim Under 46 U.S.C. 41104(a)(10)*

Paragraph (f) sets out the elements of a claim under 46 U.S.C. 41104(a)(10) for the unreasonable refusal to deal or negotiate with respect to vessel space accommodations when available. Section 41104(a)(10) claims focus on those refusals that occur at the negotiation stage.

FMC has amended paragraph (f) by adding "with respect to refusals of vessel space accommodations provided by an ocean common carrier to the end of the introductory sentence to clarify its scope and aligns § 542.1(f) with § 542.1(a). This rule is focused on the OSRA 2022 amendment to 46 U.S.C.

41104(a)(10) related to vessel space accommodations provided by an ocean common carrier. Although this rule does not extend to claims outside of those related to vessel space accommodation refusals, as noted in the NPRM, the framework of this rule may be applicable in non-vessel-space accommodation cases involving 46 U.S.C. 41104(a)(10).

*G. § 542.1(g) Non-Binding Considerations When Evaluating Unreasonable Conduct Under 46 U.S.C. 41104(a)(10)*

Paragraph (g) sets out a list of non-binding factors the Commission may consider in evaluating whether a particular ocean common carrier's conduct was unreasonable under 46 U.S.C. 41104(a)(10). This list is not exhaustive.

FMC has amended paragraphs (g)(1) and (g)(4). FMC has amended paragraph (g)(1) by changing "the efficient movement of export cargo" to "the timely and efficient movement of export cargo". The inclusion of the word "timely" comports with the goals of OSRA 2022. Many exports, particularly agricultural exports, must be loaded and transported to their destinations in a timely manner in order for exporters to fulfill contract obligations. FMC has re-written paragraph (g)(4), to simplify the language and better conform with Plain Language. No substantive change is intended by the re-write of (g)(4).

The Commission highlights that investigations into good faith negotiations may include an inquiry into whether or not good customer service was provided by a carrier. It can be unreasonable for an ocean common carrier to fail to provide a meaningful way for customers to contact the carrier or fail to timely provide a rate quotation upon request.

*H. § 542.1(h) Non-Binding Examples of Unreasonable Conduct Under 46 U.S.C. 41104(a)(10)*

Paragraph (h) sets out non-binding examples of the kinds of conduct that may be considered unreasonable under 46 U.S.C. 41104(a)(10) concerning the refusal of vessel space accommodations. The list is not exhaustive.

FMC has made a technical amendment to (h)(1) by replacing "real offer" with "good faith" offer. FMC believes that the changed wording better captures the true meaning of the example and is better aligned with concepts known by the legal and corporate communities.

FMC has revised the example in subsection (h)(2) to read: "The de facto, absolute, or systematic exclusion of

exports in providing vessel space accommodations," in order to remove ambiguity regarding the term "categorically."

FMC has removed proposed example (h)(3) as this was not a true example.

*I. § 542.1(i) Use of Sweeper Vessels*

Along with the definition of sweeper vessel, this paragraph allows the use of a sweeper vessel that has been previously designated for that purpose. The Commission also amended the regulatory text in § 542.1(i) to state that the designation of a vessel as a sweeper vessel is subject to Commission review to determine whether the designation results in an unreasonable refusal of ocean carriage services.

*J. § 542.1(j) Documented Export Policy*

The Commission amended § 542.1(j) to state that the ocean common carrier must file the document with the Commission, not that the ocean common carrier must follow the document. This change aligns with the Commission's intent that whether the ocean common carrier followed a documented export policy is a non-binding consideration that the Commission may consider in determining whether unreasonable conduct has occurred. In addition to using documented export policies to determine whether an ocean common carrier's conduct in a specific matter aligns with their general policies, and thus whether the ocean common carrier acted reasonably, the policies will be used by the Commission to monitor the industry for the unreasonable behavior vis-à-vis exports.

The Commission also added the words "timely and" before the word "efficient." This inclusion comports with the goals of the OSRA 2022 generally. Many exports, particularly agricultural exports, must be loaded and transported to their destinations in a timely manner in order for exporters to fulfill contract obligations.

The Commission also rephrased 542.1(j)(1) to place this provision in the active tense rather than the passive tense. This is a technical amendment that does not make a substantive change to the regulation.

In association with the amendments to § 542.1(i) regarding the Commission's review of sweeper vessel designations, the Commission added § 542.1(j)(ii) to state that one topic that the documented export policy should address, if applicable, is the ocean common carrier's rules and practices for the designation and use of sweeper vessels. The Commission also added § 541.2(j)(3), to clarify that the

documented export policies required to be filed with the Commission, in accordance with 46 U.S.C. 40306, will remain confidential except as may be relevant to an administrative or judicial proceeding. In accordance with the statute, the information may also be disclosed to either House of Congress, or to a duly authorized committee or subcommittee of Congress.

### K. § 542.1(k) Shifting the Burden of Production

The Commission has made technical and clarifying edits to paragraph (k), which describes the burden of production. One, the Commission amended § 542.1(k) (1) and (3) to add the words ''the Commission's'' before ''Bureau of Enforcement, Investigations and Compliance.'' This is a technical amendment to clarify that the Bureau is part of the Commission. Two, the Commission has amended (k)(1) to clarify, as discussed in the preamble to the SNPRM, that this paragraph addresses the *initial* burden to establish a *prima facie case* of a violation. Finally, the Commission has amended (k)(3) to clarify that the ultimate burden of persuasion is *always* with the complainant or the Bureau of Enforcement, Investigations and Compliance, as also discussed in the preamble to the SNPRM.

## VI. Rulemaking Analyses

### A. Regulatory Flexibility Act

The Regulatory Flexibility Act, 5 U.S.C. 601–612, provides that whenever an agency is required to publish a notice of proposed rulemaking under the Administrative Procedure Act (APA), 5 U.S.C. 553, the agency must prepare and make available for public comment an initial regulatory flexibility analysis (IRFA) describing the impact of the proposed rule on small entities, unless the head of the agency certifies that the rulemaking will not have a significant economic impact on a substantial number of small entities. 5 U.S.C. 603, 605.

The Commission initiated the rulemaking to fulfill a statutory requirement arising from the Ocean Shipping Reform Act of 2022 that prohibits ocean common carriers from unreasonably refusing to deal or negotiate with respect to vessel space accommodations and a related prohibition against unreasonably refusing cargo space accommodations. The final rule defines terms related to what is unreasonable refusal by ocean common carriers and also requires submission of a documented export policy. Like the NPRM and SNPRM, the

final rule also applies only to vessel-operating common carriers (VOCCs) who would bear the associated costs of implementation.

VOCCs fall under the Deep Sea Freight Transportation category in the North American Industrial Classification System, and the U.S. Small Business Administration (SBA) defines small entities in this category as having fewer than 1,050 employees. The Commission generally presumes that VOCCs do not qualify as small entities under these SBA guidelines. The Commission did not receive comments following publication of the NPRM or SNPRM contrary to this presumption.

For these reasons, the Chairman of the Federal Maritime Commission certifies that this rule will not have a significant economic impact on a substantial number of small entities.

### B. Congressional Review Act

The rule is not a ''major rule'' as defined by the Congressional Review Act (5 U.S.C. 801 et seq.) The rule will not result in: (1) An annual effect on the economy of $100,000,000 or more; (2) a major increase in costs or prices; or (3) significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based companies to compete with foreign based companies. 5 U.S.C. 804(2).

### C. National Environmental Policy Act

The Commission's regulations categorically exclude certain rulemakings from any requirement to prepare an environmental assessment or an environmental impact statement because they do not increase or decrease air, water or noise pollution or the use of fossil fuels, recyclables, or energy. 46 CFR 504.4. This final rule describes the Commission's criteria to determine whether an ocean common carrier has engaged in an unreasonable refusal to deal with respect to vessel space accommodations under 46 U.S.C. 41104(a)(10), or engaged in unreasonable refusal of cargo space accommodations when available under 46 U.S.C. 41104(a)(3), and the elements necessary for a successful claim under those provisions. This rulemaking thus falls within the categorical exclusion for matters related solely to the issue of Commission jurisdiction and the exclusion for investigatory and adjudicatory proceedings to ascertain past violations of the Shipping Act. *See* 46 CFR 504.4(a) (20) and (22). Therefore, no environmental assessment or environmental impact statement is required.

### D. Paperwork Reduction Act

This final rule calls for a collection of information under the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3501–3520). As defined in 5 CFR 1320.3(c), ''collection of information'' comprises reporting, recordkeeping, monitoring, posting, labeling, and other, similar actions. In compliance with the PRA, the Commission submitted the proposed information collection to the Office of Management and Budget (OMB). Notice of the information collections was published in the **Federal Register** and public comments were invited.[204] No comments were received directly on the burden estimate. However, a small number of commenters noted that the SNPRM burden estimate did not take into account the possibility that some vessel operating common carriers (VOCCs) might voluntarily update and submit written export policies more than once a year. While the Commission does not anticipate that many ocean carriers will do so, the burden calculations have been slightly updated for this final rule.

The title and description of the information collections, a description of those who must collect the information, and an estimate of the total annual burden follow. The estimate covers the time for reviewing instructions, searching existing sources of data, gathering and maintaining the data needed, and completing and reviewing the collection.

Title: 46 CFR Part 542—Common Carrier Prohibitions

*Summary of the Collection of Information:* Section 542.1(j) of title 46 Code of Federal Regulations, by this final rule, requires that VOCCs must submit a documented export policy once per year which is to include pricing strategies, services offered, strategies of equipment provision, and descriptions of markets served. The FMC has authority to require this collection under 46 U.S.C. 40104.

*Need for Information:* The report will allow the Commission to monitor the industry for unreasonable behavior prohibited by 46 U.S.C. 41104(a) (3) and (10). This in will allow the Commission to meet two key purposes of the Shipping Act: (1) ''ensur[ing] an efficient, competitive, and economical transportation system in the ocean commerce of the United States'' (46 U.S.C. 40101(2)); and (2) ''promot[ing] the growth and development of United States exports through a competitive and efficient system for the carriage of

---

[204] 88 FR 38789, 38806.

goods by water in the foreign commerce of the United States, and by placing greater reliance on the marketplace'' (46 U.S.C. 40101(4)).

*Frequency:* The regulation requires VOCCs to submit a documented export policy once per year. However, there is no prohibition against carriers updating these export policies and submitting more frequently if they voluntarily elect to do so. The Commission estimates that ten percent of VOCCs will submit documented export policies twice per year, and an additional five percent of VOCCs will submit three times per year.

*Types of Respondents:* This requirement applies only to VOCCs.

*Number of Annual Respondents:* The Commission anticipates an annual respondent universe of 140 VOCCs.

*Estimated Time Per Response:* The Commission estimates 40 hours of burden for developing, documenting, and submitting an export policy using the parameters in § 542.1(j) for the first year, assuming that no such policy already exists. For updates, whether annual as required or more frequently as desired by the VOCC, the estimated burden would be 5 hours including review and revisions of the existing policy and submitting it electronically.

*Total Annual Burden:* The Commission estimates the total person-hour burden at 5,600 hours for initial filing (140 carriers × 40 hours). Additionally in the first year, the Commission estimates an additional burden of 70 hours for the ten percent of carriers that will submit policies a second time (14 carriers × 5 hours), plus an additional 70 hours for the carriers that will submit a third updated policy per year (7 carriers × 5 hours × 2 submissions). The annual burden thereafter is estimated to be 840 hours ((140 carriers × 5 hours) + (14 carriers × 5 hours) + (7 carriers × 5 hours × 2 submissions)).

The Commission estimates the total financial burden to be $783,048.00 for the initial provision of the required export policy, and then an additional $234,914.40 per year for updates, including carriers that may choose to update and provide their export policies on a more frequent basis.

As required by the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), we have submitted a copy of this rule to OMB for its review of the collection of information. Before the Commission may enforce the collection of information requirements in this rule, OMB must approve FMC's request to collect this information. You need not respond to a collection of information unless it displays a currently valid control number from OMB.

## E. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards in E.O. 12988, "Civil Justice Reform," (61 FR 4729, Feb. 7, 1996) to minimize litigation, eliminate ambiguity, and reduce burden.

## List of Subjects in 46 CFR Part 542

Administrative practice and procedure, Non-vessel-operating common carriers, Ocean common carrier, Refusal to deal or negotiate, Vessel-operating common carriers, Vessel space accommodations.

For the reasons set forth in the preamble, the Federal Maritime Commission amends title 46 of the CFR by adding part 542 to read as follows:

■ 1. Add part 542 to read as follows:

## PART 542—COMMON CARRIER PROHIBITIONS

Sec.
542.1   Definition of unreasonable refusal of cargo space accommodations when available and unreasonable refusal to deal or negotiate with respect to vessel space provided by an ocean common carrier.
542.2–542.99   [Reserved]

**Authority:** 5 U.S.C. 553; and 46 U.S.C. 40104, 40105, 40307, 40501–40503, 40901–40904, 41101–41106.

## § 542.1   Definition of unreasonable refusal of cargo space accommodations when available and unreasonable refusal to deal or negotiate with respect to vessel space provided by an ocean common carrier.

(a) *Purpose.* This part establishes the elements and definitions necessary for the Federal Maritime Commission (Commission) to apply 46 U.S.C. 41104(a)(3) with respect to refusals of cargo space accommodations when available for containerized cargo and to apply 46 U.S.C. 41104(a)(10) with respect to refusals of vessel space accommodations provided by an ocean common carrier with respect to containerized cargo. This part applies to complaints brought before the Commission by a private party and enforcement cases brought by the Commission.

(b) *Definitions.* For the purposes of this section:

*Blank sailing* means a sailing skipping one or more specific port(s) while still traversing the rest of the scheduled route or the entire sailing being canceled.

*Cargo space accommodations* means space which has been negotiated for or confirmed aboard the vessel of an ocean common carrier for laden containers being imported to or exported from the United States. Cargo space accommodations includes the services necessary to access and load or unload cargo from a vessel calling at a U.S. port.

*Documented export policy* means a written report produced by an ocean common carrier that details the ocean common carrier's practices and procedures for U.S. outbound services.

*Sweeper vessel* means a vessel exclusively designated to load and move empty containers from a U.S. port for the purpose of transporting them to another designated location.

*Transportation factors* means factors that encompass the vessel operation considerations underlying an ocean common carrier's ability to accommodate laden cargo for import or export, which can include, but are not limited to, vessel safety and stability, weather-related scheduling considerations, and other factors related to vessel operation outside the vessel operator's control and not reasonably foreseeable.

*Unreasonable* means ocean common carrier conduct that unduly restricts the ability of shippers to meaningfully access ocean carriage services from that ocean common carrier.

*Vessel space accommodations* means space available aboard a vessel of an ocean common carrier for laden containers being imported to or exported from the United States. Vessel space accommodations also includes the services necessary to book or access vessel space accommodations.

(c) *Elements for claims.* The following elements are necessary to establish a successful private party or enforcement claim under 46 U.S.C. 41104(a)(3) with respect to refusals of cargo space accommodations when available:

(1) The respondent must be an ocean common carrier as defined in 46 U.S.C. 40102;

(2) The respondent refuses or refused cargo space accommodations when available; and

(3) The ocean common carrier's conduct is unreasonable.

(d) *Non-binding considerations when evaluating unreasonable conduct.* In evaluating the reasonableness of an ocean common carrier's refusal to provide cargo space accommodations, the Commission may consider the following factors:

(1) Whether the ocean common carrier followed a documented export policy that enables the timely and efficient movement of export cargo;

(2) Whether the ocean common carrier made a good faith effort to mitigate the impact of a refusal;

(3) Whether the refusal was based on legitimate transportation factors; and

(4) Any other relevant factors or conduct.

(e) *Non-binding examples of unreasonable conduct.* The following are examples of the kinds of conduct that may be considered unreasonable under 46 U.S.C. 41104(a)(3) when linked to a refusal to provide cargo space accommodations:

(1) Blank sailings or schedule changes with no advance notice or with insufficient advance notice;

(2) Vessel capacity limitations not justified by legitimate transportation factors;

(3) Failing to alert or notify shippers with confirmed bookings of any other changes to the sailing that will affect when their cargo arrives at its destination port;

(4) Scheduling insufficient time for cargo tendering or vessel loading so that cargo is constructively refused;

(5) Providing inaccurate or unreliable vessel information; or

(6) The de facto, absolute, or systematic exclusion of exports in providing cargo space accommodations.

(f) *Elements for claims.* The following elements are necessary to establish a successful private party or enforcement claim under 46 U.S.C. 41104(a)(10) with respect to refusals of vessel space accommodations provided by an ocean common carrier:

(1) The respondent must be an ocean common carrier as defined in 46 U.S.C. 40102;

(2) The respondent refuses or refused to deal or negotiate with respect to vessel space accommodations; and

(3) The ocean common carrier's conduct is unreasonable.

(g) *Non-binding considerations when evaluating unreasonable conduct.* In evaluating the reasonableness of an ocean common carrier's refusal to deal or negotiate with respect to vessel space accommodations, the Commission may consider the following factors:

(1) Whether the ocean common carrier followed a documented export policy that enables the timely and efficient movement of export cargo;

(2) Whether the ocean common carrier engaged in good faith negotiations;

(3) Whether the refusal was based on legitimate transportation factors; and

(4) Any other relevant factors or conduct.

(h) *Non-Binding examples of unreasonable conduct.* The following are examples of the kinds of conduct that may be considered unreasonable under 46 U.S.C. 41104(a)(10) when linked to a refusal to deal or negotiate:

(1) Quoting rates that are so far above current market rates they cannot be considered a good faith offer or an

attempt at engaging in good faith negotiations; or

(2) The de facto, absolute, or systematic exclusion of exports in providing vessel space accommodations.

(i) *Use of sweeper vessels.* Ocean common carriers are not precluded from using sweeper vessels previously designated for that purpose to reposition empty containers; however, the designation of a vessel as a sweeper vessel is subject to Commission review to determine whether the designation results in an unreasonable refusal of ocean carriage services.

(j) [Reserved]

(k) *Shifting the burden of production.* In accordance with applicable laws, the following standard applies:

(1) The initial burden of production to establish a prima facie case of a violation of this part is with the complainant or the Commission's Bureau of Enforcement, Investigations, and Compliance.

(2) Once a complainant sets forth a prima facie case of a violation, the burden shifts to the ocean common carrier to justify that its actions were reasonable.

(3) The ultimate burden of persuading the Commission always remains with the complainant or the Commission's Bureau of Enforcement, Investigations, and Compliance.

**§ 542.2–542.99   [Reserved]**

■ 2. Delayed indefinitely, add § 542.1(j) to read as follows:

**§ 542.1   Definition of unreasonable refusal of cargo space accommodations when available and unreasonable refusal to deal or negotiate with respect to vessel space provided by an ocean common carrier.**

\*    \*    \*    \*    \*

(j) *Documented export policy.* Ocean common carriers must file with the Federal Maritime Commission a documented export policy that enables the timely and efficient movement of export cargo.

(1) Each ocean common carrier must submit a documented export policy to the Commission once per calendar year and include, in a manner prescribed by the Commission, pricing strategies, services offered, strategies for equipment provision, and descriptions of markets served. Updates may be submitted more than once per year if the ocean common carrier chooses to do so. Other topics a documented export policy should also address, if applicable, include:

(i) The effect of blank sailings or other schedule disruptions on the ocean common carrier's ability to accept shipments;

(ii) The ocean common carrier's rules and practices for the designation and use of sweeper vessels; and

(iii) The alternative remedies or assistance the ocean common carrier would make available to a shipper to whom it refused vessel space accommodations.

(2) A documented export policy required to be filed by this part must be submitted to: Director, Bureau of Trade Analysis, Federal Maritime Commission, *exportpolicy@fmc.gov.*

(3) The documented export policies filed in accordance with this section shall not be circulated outside of the Federal Maritime Commission. These documents, and the information contained therein, shall not be publicly disclosable, in whole or in part, including in response to requests under the Freedom of Information Act. The information may, however, be disclosed to the extent that it is relevant to an administrative or judicial action or proceeding; or to either House of Congress, or a duly authorized committee or subcommittee of Congress.

■ 3. Delayed indefinitely, add § 542.99 to read as follows:

**§ 542.99   OMB control number assigned pursuant to the Paperwork Reduction Act.**

The Commission has received Office of Management and Budget approval for the collection of information in § 542.1(k) pursuant to the Paperwork Reduction Act of 1995, as amended. The valid control number for this collection is 3072–XXXX.

By the Commission.

**David Eng,**
*Secretary.*

[FR Doc. 2024–16148 Filed 7–22–24; 8:45 am]

**BILLING CODE 6730–02–P**

---

**DEPARTMENT OF COMMERCE**

**Office of the Secretary**

**48 CFR Parts 1306 and 1353**

**[DOCKET NO.: 240711–0188]**

**RIN 0605–AA68**

**Discontinue Use of Form CD–492, Justification for Other Than Full and Open Competition**

**AGENCY:** Office of the Secretary, Department of Commerce.

**ACTION:** Final rule.

**SUMMARY:** The Department of Commerce (Commerce) is issuing this final rule to discontinue use of Form CD–492, *Justification for Other Than Full and Open Competition,* and to make an