# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### WORLD SHIPPING COUNCIL,

#### PETITIONER,

v.

### FEDERAL MARITIME COMMISSION
### AND THE UNITED STATES OF AMERICA,

#### RESPONDENTS.

*On Petition for Review from an Order of the Federal Maritime Commission,
89 Fed. Reg. 59648*

## OPENING BRIEF OF PETITIONER

Robert K. Magovern #50634
Matthew Howell
Rachel Schwartz
Cozen O'Connor
2001 M. Street, NW
Washington, DC 20036
(202) 463-2539
rmagovern@cozen.com
*Counsel for Petitioner*

March 3, 2025

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and amici.** The parties before the Court are Petitioner World Shipping Council and Respondents Federal Maritime Commission and the United States of America. There were no district court proceedings.

**Rulings under review.** The ruling under review is *Definition of Unreasonable Refusal to Deal or Negotiate with Respect to Vessel Space Accommodations Provided by an Ocean Carrier*, 89 Fed. Reg. 59648 (July 23, 2024).

**Related cases.** This case has not previously been before this Court. Counsel is not aware of any related cases pending in this or any other court.

## CORPORATE DISCLOSURE STATEMENT

The World Shipping Council has no parent company and no publicly held company has a 10% or greater ownership interest in it. The World Shipping Council is a trade association within the meaning of Circuit Rule 26.1(b).

*/s/ Robert K. Magovern*

# TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES** ......... **i**

**CORPORATE DISCLOSURE STATEMENT** ..................................................... **i**

**TABLE OF AUTHORITIES** .............................................................................. **iv**

**GLOSSARY OF ABBREVIATIONS** ................................................................. **ix**

**JURISDICTION** ................................................................................................... **1**

**ISSUES PRESENTED FOR REVIEW** ............................................................. **1**

**STATUTES AND REGULATIONS** ................................................................... **2**

**INTRODUCTION** ................................................................................................ **2**

**STATEMENT OF THE CASE** ........................................................................... **6**

    **A.**    **Statutory and Regulatory Background** ................................................. **6**

        **1.**    **The Shipping Act.** .......................................................................... **6**

        **2.**    **The Ocean Shipping Reform Act of 2022.** ................................. **9**

        **3.**    **The Notice of Proposed Rulemaking** ....................................... **11**

            **a.**    **Defining Reasonableness** .................................................... **12**

            **b.**    **Documented Export Strategy** ............................................ **14**

        **4.**    **The Supplemental Notice of Proposed Rulemaking.** .............. **16**

        **5.**    **The Final Rule.** ............................................................................ **17**

            **a.**    **Rate Regulation** .................................................................. **18**

            **b.**    **Documented Export Policy** ................................................ **18**

            **c.**    **Business Factors** ................................................................. **19**

**SUMMARY OF ARGUMENT** .......................................................................... **19**

**STANDING** ........................................................................................................ **22**

**STANDARD OF REVIEW** ............................................................................... **27**

**ARGUMENT** ..................................................................................................... **29**

    **1.**    **The Final Rule is Arbitrary and Capricious and Exceeds the Commission's Statutory Authority Because it Regulates Ocean Carriers' Pricing.** ................................................................................................. **29**

**2. The Final Rule is Arbitrary and Capricious and Exceeds the Commission's Statutory Authority By Requiring a Documented Export Policy.** ................................................................................................32

**3. The Final Rule is Arbitrary and Capricious Because it Departs From Longstanding Precedent That Business Decisions Be Considered in a Reasonableness Analysis** ................................................................................41

**CONCLUSION**................................................................................................48

**CERTIFICATE OF COMPLIANCE** ................................................................50

**CERTIFICATE OF SERVICE** ........................................................................50

LEGAL\76064927\1

# TABLE OF AUTHORITIES[1]

**Page(s)**

## Cases

*Abbott Labs v. Gardner*,
    387 U.S. 136 (1967)........................................................................26

*Advocates for Highway and Auto Safety v. FMCSA*,
    41 F.4th 586 (D.C. Cir. 2022)......................................................24

*Aid Ass'n for Lutherans v. U.S. Postal Service*,
    321 F.3d 1166 (D.C. Cir. 2003)....................................................29

*Am. Fed'n of Gov't Emps. v. FLRA*,
    470 F. 3d 375 (D.C. Cir. 2006)....................................................42

*American Trucking Ass'n Inc. v. Fed. Motor Carrier Safety Admin.*,
    724 F.3d 243 (D.C. Cir. 2013)......................................................24

*Animal Welfare Inst. v. Kreps*,
    561 F.2d 1002 (D.C. Cir. 1977)....................................................25

*Ass'n of Am. Railroads v. Costle*,
    562 F.2d 1310 (D.C. Cir. 1977)....................................................33

*Bonacci v. TSA*,
    909 F.3d (D.C. Cir. 2018)............................................................24

*Canaveral Port Authority—Possible Violations of Section 10(b)(10),
    Unreasonable Refusal to Deal or Negotiate*,
    29 S.R.R. 1436 (F.M.C. 2003)................................................13, 44

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012)......................................................................47

*\*Department of Commerce v. New York*,
    139 S. Ct. 2551 (2019)............................................................32, 39

---

[1] Authorities marked with an asterisk are those on which we chiefly rely.

iv

*Department of Homeland Security v. Regents of the University of California,*
140, S. Ct. 1891, 1913 ........................................................43

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016)............................................................44

*\*Ethyl Corp. v. E.P.A.,*
51 F.3d 1053 (D.C. Cir. 1995)............................................35

*Evergreen Shipping Agency (Am.) Corp. v. Fed. Maritime Comm'n,*
No. 23-1052 (D.C. Cir. 2024)..............................................46

*\*F.C.C. v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009)..........................................29, 43, 46

*Fox v. Clinton,*
684 F.3d 67 (D.C. Cir. 2012)......................................28, 31

*\*Greater Boston Television Corp. v. F.C.C.,*
444 F.2d 841 (D.C. Cir. 1970)............................................45

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977)............................................................23

*Hydro Res., Inc. v. EPA,*
608 F.3d 1131 (10th Cir. 2010) ........................................25

*K. Mart Corp. v. Cartier, Inc.,*
486 U.S. 281 (1988)............................................................36

*\*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369 (2024)....................................................28, 36

*Maher Terminals, LLC v. PANYNJ,*
2015 WL 435475 (F.M.C. 2015) ................................11, 43

*Maher Terminals, LLC v. PANYNJ,*
33 S.R.R. 821 (F.M.C. 2014)........................................14, 44

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.,*
70 F.4th 582 (D.C. Cir. 2023)............................................23

v

*Michigan Consol. Gas Co. v. FERC*,
883 F. 2d 117 (D.C. Cir. 1989)............................................................43

\*Motor Vehicle Mgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).............................................................28, 30, 31, 37, 38

*MSRF, Inc. v. HMM Co. Ltd.*,
Docket No. 22-20 (F.M.C. Nov. 22, 2023) ........................................26

*New Orleans Stevedoring Co. v. Bd. of Commissioners of the Port of New Orleans*,
29 S.R.R. 1066 (F.M.C. 2002), *aff'd mem.*, 30 S.R.R. 261 (D.C. Cir. 2003) ...............................................................................................13

*Northwest Immigrant Rights Project v. United States Citizenship and Immigration Servs.*,
496 F.Supp.3d 31 (D.C. Cir. 2020).....................................................26

*Notice of Inquiry Concerning Use and Effect of Surcharges by Common Carries and Conferences*, 26 S.R.R. 108, 119 (FMC 1992) ....................................................................................................8

*OJ Commerce, LLC v. Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S*,
Docket No. 21-11 (F.M.C. Aug. 27, 2024) ........................................26

*Pac. Gas & Elec. Co. v. FERC*,
113 F.4th 943 (D.C. Cir. 2024)............................................................34

*PKDC, LLC v. CMA CGM S.A.*,
Docket No. 24-21 (complaint filed May 15, 2024) .............................27

\*Postal Regulatory Com'n*,
785 F.3d 740, 753-55 (D.C. Cir. 2015) ...............................................47

*Prof. Reactor Operator Soc'y v. U.S. Nuclear Regul. Comm'n*,
939 F.2d 1047 (D.C. Cir. 1991)............................................................22

*Rothe Dev., Inc. v. United States Dep't of Def.*,
836 F.3d 57 (D.C. Cir. 2016)................................................................33

*Seacon Terminals, Inc. v. Port of Seattle*,
26 S.R.R. 886 (F.M.C. 1993)................................................11, 13, 44

vi

*Sebelius v. Cloer*,
    569 U.S. 369 (2013)...........................................................................36

*Sierra Club v. E.P.A.*,
    292 F.3d 895 (D.C. Cir. 2002).........................................................24

*State Nat'l. Bank of Big Spring v. Lew*,
    795 F.3d 48 (D.C. Cir. 2015)...........................................................24

*United States Sugar Corp. v. Env't Prot. Agency*,
    113 F.4th 984 (D.C. Cir. 2024).......................................................28

*Vanda Pharms., Inc. v. United States Food & Drug Admin.*,
    No. 23-5200, 2024 WL 5131050 (D.C. Cir. 2024) ...........................28

*Williams Gas Processing Gulf Cost Co. v. FERC*,
    475 F. 3d 319 (D.C. Cir. 2006).......................................................47

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*,
    82 F.4th 1273 (D.C. Cir. 2023).......................................................23

**Statutes**

5 U.S.C. §§ 551-559.............................................................................5

5 U.S.C. § 706.................................................................................1, 27

28 U.S.C. §§ 2342-2344 .......................................................................1

46 U.S.C. § 40101...............................................................................14

46 U.S.C. § 40104.................................................... 17, 18, 20, 33, 34, 35, 37

46 U.S.C. §§ 41102-41104 ...................................................................9

46 U.S.C. § 41104...................................... 9, 10, 11, 12, 21, 33, 41, 43

46 U.S.C. § 46105..................................................................................1

Shipping Act of 1916, Pub. L. No. 64-260, 39 Stat. 728 (Sept. 7,
    1916) .................................................................................................6

Ocean Shipping Reform Act of 1998, Pub. L. No. 105-258, 112 Stat.
    1902 (Oct. 14, 1998) ......................................................................8, 9

LEGAL\76064927\1

Ocean Shipping Reform Act of 2022, Pub. L. No. 117-146, 136 Stat. 1272 (June 16, 2022) ............................................................4, 9, 10, 11

Shipping Act of 1984, Pub. L. 98-237, 98 Stat. 67 (March 20, 1984) .................7, 9

U.S. Shipping Act, 46 U.S.C. § 40101 *et seq.* ..............................................4, 6, 7, 8

**Other Authorities**

46 C.F.R. § 542.1 ................................................. 5, 14, 16, 19, 23, 25, 26, 30, 31, 33

Definition of Unreasonable Refusal to Deal or Negotiate with Respect to Vessel Space Accommodations Provided by an Ocean Common Carrier, 87 Fed. Reg. 57674 (proposed Sept. 21, 2022) (the "NPRM") .............................................................. 12, 13, 14, 17, 22, 33, 44, 46

Definition of Unreasonable Refusal to Deal or Negotiate with Respect to Vessel Space Accommodations Provided by an Ocean Carrier, 88 Fed. Reg. 38789 (proposed June 14, 2023) (the "SNPRM") .....16, 17, 33, 35, 41, 42, 45

Federal Maritime Commission, Definition of Unreasonable Refusal to Deal or Negotiate with Respect to Vessel Space Accommodations Provided by an Ocean Common Carrier, 90 Fed. Reg. 30 (January 3, 2025) ...............................................................................................25

*Containerized Logistics*, MCKINSEY & COMPANY (March 14, 2022) https://www.mckinsey.com/industries/logistics/our-insights/navigating-the-current-disruption-in-containerized-logistics ..............................................................................................15

Definition of Unreasonable Refusal to Deal or Negotiate with Respect to Vessel Space Accommodations Provided by an Ocean Carrier, 89 Fed. Reg. 59648 (July 23, 2024).. 5, 10, 17, 18, 19, 25, 30, 31, 35, 36, 37, 39, 41, 44, 45

*Report*, Black's Law Dictionary (12th ed. 2024).....................................................34

LEGAL\76064927\1

# GLOSSARY OF ABBREVIATIONS

| Term | Abbreviation |
|------|--------------|
| Administrative Procedure Act | "APA" |
| Certified Index to the Record | "CIR" |
| Federal Maritime Commission | "Commission" |
| Notice of Proposed Rulemaking | "NPRM" |
| Ocean Shipping Reform Act of 1998 | "OSRA 98" |
| Ocean Shipping Reform Act of 2022 | "OSRA 22" |
| Shipping Act of 1916 | "1916 Act" |
| Shipping Act of 1984 | "1984 Act" |
| Supplemental Notice of Proposed Rulemaking | "SNPRM" |
| World Shipping Council | "WSC" |

LEGAL\76064927\1

# JURISDICTION

The Commission promulgated the Final Rule on July 23, 2024, pursuant to 46 U.S.C. § 46105. Petitioner filed a timely petition for review on September 13, 2024. This Court has jurisdiction under 28 U.S.C. §§ 2342-2344 and 5 U.S.C. § 706.

# ISSUES PRESENTED FOR REVIEW

1. Whether the Final Rule is arbitrary and capricious and exceeds the Commission's statutory authority because it regulates ocean carriers' pricing by considering in its reasonableness analysis: (1) ocean carriers' "quoting of rates that are so above market rates that they cannot be considered a real offer or an attempt at engaging in good faith negotiations," and (2) information regarding ocean carriers' "pricing strategies."

2. Whether the Final Rule is arbitrary and capricious and exceeds the Commission's statutory authority because it requires ocean carriers to create and submit a prospective "Documented Export Policy," fails to provide any meaningful guidance on what should be included in such a policy, and fails to reasonably explain how the Commission would use such a document as a benchmark in evaluating reasonableness.

3. Whether the Final Rule is arbitrary and capricious because it departs from past Commission precedent without a reasoned explanation by removing

business decisions as express factors to be considered in a reasonableness analysis.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the addendum to this brief.

## INTRODUCTION

Liner shipping companies are the engines of international trade, providing regularly scheduled ocean transportation services to/from key ports for essential manufactured goods, consumer products, raw materials, and agricultural commodities. Liner shipping vessels, like those operated by the World Shipping Council's ("WSC") ocean carrier members, provide these regularly scheduled services to exporters and importers worldwide on fixed routes, much like a bus route or subway line. There are no separate "import" or "export" systems—the same vessels and equipment carry both imports and exports.

To function properly, this global transportation system relies on efficient, timely, and undisrupted networks involving ocean carriers and numerous other stakeholders throughout the supply chain. When disruptions occur at any point in the network, the effects can be felt across the entire logistics system. The COVID-19 pandemic in 2020 triggered a "perfect storm" for global shipping, putting an enormous strain on supply chains and disrupting global trade. The normally stable and predictable patterns of product demand, sourcing, production, and distribution

were thrown into disarray. At the start of the pandemic, demand for consumer goods plummeted and ocean carriers saw cargo volumes decline significantly. Production and distribution came to an abrupt halt as countries across the world implemented lockdowns to contain the outbreak.

Yet, in the second half of 2020, there was an unprecedented and continuing surge in demand as the extended lockdowns fundamentally changed consumer behavior to spending on finished goods over services. In North America, demand skyrocketed for recreational goods and electronics produced in Asia, further exacerbating a preexisting trade imbalance.

There were particularly acute effects in the U.S. market, including a combination of factors such as: (1) dramatic increases in demand by U.S. importers (and U.S. consumers), (2) severe limitations in the abilities of U.S. landside facilities to store, process, and distribute imports in a timely manner, and (3) congestion at U.S. ports that required vessels to wait for days to enter port and discharge/load cargo. The high demand for ocean transportation services, coupled with landside congestion, meant that importers and exporters in all trades were effectively competing for limited vessel space and container equipment. *See* David Dierker, *Navigating the Current Disruption in Containerized Logistics*, MCKINSEY & COMPANY (March 14, 2022) https://www.mckinsey.com/industries/logistics/our-insights/navigating-the-current-disruption-in-containerized-logistics.

LEGAL\76064927\1

In response to these significant supply chain disruptions, Congress revised the statute governing liner shipping, the U.S. Shipping Act, 46 U.S.C. § 40101 *et seq.*, by enacting the Ocean Shipping Reform Act of 2022 ("OSRA 22"). Ocean Shipping Reform Act of 2022, Pub. L. No. 117-146, 136 Stat. 1272 (June 16, 2022); *see e.g.*, 168 Cong. Rec. H5430-01 (June 9, 2022) (statement of Rep. Steny Hoyer) ("This legislation will address continued supply chain problems and ensure the fair and expeditious flow of goods in and out of our ports, helping lower costs for American consumers and bolstering our domestic agriculture products."); 168 Cong. Rec. H5460-02, H5466 (June 13, 2022) (statement of Rep. Dusty Johnson) ("This bill moves us in the right direction. It is going to help during this current crisis. And even more importantly … it will make a future crisis less likely); *id.* at H5467 (statement of Rep. Jackson Lee) (noting "supply chain disruption" included delays in processing goods from vessels to port facilities to warehouses).

Section 7 of OSRA 22 required the Federal Maritime Commission ("Commission"), which enforces the Shipping Act, to undertake a rulemaking to define when an ocean carrier has unreasonably refused to negotiate or deal with a customer with respect to vessel space accommodations. Ocean Shipping Reform Act of 2022, Pub. L. No. 117-146, 136 Stat. at 1276 (June 16, 2022). In response to that Congressional directive, the Commission issued the Final Rule entitled "Definition of Unreasonable Refusal to Deal or Negotiate with Respect to Vessel

Space Accommodations Provided by an Ocean Common Carrier" on July 23, 2024. 89 Fed. Reg. 59648 (July 23, 2024) (codified at 46 C.F.R. § 542.1) (hereinafter the "Final Rule").

The Final Rule stated that "unreasonable" in the context of providing vessel space accommodations must be determined on a case-by-case basis, and included a suite of non-exclusive factors that the Commission would use to evaluate reasonableness. WSC agreed with the Commission that any allegations of "unreasonable refusal to deal or negotiate" should be dealt with on a case-by-case basis, and it generally agreed that using a suite of non-exclusive factors was both appropriate and consistent with its past precedent.

Although WSC agreed with the Commission's general approach, the Final Rule in several respects exceeds the Commission's authority in the Shipping Act, departs from past Commission practice and precedent without explanation, ignores "important aspects" of the issue raised by numerous commenters throughout the rulemaking, and fails to make any rational connection between the facts found and the choices made, all of which violates the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 551-559.

For all of these reasons, the Final Rule must be reversed.

# STATEMENT OF THE CASE

## A. Statutory and Regulatory Background

## 1. **The Shipping Act.**

The Shipping Act regulates the carriage of goods by water in the foreign commerce of the United States. *See* 46 U.S.C. § 40101 *et seq*. The Shipping Act regulates ocean common carriers, non-vessel operating common carriers, and marine terminal operators, and charges the Commission with oversight and enforcement of its provisions.

Congress first regulated international liner shipping in the Shipping Act of 1916 ("1916 Act"), which established the United States Shipping Board, the predecessor to the Commission. Shipping Act of 1916, Pub. L. No. 64-260, 39 Stat. 728 (Sept. 7, 1916) (current version at 46 U.S.C. § 40101 *et seq*.). Notably, Congress gave the U.S. Shipping Board broad authority to protect U.S. exporters and importers against unreasonably high rates and potential reductions in services. Specifically, the U.S. Shipping Board had the authority to suspend ocean carrier rates and charges, or prescribe rules relating to such rates and charges, if there was a substantial reason to believe they were so unreasonably high or low as to be detrimental to U.S. commerce. *See* Shipping Act of 1916, § 18(a), Pub. L. No. 64-260, 39 Stat. at 735 (amended 1984) ("Whenever the board finds that any rate, fare, charge, classification, tariff, regulation, or practice, demanded, charged,

collected, or observed by such carrier is unjust or unreasonable, it may determine, prescribe, and order enforced a just and reasonable maximum rate, fare, or charge, or a just and reasonable classification, tariff, regulation, or practice").

The Commission was created in 1961 and retained its predecessors' authority over ocean carrier pricing through 1984, when Congress enacted the Shipping Act of 1984 ("1984 Act"). *See* Shipping Act of 1984, Pub. L. 98-237, 98 Stat. 67 (March 20, 1984) (current version at 46 U.S.C. § 40101 *et seq*.).

The 1984 Act introduced the concept of pricing liner services via service contracts, which allowed cargoes to be moved under negotiated contracts in addition to public tariff rates. Importantly, in the 1984 Act, Congress expressly removed the Commission's authority to generally prescribe the levels of ocean carrier rates or charges. Congress decided these commercial issues were most appropriately left to the individual ocean carrier and its customer to decide in their negotiations. *See* Shipping Act of 1983, Report of the Senate Committee on Commerce, Science, and Transportation, S. 504 at 16-18 (February 17, 1893) (stating that the proposed revisions to the Shipping Act "[e]liminates the [Commission]'s ability to scrutinize rate levels … while preserving the [Commission]'s role as a repository of tariffs and enforcer of tariff adherence" and further stating that: "[t]o meet the needs of the U.S. foreign commerce, the first objective [of the Act] states the centerpiece of our regulatory policy, to develop and

LEGAL\76064927\1

maintain an efficient ocean transportation system through commercial means, with minimum Government involvement. Excessive Government involvement has unnecessarily interfered in many aspects of shipping activity where commercial parties more appropriately should govern their own conduct. *Wherever Government supervision could be reduced with confidence that shippers, ports, and independent carriers would remain protected, the bill does so*.") (emphasis added)*; Notice of Inquiry Concerning Use and Effect of Surcharges by Common Carries and Conferences*, 26 S.R.R. 108, 119 (FMC 1992).

In 1998, Congress enacted the Ocean Shipping Reform Act of 1998 ("OSRA 98"). Ocean Shipping Reform Act of 1998, Pub. L. No. 105-258, 112 Stat. 1902 (Oct. 14, 1998) (current version at 46 U.S.C. § 40101 *et seq*.). According to the Commission's website, "[t]he primary objectives of OSRA [98] were to provide the ocean shipping industry with more flexibility in conducting daily business, remove certain regulatory restrictions, and promote U.S. international liner trade by supporting greater reliance on the marketplace." *See* Federal Maritime Commission, *Our History: The Ocean Shipping Reform Act of 1998*, https://www.fmc.gov/about/fmc-history/ (last visited March 3, 2025).

Under the 1984 Act, as amended by OSRA 98, there are a number of "prohibited acts" that relate to both individual and collective ocean carrier action. Included among these are prohibitions on unreasonable refusals to deal, predatory

8

actions, allocations of customers, discrimination against certain types of shippers and failure to adhere to published tariffs or service contracts filed with the Commission. *See* Shipping Act of 1984, §10, Pub. L. 98-237, 98 Stat. at 77-80, *amended by* Ocean Shipping Reform Act of 1998, Pub. L. No. 105-258, 112 Stat. 1902 (Oct. 14, 1998) (current version at 46 U.S.C. §§ 41102-41104).

## 2. **The Ocean Shipping Reform Act of 2022.**

OSRA 22 revised and added to the Shipping Act's prohibited acts. *See* Ocean Shipping Reform Act of 2022, Pub. L. No. 117-146, 136 Stat. 1272 (June 16, 2022). The two statutory provisions revised by OSRA 22 that are the subject of the Final Rule are: (1) 46 U.S.C. § 41104(a)(3), which makes it unlawful for a common carrier to "unreasonably refuse cargo space accommodations when available, or resort to other unfair or unjustly discriminatory methods," and (2) 46 U.S.C. § 41104(a)(10), which makes it unlawful for a common carrier to "unreasonably refuse to deal or negotiate, including with respect to vessel space accommodations provided by an ocean common carrier." OSRA 22 tasked the Commission with defining unreasonableness with respect to these two statutory provisions. The Final Rule distinguishes between these two related prohibitions based on when the conduct occurs. Subsection 41104(a)(10) applies when ocean carriers and customers are negotiating for space. Subsection 41104(a)(3) applies at

the "execution" stage, *i.e.*, when there is a service contract or confirmed booking in place. 89 Fed. Reg. 59648.

OSRA 22 did not add the "unreasonable refusal to deal" prohibition. Instead, OSRA 22 merely added language to the section by expressly naming vessel space accommodations as a factual situation to which the prohibition applies. *See* Ocean Shipping Reform Act of 2022, Pub. L. No. 117-146, 136 Stat. at 1274-76 (codifying title 46 of the United States Code, including § 41104's prohibition against an ocean carrier from "unreasonably refus[ing] to deal or negotiate."). The table below compares the two statutory provisions that are the subject of the Final Rule prior to and following enactment of OSRA 22.

|  | **Pre-OSRA 22** | **Post-OSRA 22** |
|---|---|---|
| § 41104(a)(3) | retaliate against a shipper by refusing, or threatening to refuse, cargo space accommodations when available, or resort to other unfair or unjustly discriminatory methods because the shipper has patronized another carrier, or has filed a complaint, or for any other reason | unreasonably refuse cargo space accommodations when available, or resort to other unfair or unjustly discriminatory methods |
| § 41104(a)(10) | unreasonably refuse to deal or negotiate | unreasonably refuse to deal or negotiate, including with respect to vessel space accommodations provided by an ocean common carrier |

10

The prohibitions contained in 46 U.S.C. § 41104(a), as well as the reasonableness standard included therein, has been subject to Commission interpretation and precedent for decades, none of which was overturned by OSRA 2022. To this end, the Commission, in the context of refusing to deal, historically interpreted this standard as one of *commercial* reasonableness by parties engaged in a for-profit, free market industry. *See Maher Terminals, LLC v. PANYNJ*, 2015 WL 435475 at *21 (F.M.C. 2015) ("[T]he Commission may defer to a port's reasonable, discretionary business decisions during negotiations."); *Seacon Terminals, Inc. v. Port of Seattle*, 26 S.R.R. 886, 899 (F.M.C. 1993) (Commission holding that a port's decision not to enter into a lease "was a wholly reasonable exercise of its business discretion.").

Rather than substantively revising the underlying prohibitions in the Shipping Act, OSRA 22 merely directed the Commission to *define* when an ocean carrier engages in an unreasonable refusal to negotiate or deal with respect with to vessel space accommodations pursuant to §§ 41104(a)(3), (10). Ocean Shipping Reform Act of 2022, § 7(d), Pub. L. No. 117-146, 136 Stat. at 1276 (June 16, 2022).

### 3. __The Notice of Proposed Rulemaking.__

The Commission published its Notice of Proposed Rulemaking in September 2022, which intended to specify how the Commission would "define

the elements necessary to establish a violation and the criteria it will consider in assessing reasonableness." Definition of Unreasonable Refusal to Deal or Negotiate with Respect to Vessel Space Accommodations Provided by an Ocean Common Carrier, 87 Fed. Reg. 57674 (proposed Sept. 21, 2022) (the "NPRM").

a.   Defining Reasonableness

In first attempting to define "reasonableness," the Commission articulated that it would maintain a factually driven, case-by-case analysis with identified criteria to be considered in "any given case." Definition of Unreasonable Refusal to Deal or Negotiate with Respect to Vessel Space Accommodations Provided by an Ocean Common Carrier, 87 Fed. Reg. at 57678 (defining unreasonable to mean "an ocean common carrier's refusal to deal or negotiate as prohibited under 46 U.S.C. § 41104(a)(10)."). The Commission articulated that, per its precedent regarding these longstanding statutory provisions, decisions may be considered "reasonable" when "connected to a legitimate business decision or motivated by legitimate transportation factors," and that the Commission "has said that a just and reasonable practice is one otherwise lawful but not excessive and suited to the end in view." *Id.* at 57676.

The Commission's proposed elements for evaluating reasonableness in the NPRM ultimately included three explicit elements and one generic "catch-all" provision: (i) whether the ocean carrier followed a documented export strategy; (ii)

whether the ocean carrier engaged in good faith negotiations and made business decisions in a fair and consistent manner; (iii) the presence of any legitimate transportation factors; and (iv) "any other factors the Commission deems relevant." *Id.* at 57678-79.

Regarding transportation factors, the Commission provided a list of items to be considered, all of which relate to "the characteristics of the cargo or vessel," including vessel safety and stability, operational schedules, and the adequacy of facilities. *Id.* at 57677. Relating to "business factors," the Commission provided an overview of its longstanding "history of recognizing that it is appropriate to defer to a party's reasonable business decisions and not to substitute its business judgment for that of an entity conducting negotiations" and that its role "is to ensure that parties are not precluded from obtaining preferential treatment due to unreasonable or unjustly discriminatory reasons." *Id.* The Commission specifically noted, in accord with its precedent, that factors such as "profitability and compatibility with [a] business development strategy" should be considered in any case-by-case analysis. *Id.*; *see, e.g.*, *Seacon Terminals, Inc. v. The Port of Seattle*, 26 S.R.R. 886 (F.M.C. 1993); *New Orleans Stevedoring Co. v. Bd. of Commissioners of the Port of New Orleans*, 29 S.R.R. 1066 (F.M.C. 2002), *aff'd mem.*, 30 S.R.R. 261 (D.C. Cir. 2003); *Canaveral Port Authority—Possible Violations of Section 10(b)(10), Unreasonable Refusal to Deal or Negotiate*, 29

13

S.R.R. 1436 (F.M.C. 2003); *Maher Terminals, LLC v. PANYNJ*, 33 S.R.R. 821 (F.M.C. 2014).

b. <u>Documented Export Strategy</u>

The NPRM introduced a new concept of a so-called "documented export strategy," which the Commission stated ocean carriers "should have" in order to enable freight fluidity in all trades. *See* 87 Fed. Reg. at 57675-76. The Commission included this newly required strategy as among the explicit factors that it would consider when evaluating an ocean carrier's reasonableness, particularly whether an ocean carrier "follows a documented export strategy." *Id.* at 57678-79 (proposed 46 C.F.R. § 542.1(b)(2)(i)).

The Commission relied on the Shipping Act's "Purposes" section, as amended by OSRA 22, as authority to require ocean carriers to create and submit such an export strategy. *Id.* at 57674-75; *see also* 46 U.S.C. § 40101(4) (stating that one of the purposes of the Shipping Act is to "promote the growth and development of United States exports through a competitive and efficient system for the carriage of goods by water in the foreign commerce of the United States, and by placing a greater reliance on the marketplace.").

The Commission noted that ocean carriers "typically maintain documented procedures and policies related to their operations," presumably believing this new requirement would not create new regulatory burdens. *See* 87 Fed. Reg. at 57675.

14

The Commission's only support for this claim was a reference to information it apparently received as part of a "VOCC audit program," without providing any specific information on the number and types of "procedures and policies" it found as part of such audit. *Id.*

In its comments to the NPRM, WSC offered general support for the Commission's case-by-case approach with reliance on its precedent when interpreting reasonableness. CIR Doc. 0020 at 2. Relevant to this appeal, WSC noted that to withstand judicial scrutiny, the Commission must, however (i) remove the proposed documented export strategy due to the absence of specific statutory authority to require such a document and (ii) enumerate other important "legitimate business factors" in the regulatory text consistent with its prior precedent. WSC suggested additional business factors should include fulfillment of contractual obligations, good faith negotiations with a shipper that do not result in a contract, a contracting party that has a poor safety or financial record, balancing the needs of import and export customers, and decisions to delay or skip service to a port to keep a vessel on its schedule. CIR Doc. 0020 at 12-14.

In January 2023, the Commission announced it would issue a Supplemental Notice of Proposed Rulemaking to address the "multitude of substantive questions that demand appropriate time and further opportunity for comment." Federal Maritime Commission, *FMC to Seek Additional Comments on Unreasonable*

*Refusal to Deal Rulemaking*, (January 25, 2023),

https://www.fmc.gov/articles/fmc-to-seek-additional-comments-on-unreasonable-refusal-to-deal-rulemaking/.

4. **The Supplemental Notice of Proposed Rulemaking.**

The Commission published the Supplemental Notice of Proposed Rulemaking on June 14, 2023. Definition of Unreasonable Refusal to Deal or Negotiate with Respect to Vessel Space Accommodations Provided by an Ocean Carrier, 88 Fed. Reg. 38789 (proposed June 14, 2023) (the "SNPRM"). The Commission noted that it deemed the SNPRM advisable to "further explore certain issues and modify other aspects" of the NPRM while maintaining that the "framework" for the SNPRM relies on Commission precedent and "suggestions offered by commenters." 88 Fed. Reg. at 38791.

The SNPRM included three significant changes from the NPRM in how the Commission proposed to evaluate "unreasonable conduct." *See* 46 C.F.R. § 542.1(b)(5) (proposed). First, among the express "non-binding and non-exhaustive" reasonableness factors, the Commission proposed to review ocean carriers': (1) pricing strategies, and (2) quoting of rates as part of its reasonableness analysis. Second, the SNPRM now mandated the creation and annual submission of a "Documented Export Policy," as compared to the NPRM's references to allegedly preexisting strategies that an ocean carrier should adhere to

16

when considering vessel space accommodations. *Compare* 87 Fed. Reg. at 57675

("Ocean common carriers operating in the U.S. trade should have a documented

export strategy that enables the efficient movement of export cargo.") *with* 88 Fed.

Reg. at 38803 ("This SNPRM then revises the voluntary export policy

documentation language and proposes that ocean common carriers submit a

documented export policy to the Commission once per year."). To support this

requirement, the Commission invokes a separate statutory provision of the

Shipping Act rather than the NPRM's reliance on the Purposes provision. *See* 88

Fed. Reg. at 38796-96 (Commission referencing its authority pursuant to 46 U.S.C.

§ 40104). Third, rather than expand the enumerated reasonableness factors to

include additional business factors, the Commission determined instead that

business factors, which it long considered to be an important part of any

reasonableness analysis, would no longer be listed as express factors at all. *Id.* at

38797.

5. **The Final Rule.**

In WSC's comments to the SNPRM, it sought: (i) elimination of any

evaluation of rates or pricing as a factor in any reasonableness analysis, (ii)

removal of the Documented Export Policy, and (iii) reinsertion of "business

factors" as an explicit consideration in the Commission's reasonableness analysis.

CIR Doc. 0041 at 3-4. On July 23, 2024, the Commission issued the Final Rule. 89

17

Fed. Reg. 59648. The Commission declined to incorporate any of the above WSC comments in the Final Rule.

### a. Rate Regulation

In declining to remove the rate-related provisions from the Final Rule, the Commission characterized its oversight not as rate regulation, but as "letting the market work" with the Commission "allowing the market to set the rates and … then examining whether the rates that any carrier puts forth in negotiations is so far above those market rates as to be unreasonable." *Id.* at 59662. The Commission did not explain what it meant by the phrase "so far above market rates," and it did not provide any explanation regarding what specific data or metrics it would use to conduct this type of analysis to ensure that it was applied fairly and uniformly in all cases.

### b. Documented Export Policy

The Commission similarly declined to remove the requirement that ocean carriers create and submit a Documented Export Policy from the Final Rule. Without further discussion, the Commission noted its position that 46 U.S.C. § 40104 provides it "with clear authority to require ocean common carriers to file documented export policies as directed by this final rule." 89 Fed. Reg. at 59663. The Commission stated, but did not explain, its interpretation that this provision is not restricted to its requesting information regarding past actions. It similarly

stated, but did not explain how, this new requirement is consistent with the statute's requirement that such requests be "limited in scope to fulfill its objective." *Id.*

    c.   <u>Business Factors</u>

WSC and several of its members individually argued to the Commission that the SNPRM's complete reversal from including business factors among the enumerated factors to be considered in a reasonableness analysis was inconsistent with (i) decades of Commission precedent, (ii) the commercial reality that liner shipping is a free market, for-profit industry, and (iii) the Commission's own recognition in the NPRM that these matters are important. *See* CIR Doc. 0041 at 6-8.

The Commission declined to re-insert business factors into the regulatory text, but instead assured commenters that it could in any future case consider such factors under the "catch-all" provision within the Final Rule, which states the Commission *may* consider any factor it so chooses. 89 Fed. Reg. at 59657; *see* 46 C.F.R. § 542.1(d)(4), (g)(4).

## SUMMARY OF ARGUMENT

**I.A.** The Final Rule exceeds the Commission's statutory authority because it regulates ocean carriers' pricing by considering in its reasonableness analysis: (1) ocean carriers' "quoting of rates that are so above market rates that they cannot be considered a real offer or an attempt at engaging in good faith negotiations," and

(2) information regarding ocean carriers' "pricing strategies." The Commission previously had general statutory authority to regulate ocean carrier rates and charges, but Congress explicitly removed that authority in 1984. Nothing in the current statute authorizes the Commission to engage in general rate making or regulation as put in place by the Final Rule.

**I.B.** The Final Rule is also arbitrary and capricious because the Commission failed to offer any reasoned explanation as to how either above mentioned factors are relevant to or would be evaluated in a reasonableness analysis.

**II.A.** The Final Rule exceeds the Commission's statutory authority by requiring ocean carriers to create and submit a prospective "Documented Export Policy." The statutory provision relied upon by the Commission, 46 U.S. § 40104, "Reports filed with the Commission," only provides the Commission with authority to collect information or an accounting of events that have already taken place. This is supported by the statutory plain text of the provision, the plain meaning of the term "report," and the Commission's own previous interpretation of this statutory provision. This provision does not authorize the Commission to direct the development and submission of a forward-looking document.

**II.B.** Even assuming the Commission was authorized to require a Documented Export Policy, because it predicated its authority on this statutory provision, it

nonetheless failed to abide by the limitations set forth in this provision, which states that the Commission "shall … limit the scope of any filing ordered under this section to fulfill the objective of the order." The Commission failed to articulate why and how such Policies are needed to fulfill a stated objective.

**II.C.** The Final Rule is arbitrary and capricious because the Commission failed to provide any meaningful guidance on what should be included in a Documented Export Policy, failed to reasonably explain how such a Documented Export Policy is rationally connected to individual cases of alleged unreasonable refusals to deal, negotiate, or provide cargo space accommodations and failed to reasonably explain how the Commission would in fact use such a Documented Export Policy as benchmarks in evaluating reasonableness.

**III.A.** The Final Rule is arbitrary and capricious because it departs from past Commission precedent without a reasoned explanation by removing business decisions from the regulatory text as express factors to be considered in a reasonableness analysis. The Commission has decades of caselaw discussing the application of the term "unreasonable" for cases brought under 46 U.S.C. § 41104(a), and the central feature of this longstanding precedent is a standard of commercial reasonableness. The Commission explicitly recognized this precedent in the rulemaking, nothing that it "has previously found reasonable those decisions that are connected to a *legitimate business decision* or motivated by legitimate

21

transportation factors." 87 Fed. Reg. at 57676 (emphasis added). The Commission's only explanation for their removal is a short and uninformative statement that "there is potential for business decisions to overwhelm the rest of the factors."

**III.B.** The Commission's reliance on a regulatory catch-all provision that allows it to consider any factor it chooses in any given case does not excuse its lack of reasoned explanation for departing from longstanding precedent. Agencies are required to give regulated parties clear direction as to how they are going to enforce a regulation in a uniform and fair manner, and because there is no such direction in the Final Rule, it is arbitrary and capricious.

## STANDING

As the primary non-profit global trade association representing the interests of ocean carriers, WSC unquestionably has associational standing to bring this matter.

As previously acknowledged by the Commission, WSC participated in all the administrative proceedings below on behalf of its members. CIR Doc. 0020 (WSC Comments to Notice of Proposed Rulemaking); CIR Doc. 0041 (WSC Comments to Supplemental Notice of Proposed Rulemaking); *see also Prof. Reactor Operator Soc'y v. U.S. Nuclear Regul. Comm'n*, 939 F.2d 1047, 1049 n.1 (D.C. Cir. 1991) (stating that a party submitting comments confers "party

aggrieved" status in a rulemaking context). Furthermore, WSC meets this Court's test for establishing associational standing: (i) whether WSC's members themselves have standing to bring this action, (ii) if the interests WSC seeks to protect are germane to its purpose; and (iii) neither the claim nor relief requested requires participation by individual members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977).

WSC's individual members themselves have standing to bring this action because the Final Rule directly regulates the activities of the ocean carriers that make up WSC's membership. *See, e.g.,* 46 C.F.R. § 542.1(a), (c), (d), (j) (Final Rule provisions noting prohibitions against ocean carrier conduct). As such, WSC's members are "the object of the action at issue," and it is therefore self-evident from the administrative record that both its individual members and WSC have standing.[2] *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592 (D.C. Cir. 2023) ("The lobstermen's standing to challenge the phase one rule is self-evident, as they are the 'object of the action.'") (cleaned up); *Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1282 (D.C. Cir. 2023) ("The WCMA has representational standing in this matter, as its members consist of companies who are the 'object of the action … at issue.'")

---

[2] WSC also provides affidavits from members Hapag-Lloyd AG and Maersk A/S to further support its standing in this case. *See* Exhibit A (Affidavit of Hapag-Lloyd AG) and Exhibit B (Affidavit of Maersk A/S).

(cleaned up); *see also American Trucking Ass'n Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013) (stating that the association "has an obvious interest in challenging FMCSA rulemaking that directly—and negatively—impacts its motor carrier members."); *Sierra Club v. E.P.A.*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (stating that there is normally little question of standing when the complainant is the object of the action at issue).

Second, WSC's individual members have standing because they are already concretely injured by the Final Rule. The Final Rule violates the APA and the Shipping Act, which itself constitutes an injury to WSC's members. *See Bonacci v. TSA*, 909 F.3d at 1159 (D.C. Cir. 2018) (noting "there is ordinarily little question that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated.") (quotations omitted); *Advocates for Highway and Auto Safety v. FMCSA*, 41 F.4th 586, 594 (D.C. Cir. 2022) ("[H]ere the *primary injury is an allegedly illegal rule under which the drivers are regulated*.") (citing *Bonacci v. TSA*, 909 F.3d at 1159 (D.C. Cir. 2018)) (quotations omitted) (emphasis added); *State Nat'l. Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)).

The Final Rule has also directly injured WSC's members because it already imposes regulatory restrictions, costs, and other burdens on WSC members. *See*

*Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1144-45 (10th Cir. 2010) (en banc) (Gorsuch, J.) ("[T]he out-of-pocket cost to a business of obeying a new rule of government … suffices to establish an injury in fact.") (quotations omitted); *Animal Welfare Inst. v. Kreps*, 561 F.2d 1002, 1008 (D.C. Cir. 1977) (holding that "standing does not depend on the size or quantum of harm to the party."). Ocean carriers have created and submitted Documented Export Policies to the Commission to meet the Final Rule's March 1, 2025 effective date. *See* Federal Maritime Commission, Definition of Unreasonable Refusal to Deal or Negotiate with Respect to Vessel Space Accommodations Provided by an Ocean Common Carrier, 90 Fed. Reg. 30 (January 3, 2025). The Commission previously estimated that it could take up to 40 hours to develop, document, and submit an export policy that meets to the requirements of the Final Rule. 89 Fed. Reg. at 59671; *see* Exhibit A at ¶ 8 (Affidavit of Hapag-Lloyd AG) (noting costs relating to development and submission of Documented Export Policy) and Exhibit B at ¶ 7 (Affidavit of Maersk A/S) (same).

Additionally, ocean carriers have incurred costs and taken steps to conform their business practices to avoid conduct that the Commission signaled it would likely find unreasonable through its adoption of "non-binding" factors in the Final Rule. *See, e.g.,* 46 C.F.R. § 542.1(e)(1) (notification of blank sailing or schedule changes); *id.* at § 542.1(e)(3) (new notification requirements for ocean carriers to

"alert" shippers "of any other changes to the sailing"); *id.* at § 542.1(e)(4)

(scheduling sufficient time for cargo tendering); *id.* at 542.1(e)(5) (validating

vessel information)*; see also Abbott Labs v. Gardner*, 387 U.S. 136, 154 (1967)

("[P]etitioners have sufficient standing as plaintiffs [because] the regulation is

directed at them in particular; it requires them to make significant changes in their

everyday business practices; if they fail to observe the agency's rule, they are quite

clearly exposed to the imposition of strong sanctions."); *Northwest Immigrant*

*Rights Project v. United States Citizenship and Immigration Servs.*, 496 F.Supp.3d

31, 47-48 (D.C. Cir. 2020) (holding that organizational plaintiffs had standing to

challenge a rule that, if implemented, was "likely to impose new burdens and costs

on the organization.").

In addition to the cost and burden that WSC's members have incurred from

the Final Rule, the Final Rule also sets forth an imminent threat of enforcement to

WSC's members. Members are already fielding multiple legal challenges filed by

interested parties before the Commission relating to alleged unreasonable refusal to

deal conduct, and the Commission has signaled that it plans to vigorously enforce

the regulations stemming from the Final Rule. *See OJ Commerce, LLC v. Hamburg*

*Südamerikanische Dampfschifffahrts-Gesellschaft A/S*, Docket No. 21-11 (F.M.C.

Aug. 27, 2024); *MSRF, Inc. v. HMM Co. Ltd.*, Docket No. 22-20 (F.M.C. Nov. 22,

2023); *PKDC, LLC v. CMA CGM S.A.*, Docket No. 24-21 (complaint filed May 15, 2024).

Lastly, the administrative record establishes that the Final Rule is germane to WSC's purpose, and that individual member participation is not required to participate in this proceeding. WSC's challenge is directly tied to its purpose as a global trade association representing the interests of the parties subject to the Final Rule. Additionally, as this proceeding relies solely on a preexisting administrative rulemaking record, there is no requirement that any individual member of WSC participate in this proceeding.

For the above reasons, WSC has associational standing to bring this matter before this Court.

## STANDARD OF REVIEW

Pursuant to the APA, courts must hold unlawful administrative rules that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or are otherwise "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C). When reviewing a case pursuant to this standard, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires.… And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while

27

ensuring that the agency acts within it." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412-13 (2024).

In conducting this review, courts must "construe statutes *de novo*, without deference to the views of agencies entrusted to administer the statutes." *United States Sugar Corp. v. Env't Prot. Agency*, 113 F.4th 984, 991 n.7 (D.C. Cir. 2024). Under this standard courts also must employ traditional tools of statutory construction in determining whether an agency has acted within its statutory authority. *See United States Sugar Corp.*, 113 F.4th at 997. Furthermore, this Court has stated its judicial inquiry under this standard includes a determination as to whether the statute in question delegates discretionary authority to the agency and whether the agency engaged in reasoned decision making within the boundaries of that statutory delegation. *Vanda Pharms., Inc. v. United States Food & Drug Admin.*, No. 23-5200, 2024 WL 5131050, at *4 (D.C. Cir. 2024).

Whether an agency's action is arbitrary and capricious depends on whether such action is supported by "substantial evidence on the record considered as a whole." *See Motor Vehicle Mgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 44 (1983)*; Fox v. Clinton*, 684 F.3d 67, 74-75 (D.C. Cir. 2012) (stating this standard requires agency action to "be the product of reasoned decision making."). This standard of review requires a court to determine whether an agency examined the relevant data and articulated a "rational connection between the facts found and

the choices made." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An administrative decision is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.; see F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009).

## ARGUMENT

1. **The Final Rule is Arbitrary and Capricious and Exceeds the Commission's Statutory Authority Because it Regulates Ocean Carriers' Pricing.**

The Commission has no general authority under the Shipping Act to regulate prices. As stated above, this authority was expressly removed in the 1984 Act and nothing in OSRA 22 changed that. *See infra* at 18-19. Despite this direction from Congress, the Final Rule impermissibly contains two factors that regulate ocean carrier rates. *See Aid Ass'n for Lutherans v. U.S. Postal Service*, 321 F.3d 1166, 1174 (D.C. Cir. 2003) ("An agency construction of a statute cannot survive judicial review if a contested regulation reflects an action that exceeds the agency's authority.").

29

First, the Final Rule provides that the Commission will consider the "[q]uoting of rates that are so far above current market rates they cannot be considered a good faith offer or an attempt at engaging in good faith negotiations." 46 C.F.R. § 542.1(h)(1). WSC and others commented that there is no scenario under which an agency that does not have authority to regulate rates can permissibly use rate levels as a measure of reasonableness. CIR Doc. 0041 at 19-20. The simple act of claiming that a rate is unreasonably high or low is tantamount to setting an upper or lower rate limit, thus regulating the rate. The Commission counters in the Final Rule by stating that it is not regulating *specific* rates but merely providing a "comparison point" between too high and reasonable rates. 89 Fed. Reg. at 59662. There is no meaningful distinction between the two, practically or legally.

Beyond the Commission's lack of statutory authority to employ this type of rate-based test, the Commission also offers no reasoned explanation at all as to how it would actually conduct this analysis. The phrase "so far above current market rates" is vague and undefined, and the Commission fails to explain what it means. How high is too high? What data or metrics would the Commission use in its analysis? How would it ensure this factor was applied uniformly or fairly in all cases? The Commission's complete lack of explanation as to how this factor would even be applied renders it arbitrary and capricious. *See Motor Vehicle Mgrs. Ass'n*

*v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 44 (1983)*; Fox v. Clinton*, 684 F.3d 67, 74-75 (D.C. Cir. 2012).

Second, in the requirement that ocean carriers create and submit a Documented Export Policy, the Commission requires ocean carriers to submit information regarding its "pricing strategies." 46 C.F.R. § 542.1(j). Under the Final Rule, non-adherence to a Documented Export Policy, including any "pricing strategies" contained therein, can be used as evidence against the ocean carrier of unreasonable conduct. 89 Fed. Reg. at 59657-58 ("The degree of divergence from that policy will be one factor that the Commission may consider in a refusal to deal or negotiate case."). Setting aside the Commission's lack of statutory authority to implement the Documented Export Policy requirement at all (discussed below), the Commission in particular has no authority to determine whether any ocean carrier's pricing strategies are reasonable because it lacks authority to regulate rates generally.

The Commission compounds this problem with no explanation of (1) what it means by "pricing strategies," (2) how they are relevant to a reasonableness analysis, or (3) how it would evaluate or apply this factor in any such analysis. Following the Final Rule, the Commission has offered no substantive guidance regarding the various requirements within the Documented Export Policy. In its only attempt to do so, the Commission did nothing more than repeat the general

LEGAL\76064927\1

requirement that an ocean carrier's "pricing strategies" must be included in a filed "documented export strategy." Federal Maritime Commission, *Deadline Announced for Required Filing of Annual Export Strategies at FMC*, (Dec. 31, 2024) https://www.fmc.gov/articles/deadline-announced-for-required-filing-of-annual-export-strategies-at-fmc/.

Even assuming the Commission had statutory authority under the Shipping Act to require the ocean carriers to submit information regarding their pricing strategies, the APA requires far more of an explanation as to how such strategies are relevant to a reasonableness analysis, and how the Commission would use it in its analysis. *See Department of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) ("The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public.").

**2. The Final Rule is Arbitrary and Capricious and Exceeds the Commission's Statutory Authority By Requiring a Documented Export Policy.**

The Commission does not have the statutory authority to require ocean carriers to produce, submit, and follow a "documented export policy," or to consider "[w]hether the ocean common carrier followed" such a policy when evaluating the reasonableness of any refusal to provide cargo space

accommodations under 46 U.S.C. § 41104(a)(3) or (a)(10). *See* 46 C.F.R. § 542.1(d)(1), g(1).

First, there is no authority in OSRA 22 or the Shipping Act that allows the Commission to require ocean carriers to develop and submit this type of policy. In the NPRM, the Commission searched for legal authority and landed on the "Purposes" Section of OSRA 22's amendment to the Shipping Act. 87 Fed. Reg. at 57674-75. WSC does not need to address in any great detail that administrative case law is clear that the "preamble," "findings," or "purposes" sections of a statute may not be relied upon in conferring or enlarging an agency's authority because in response to comments the Commission appears to have abandoned this argument in the SNPRM. *See, e.g.*, *Ass'n of Am. Railroads v. Costle*, 562 F.2d 1310, 1316 (D.C. Cir. 1977); *Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57, 65-66 (D.C. Cir. 2016).

In the SNPRM, the Commission changed course and turned to another statutory provision, 46 U.S.C. § 40104, "Reports filed with the Commission," as support for its authority to impose an export policy. This reliance is similarly flawed. 88 Fed. Reg. at 38796-97. This Shipping Act provision permits the Commission to require a regulated entity "to file with the Commission a periodical or special report, an account, record, rate, or charge, or a memorandum of facts and transactions related to the business of" an ocean carrier. 46 U.S.C. § 40104(a)(1).

33

As is appropriate when determining the scope of an agency's statutory authority, the analysis must begin with the plain text of that provision. *Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 947-48 (D.C. Cir. 2024). The statutory text makes clear that Subsection 40104(a)(1) provides the Commission with authority to collect information or an accounting of events that have already taken place. 46 U.S.C. § 40104(a)(1); *see also Report*, Black's Law Dictionary (12th ed. 2024) ("a formal oral or written presentation of the results of an investigation, research assignment, etc., often with a recommendation for action."). This position is further supported by the Commission's historical usage of this provision and its own interpretation of same in the legislative history of the Shipping Act. *See First Session on S. 1593 to Revise Regulation on International Shipping Operating in the United State Foreign Commerce and S. 125 to Revise and Codify the Shipping Act, 1916, and Related Laws, Before the Subcommittee on Merchant Marine of the Senate Commerce Committee*, 97th Cong. 147-48 (1981) (statement of Hon. Alan Green, Jr., Chairman, Federal Maritime Commission, commenting that the Commission uses this authority to gather "relevant facts" and "specific information," which it uses "on infrequent but necessary occasions."). The provision does not, as the Commission suggests, direct the development and submission of a forward-looking document to then judge regulated entities against in enforcement proceedings. If Congress had intended to give the Commission the

authority to seek or require the development of prospective information in the form of a policy or strategy document, and to require commercial parties to conduct their businesses in accordance with such a document under threat of government penalties, it would have done so explicitly. *See Ethyl Corp. v. E.P.A.*, 51 F.3d 1053, 1060 (D.C. Cir. 1995) ("Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony . . . [w]e refuse, once again, to presume a delegation of power merely because Congress has not expressly withheld such power"). Congress did not do so in either the Shipping Act or OSRA 22.

Interestingly, after it abandoned its argument that the "Purposes" section of OSRA 22 authorized it to require this new filing, the Commission altered the nomenclature of the filing itself, labeling this document as a Documented Export *Policy* in the SNPRM as compared to a Documented Export *Strategy* in the NPRM. 88 Fed. Reg. at 38790 (Commission noting one of the needs for the SNPRM is the proposed definition of "documented export policy"). The Commission cannot shoehorn this document into 40104(a)(1)'s authority simply by calling it a "policy" or a "report." 88 Fed. Reg. at 38803 ("The proposal is intended to identify that the export policy must be in the form of a report"). As noted above, the Documented Export Policy must include "pricing *strategies*, services *offered*, *strategies* of equipment provision, and descriptions of markets *served*." 89 Fed.

Reg. at 59670 (emphasis added). Strategies, offers, and markets served are all inherently prospective in nature. They are not "reports" of events that have already occurred and which have already been recorded nor are they a collection of facts to inform the Commission's expertise. The Commission's attempt to self-define a prospective strategy document as a retroactive report is contrary to the plain language of the Shipping Act as well as the ordinary and commonsense meaning of the words within the statute. *See Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) ("As in any statutory construction case, we start, of course, with the statutory text") (quotations omitted); *K. Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291(1988) ("In determining whether a challenged regulation is valid, a reviewing court must first determine if the regulations is consistent with language of the statute."). Furthermore, the Commission's interpretation of this provision, notably the meaning of words such as "report," does not "rest[ ] on factual premises within the agency's expertise" and therefore should not be considered "especially informative" in determining the "best reading" of this statutory provision's authorizations and directives. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 374 (2024) (quoting *Bureau of Alcohol, Tobacco, and Firearms v. FLRA*, 464 U.S. 89, 98, n.8 (1983)).

Additionally, if the Commission is predicating its authority to require an export policy on this statutory provision, then it also must abide by the limitations

set forth in that provision, which states that the Commission "shall … limit the scope of any filing ordered under this section to fulfill the objective of the order." 46 U.S.C. § 40104(a)(3). The statutory language demonstrates that the Commission is prohibited from asking for information unless it can articulate why and how such information is needed to fulfill a stated objective. If it cannot or does not provide such an explanation, the statute is clear the Commission cannot require the information. As discussed below, since the Commission has not reasonably explained why an export policy is at all relevant to a reasonableness analysis, or how it will be used in any such analysis, the statutory provision upon which it now relies, in addition to the APA, bars the Commission from requiring it. 46 U.S.C. § 40104(a)(3); *State Farm*, 463 U.S. at 57.

According to the Commission, the purpose of the document is to "help the Commission determine whether an ocean common carrier's conduct in a specific matter aligns with their general policies and whether the ocean common carrier thus acted reasonably." 89 Fed. Reg. at 59663-64. But the Final Rule gives no meaningful guidance to ocean carriers beyond illustrative general topics as to what actually must be included in such a document. *See id.* at 59670 (stating that the Documented Export Policy must include "pricing strategies, services offered, strategies of equipment provision, and descriptions of markets served."). The Commission completely failed to provide any substantive guidance to inform

ocean carriers on the Commission's interpretations of these general topics prior to the Commission's deadline March 1, 2025 to submit these filings. Ocean carriers were simply left to guess.

Indeed, beyond vague and ambiguous statements, the Commission has not explained how any aspect of a Documented Export Policy is even relevant to individual cases of alleged unreasonable refusals to deal or negotiate. In this regard, the Commission never attempts to make any rational connection between this requirement and the statutory provision in OSRA 22 that requires the Commission to define when a carrier has unreasonably refused to negotiate or deal with respect to vessel space accommodations. *State Farm*, 463 U.S. at 43-44. Thus, not only is it impossible for either ocean carriers or fact-finders to determine in the first instance whether any particular Documented Export Policy would be considered reasonable by the Commission, the Commission has not explained how any of the illustrative topics to be included in a Documented Export Policy have any evidentiary value in evaluating the reasonableness of an ocean carrier's decisions in any given case.

Put plainly, if the Commission says it will use the information in the Documented Export Policy to determine reasonableness, it must explain how it will objectively use this information to benchmark reasonableness. Does the Commission have an acceptable or unacceptable standard of deviation from a goal

in an ocean carrier's Documented Export Policy that would constitute unreasonableness? Are there minimum levels of vessel or equipment services required in order for a Documented Export Policy to be reasonable? If one ocean carrier has a less ambitious plan to attract export cargoes than others, is that more likely to be considered unreasonable? These questions were all asked during the rulemaking, and the Commission ignored them all under the guise that a reasonableness rulemaking cannot address every factual scenario. *See* 89 Fed. Reg. at 59659. Although the APA does not mandate the Commission address every single circumstance in a given context, it requires the Commission to at least provide a reasoned explanation offering "genuine justifications" for the decisions made. *See Department of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019). Here, the Commission threw up its hands when confronted with specific issues of concern, exacerbating the Final Rule's errors in ignoring important aspects of the problem.

Perhaps the reason the Commission failed to articulate a rational basis for this requirement is because there is none. As WSC explained to the Commission in its comments, the export business is volatile with rapidly changing factors that impact space availability on a daily basis. CIR Doc. 0020 at 8; CIR Doc. 0041 at 13-14. An ocean carrier must therefore adapt in real time as factors change from port to port, commodity to commodity, and day to day. These adaptations may

include or implement short-, medium-, and long-term initiatives, with variation based on seasons, locations, and equipment availability. But in no case would any generalized strategy, whether preexisting or created in response to the Commission's new directive, describe when an ocean carrier conducts business with a shipper in a specific circumstance. The Commission fails to explain how a requirement to submit such a generalized document is not internally inconsistent with its own acknowledgement that every case must be decided on its specific facts on a real-time basis.

The failure of the Commission either to provide a credible statutory basis for the Documented Export Policy (whether Subsection 40104 or otherwise) or to explain how it would use such policies in the context of the proposed reasonableness analysis underscores the extraordinary nature of this requirement. Here, under the guise of evaluating reasonableness, the Commission directly interferes with the commercial decision making and operational plans of ocean carriers. Only Congress can expand the agency's authority in this manner. Nothing in the Shipping Act nor OSRA 22 allows the Commission to take this unprecedented step from its role as a regulator into the boardrooms of regulated entities. In the end, the Final Rule: (1) tells ocean carriers they must create and file a Documented Export Policy, (2) provides no substantive guidance on what the policy should include, (3) offers no coherent explanation as to how such filing

would be useful as a benchmark in deciding cases alleging unreasonable refusals to deal, (4) fails to respond to meaningful comments explaining why such a requirement is neither useful nor necessary, and (5) tells ocean carriers they must follow their respective Documented Export Policies anyway under threat of penalty. A simple review of the administrative record leads to only one unavoidable conclusion—that the Commission itself has no idea how the existence of the Documented Export Policy would contribute to a rational determination of reasonableness under 46 U.S.C. § 41104(a)(3) or (a)(10).

### 3. The Final Rule is Arbitrary and Capricious Because it Departs From Longstanding Precedent That Business Decisions Be Considered in a Reasonableness Analysis.

The Final Rule is arbitrary and capricious because the Commission chose to remove "business decisions" from the explicit "non-binding" factors that it would consider when analyzing reasonableness, without a reasoned explanation and contrary to decades of precedent. *See* 89 Fed. Reg. at 59657 ("[T]he Commission has removed business factors from being specifically listed as a requirement the Commission *must consider* to something that the Commission *'may' consider*, and is not precluded from doing so.") (emphasis added). As noted above, business decisions were included as express factors in the NPRM, and then taken out in the SNPRM. *See id.* at 59656 (noting the "SNPRM removed 'business decisions' as an

explicit factor that the Commission *would be required to consider* in determining whether there was an unreasonable refusal to deal.") (emphasis added).

As to why business decisions were relegated from being an explicitly stated factor, the Commission offered a very short explanation that, "[g]iven the thoughtful and varied comments received on the concept of reasonable business decision making, this SNPRM removes the general concept from the definition of unreasonableness." 88 Fed. Reg. at 38797. In its only attempt to further explain its dramatic U-turn on nearly 50 years of precedent considering business decisions within the context of unreasonable refusals to deal or negotiate, the Commission offers a nonsensical explanation that "there is potential for business decisions to overwhelm the rest of the factors," thus necessitating their removal. *See id.* at 38804. But if business decisions are that critical to a reasonableness analysis— which the Commission concedes in the SNPRM—then they must be included, not excluded. The Commission's own reasoning supports precisely the opposite outcome to the one embodied in the Final Rule, arriving at an illogical outcome that is the very definition of arbitrary and capricious rulemaking. *See Am. Fed'n of Gov't Emps. v. FLRA*, 470 F. 3d 375, 380 (D.C. Cir. 2006) ("Certainly, if the result reached is illogical on its own terms, the [agency's] order is arbitrary and capricious").

Because OSRA 22 did not create the "unreasonable refusal to deal or negotiate" prohibition in the Shipping Act, but merely added "vessel space accommodations" as a factual situation to which this prohibition applies, adherence to past Commission precedent is required absent a reasoned explanation why its policies and standards are being changed. *Department of Homeland Security v. Regents of the University of California*, 140, S. Ct. 1891, 1913 ("[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy]'"); *Fox Television*, 556 U.S. at 515 ("[I]t is not that further justification is demanded by the mere fact of policy change, but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.); *Michigan Consol. Gas Co. v. FERC*, 883 F. 2d 117, 122 (D.C. Cir. 1989) ("[I]t is well established that an agency may not 'casually ignore' its own past decisions"). Though the relevant statutory language slightly changed following OSRA 22, the underlying prohibition to engage in "unreasonable" actions did not. The Commission has decades of caselaw discussing the application of the term "unreasonable" for cases brought under 46 U.S.C. § 41104(a), and it must adhere to that precedent or explain why it is departing from it. The central feature of this longstanding precedent is a standard of commercial reasonableness. *Maher Terminals, LLC v. PANYNJ*, 2015 WL 435475 at *21 (F.M.C. 2015) ("[T]he Commission may defer

43

to a port's reasonable, discretionary business decisions during negotiations.");

*Seacon Terminals, Inc. v. Port of Seattle*, 26 S.R.R. 886, 899 (F.M.C. 1993)

(Commission holding that a port's decision not to enter into a lease "was a wholly

reasonable exercise of its business discretion."). The Commission took care in

acknowledging this longstanding precedent regarding reasonableness

determinations in the NPRM, stating, "a just and reasonable practice is one

otherwise lawful but not excessive and suited to the end in view." 87 Fed. Reg. at

57676 (citing *Canaveral Port Authority—Possible Violations Of Section 10(b)(10)*,

29 S.R.R. 1436 (FMC 2003); *Maher Terminals, LLC v. PANYNJ*, 33 S.R.R. 821

(F.M.C. 2014). The Commission explicitly recognized it "has previously found

reasonable those decisions that are connected to a *legitimate business decision* or

motivated by legitimate transportation factors." *Id.* (emphasis added).

Broadly stating, as the Commission does in the preamble to the Final Rule,

that it has "made clear that information on business decisions relevant to

establishing a reasonable refusal to deal would still be relevant to the

Commission's analysis," does not excuse the Commission from its requirement to

provide a reasoned analysis, which it failed to do here. *See* 89 Fed. Reg. at 59657;

*see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-24 (2016) (holding that

the agency's regulation was arbitrary and capricious because while the agency said

that "it had 'carefully considered the comments, analyses, and arguments made for

and against the proposed changes,'" in reality, "the Department did not explain

what (if anything) it found persuasive in [comments to the rule]" and "when it

came to explaining the 'good reasons for the new policy', the Department said

almost nothing."); *see also Greater Boston Television Corp. v. F.C.C.*, 444 F.2d

841, 852 (D.C. Cir. 1970) ("[A]n agency changing its course must supply a

reasoned analysis indicating that prior policies and standards are being deliberately

changed, not casually ignored, and if an agency glosses over or swerves from prior

precedents without discussion it may cross the line from the tolerably terse to the

intolerably mute.").

The Commission's vague assurances in the preamble of the Final Rule that

"information on business decisions … would still be relevant to the Commission's

analysis," are similarly insufficient. The Final Rule suggests business factors could

still be considered under the "catch-all" regulatory provision of "other relevant

factors or conduct" that the Commission *may* consider in its discretion. *See* 88 Fed.

Reg. at 38797 ("The SNPRM does not preclude considerations that an ocean

common carrier can present when articulating its justification for refusing to

deal."). Notwithstanding such assurances, by expressly removing business factors

from the regulatory text, the Commission has effectively said that either business

factors will no longer be considered in this reasonableness analysis, or they will be

de-prioritized in favor of other factors it chose to expressly enumerate. *See* 89 Fed.

Reg. at 59657 (the Commission, in the preamble, stating it "removed business factors" as something it "must consider" to something it "'may' consider"). In either case, this approach is arbitrary and capricious because the Commission is simply refusing to consider what it has itself previously identified as a critical part of a reasonableness analysis, both in its precedent and this rulemaking. *See* 87 Fed. Reg. at 57677 n.29 (Commission referencing its own precedent when noting its "history of recognizing that it is appropriate to defer to a party's reasonable business decisions and not to substitute its business judgment for that of an entity conducting negotiations."). Rather the Commission now identifies business factors as so important that their inclusion may "overwhelm" other factors—in effect acknowledging the critical importance of the relevant category. This constitutes both a failure to consider an important part of the issue, and a departure from precedent without explanation. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Recent experience in this Court demonstrates that, for the Commission to take into account a particular factor in a reasonableness analysis, it must be expressly included in the regulatory text, and the regulatory text must also require the Commission to consider the enumerated factor. *Evergreen Shipping Agency (Am.) Corp. v. Fed. Maritime Comm'n*, No. 23-1052 at 10 (D.C. Cir. 2024). In that proceeding, when faced with a similar regulatory paradigm with several "non-

46

exhaustive" factors in determining reasonableness, this Court vacated the Commission's order, holding that the Commission "commit[ted] to making a circumstantial, fact-bound inquiry in the interpretive rule and then, when it came time to apply the rule, [ ] jettison[ed] all but its favorite factor." *Id.* Similarly, giving itself unfettered discretion to consider—or ignore—any relevant factor in any given case amounts to the Commission acting in an arbitrary and capricious manner. *See Postal Regulatory Com'n*, 785 F.3d 740, 753-55 (D.C. Cir. 2015) ("At its core, the Commission's Order is arbitrary and capricious because it fails to articulate a comprehensible standard" and while "the Commission does not claim this unbridled authority . . . unfortunately the Commission's decision fails to set forth a standard to ensure that this promise is kept."); *Williams Gas Processing Gulf Cost Co. v. FERC*, 475 F. 3d 319, 326 (D.C. Cir. 2006) (stating that "[a]rbitrary and capricious review demands evidence of reasoned decision making *at the agency level*") (emphasis original). Regulated parties have the right to require clear direction from an agency as to how it is going to enforce a regulation in a uniform and fair manner and to challenge a regulation that fails to meet the requirements of the APA rather than wait for the agency to announce its intentions in an enforcement proceeding. *See id.; Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-59 (2012). There is no such direction here in the Final Rule and, without it, ocean carriers cannot meaningfully tailor their practices to comply with

the Final Rule, and they therefore risk needless litigation and arbitrary enforcement by the Commission.

## CONCLUSION

In OSRA 22, Congress directed the Commission to define when an ocean carrier has unreasonably refused to negotiate or deal with respect to vessel space accommodations. Instead of doing what Congress directed, the Commission adopted a Final Rule that exceeds the Commission's authority in the Shipping Act, departs from past Commission practice without explanation, and fails to make any rational connection between the facts found and the choices it made. Accordingly, the Commission has adopted a vague, standardless rule giving itself the authority to consider any factor it wants, and where any conduct could theoretically be found to fit within the Commission's vast and undefined concept of "unreasonable." In the process of creating that confusion, the Commission fatally erred in both its flawed interpretation of its authority derived from the Shipping Act (as amended by OSRA 22) as well as in its illogical and lacking explanations, leading it to impermissibly: (1) regulate rates in excess of its statutory authority; (2) require the filing of Documented Export Policies, again contrary to the Commission's statutory authority; and (3) remove "business decisions" as relevant, explicit reasonableness factors, overturning decades of precedent holding them to be

LEGAL\76064927\1

central to a reasonableness analysis based on the illogical reasoning that they are so important as to potentially "overwhelm the rest of the factors."

With virtually no clarity to carriers, shippers, or finders of fact on what actions the Commission believes would constitute unreasonable behavior in any given context, every allegation of an unreasonable refusal to deal will have to be litigated to understand if a violation has occurred, costing stakeholders across the supply chain unnecessary time, money, and resources. That is exactly the opposite of what Congress directed the Commission to do when it tasked it to undertake this rulemaking.

For all of these reasons, the Final Rule should be vacated and remanded to the Commission to do what Congress directed it to do, within the limits of its statutory authority, giving clarity to regulated entities on what conduct is unreasonable in the context of negotiating or dealing with respect to vessel space accommodations.

LEGAL\76064927\1

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i) Complies with the type-volume limitation of Rule 32(a)(7) because it contains 10,959 words, excluding the parts of the brief exempted by Rule 32(f) and Circuit Rule 32(e)(1); and

(ii) Complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word and is set in Times New Roman font in a size equivalent to 14 points or larger.

Dated: March 3, 2025                    */s/ Robert K. Magovern*

# CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2025, I electronically filed the foregoing brief with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: March 3, 2025                    */s/ Robert K. Magovern*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

46 U.S.C. § 40101……………………………………………..………..…ADD1

46 U.S.C. § 40104(a)…………………………………………….….…ADD2

46 U.S.C. § 41102…………………………………………….…...………ADD3

46 U.S.C. § 41103…………………………………………...…..……………ADD5

46 U.S.C. § 41104 (Current)…..……………………………….…….………ADD6

46 U.S.C. § 41104 (Pre-OSRA 22)…..……………………….…...………ADD10

Public Law 64-260 § 18(a) (1916 Act)…..……………………………...…ADD13

46 C.F.R. § 542.1…..………………………………………...………..…ADD14

**46 U.S.C. § 40101 – Purposes**

The purposes of this part are to—

(1) establish a nondiscriminatory regulatory process for the common carriage of goods by water in the foreign commerce of the United States with a minimum of government intervention and regulatory costs;

(2) ensure an efficient, competitive, and economical transportation system in the ocean commerce of the United States;

(3) encourage the development of an economically sound and efficient liner fleet of vessels of the United States capable of meeting national security needs and supporting commerce; and

(4) promote the growth and development of United States exports through a competitive and efficient system for the carriage of goods by water in the foreign commerce of the United States, and by placing a greater reliance on the marketplace.

**46 U.S.C. § 40104(a) – Reports Filed with the Commission**

**(a) Reports.—**

**(1) In general.—**The Federal Maritime Commission may require a common carrier or marine terminal operator, or an officer, receiver, trustee, lessee, agent, or employee of the common carrier or marine terminal operator to file with the Commission a periodical or special report, an account, record, rate, or charge, or a memorandum of facts and transactions related to the business of the common carrier or marine terminal operator, as applicable.

**(2) Requirements.—**Any report, account, record, rate, charge, or memorandum required to be filed under paragraph (1) shall—

> (A) be made under oath if the Commission requires; and

> (B) be filed in the form and within the time prescribed by the Commission.

**46 U.S.C. § 41102 – General prohibitions**

**(a) Obtaining Transportation at Less Than Applicable Rates.**—A person may not knowingly and willfully, directly or indirectly, by means of false billing, false classification, false weighing, false report of weight, false measurement, or any other unjust or unfair device or means, obtain or attempt to obtain ocean transportation for property at less than the rates or charges that would otherwise apply.

**(b) Operating Contrary to Agreement.**—A person may not operate under an agreement required to be filed under section 40302 or 40305 of this title if—

    (1) the agreement has not become effective under section 40304 of this title or has been rejected, disapproved, or canceled; or

    (2) the operation is not in accordance with the terms of the agreement or any modifications to the agreement made by the Federal Maritime Commission.

**(c) Practices in Handling Property.**—A common carrier, marine terminal operator, or ocean transportation intermediary may not fail to establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property.

**(d) Retaliation and Other Discriminatory Actions.**—A common carrier, marine terminal operator, or ocean transportation intermediary, acting alone or in conjunction with any other person, directly or indirectly, may not—

    (1) retaliate against a shipper, an agent of a shipper, an ocean transportation intermediary, or a motor carrier by refusing, or threatening to refuse, an otherwise-available cargo space accommodation; or

    (2) resort to any other unfair or unjustly discriminatory action for—

(A) the reason that a shipper, an agent of a shipper, an ocean transportation intermediary, or motor carrier has—

   (i) patronized another carrier; or

   (ii) filed a complaint against the common carrier, marine terminal operator, or ocean transportation intermediary; or

 (B) any other reason

## 46 U.S.C. § 41103 – Disclosure of Information

**(a) Prohibition.**—A common carrier, marine terminal operator, or ocean freight forwarder, either alone or in conjunction with any other person, directly or indirectly, may not knowingly disclose, offer, solicit, or receive any information concerning the nature, kind, quantity, destination, consignee, or routing of any property tendered or delivered to a common carrier, without the consent of the shipper or consignee, if the information—

> (1) may be used to the detriment or prejudice of the shipper, the consignee, or any common carrier; or

> (2) may improperly disclose its business transaction to a competitor.

**(b) Exceptions**.—Subsection (a) does not prevent providing the information—

> (1) in response to legal process;

> (2) to the Federal Maritime Commission or an agency of the United States Government; or

> (3) to an independent neutral body operating within the scope of its authority to fulfill the policing obligations of the parties to an agreement effective under this part.

**(c) Disclosure for Determining Breach or Compiling Statistics**.—An ocean common carrier that is a party to a conference agreement approved under this part, a receiver, trustee, lessee, agent, or employee of the carrier, or any other person authorized by the carrier to receive information—

> (1) may give information to the conference or any person or agency designated by the conference, for the purpose of—

>> (A) determining whether a shipper or consignee has breached an agreement with the conference or its member lines;

>> (B) determining whether a member of the conference has breached the conference agreement; or

>> (C) compiling statistics of cargo movement; and

> (2) may not prevent the conference or its designee from soliciting or receiving information for any of those purposes.

## 46 U.S.C. § 41104 – Common carriers (Current)

**(a) In General.—**A common carrier, either alone or in conjunction with any other person, directly or indirectly, shall not—

(1) allow a person to obtain transportation for property at less than the rates or charges established by the carrier in its tariff or service contract by means of false billing, false classification, false weighing, false measurement, or any other unjust or unfair device or means;

(2) provide service in the liner trade that is—

(A) not in accordance with the rates, charges, classifications, rules, and practices contained in a tariff published or a service contract entered into under chapter 405 of this title, unless excepted or exempted under section 40103 or 40501(a)(2) of this title; or

(B) under a tariff or service contract that has been suspended or prohibited by the Federal Maritime Commission under chapter 407 or 423 of this title;

(3) unreasonably refuse cargo space accommodations when available, or resort to other unfair or unjustly discriminatory methods;

(4) for service pursuant to a tariff, engage in any unfair or unjustly discriminatory practice in the matter of—

(A) rates or charges;

(B) cargo classifications;

(C) cargo space accommodations or other facilities, with due regard being given to the proper loading of the vessel and the available tonnage;

(D) loading and landing of freight; or

(E) adjustment and settlement of claims;

(5) for service pursuant to a service contract, engage in any unfair or unjustly discriminatory practice against any commodity group or type of shipment or in the matter of rates or charges with respect to any port;

(6) use a vessel in a particular trade for the purpose of excluding, preventing, or reducing competition by driving another ocean common carrier out of that trade;

(7) offer or pay any deferred rebates;

(8) for service pursuant to a tariff, give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage;

(9) for service pursuant to a service contract, give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage with respect to any port;

(10) unreasonably refuse to deal or negotiate, including with respect to vessel space accommodations provided by an ocean common carrier;

(11) knowingly and willfully accept cargo from or transport cargo for the account of a non-vessel-operating common carrier that does not have a tariff as required by section 40501 of this title, or an ocean transportation intermediary that does not have a bond, insurance, or other surety as required by section 40902 of this title;

(12) knowingly and willfully enter into a service contract with an ocean transportation intermediary that does not have a tariff as required by section 40501 of this title and a bond, insurance, or other surety as required by section 40902 of this title, or with an affiliate of such an ocean transportation intermediary;

(13) continue to participate simultaneously in a rate discussion agreement and an agreement to share vessels, in the same trade, if the interplay of the authorities exercised by the specified agreements is likely, by a reduction in competition, to produce an unreasonable reduction in transportation service or an unreasonable increase in transportation cost;

(14) assess any party for a charge that is inconsistent or does not comply with all applicable provisions and regulations, including subsection (c) of section 41102 or part 545 of title 46, Code of Federal Regulations (or successor regulations);

(15) invoice any party for demurrage or detention charges unless the invoice includes information as described in subsection (d) showing that such charges comply with—

    (A) all provisions of part 545 of title 46, Code of Federal Regulations (or successor regulations); and

    (B) applicable provisions and regulations, including the principles of the final rule published on May 18, 2020, entitled "Interpretive Rule on Demurrage and Detention Under the Shipping Act" (or successor rule); or

(16) for service pursuant to a service contract, give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage against any commodity group or type of shipment.

**(b) Rule of Construction.—**Notwithstanding any other provision of law, there is no private right of action to enforce the prohibition under subsection (a)(13).

**(c) Agreement Violation.—**Participants in an agreement found by the Commission to violate subsection (a)(13) shall have 90 days from the date of such Commission finding to withdraw from the agreement as necessary to comply with that subsection.

**(d) Detention and Demurrage Invoice Information.—**

    (1) Inaccurate invoice.—If the Commission determines, after an investigation in response to a submission under section 41310, that an invoice under subsection (a)(15) was inaccurate or false, penalties or refunds under section 41107 shall be applied.

    (2) Contents of invoice.—An invoice under subsection (a)(15), unless otherwise determined by subsequent Commission rulemaking, shall include accurate information on each of the following, as well as minimum information as determined by the Commission:

        (A) Date that container is made available.

        (B) The port of discharge.

        (C) The container number or numbers.

        (D) For exported shipments, the earliest return date.

(E) The allowed free time in days.

(F) The start date of free time.

(G) The end date of free time.

(H) The applicable detention or demurrage rule on which the daily rate is based.

(I) The applicable rate or rates per the applicable rule.

(J) The total amount due.

(K) The email, telephone number, or other appropriate contact information for questions or requests for mitigation of fees.

(L) A statement that the charges are consistent with any of Federal Maritime Commission rules with respect to detention and demurrage.

(M) A statement that the common carrier's performance did not cause or contribute to the underlying invoiced charges.

**(e) Safe Harbor.**—If a non-vessel operating common carrier passes through to the relevant shipper an invoice made by the ocean common carrier, and the Commission finds that the non-vessel operating common carrier is not otherwise responsible for the charge, then the ocean common carrier shall be subject to refunds or penalties pursuant to subsection (d)(1).

**(f) Elimination of Charge Obligation.**—Failure to include the information required under subsection (d) on an invoice with any demurrage or detention charge shall eliminate any obligation of the charged party to pay the applicable charge.

## 46 U.S.C. § 41104 – Common Carriers (Pre-OSRA 22)

**(a) In general.--**A common carrier, either alone or in conjunction with any other person, directly or indirectly, may not--

(1) allow a person to obtain transportation for property at less than the rates or charges established by the carrier in its tariff or service contract by means of false billing, false classification, false weighing, false measurement, or any other unjust or unfair device or means;

(2) provide service in the liner trade that is--

(A) not in accordance with the rates, charges, classifications, rules, and practices contained in a tariff published or a service contract entered into under chapter 405 of this title, unless excepted or exempted under section 40103 or 40501(a)(2) of this title; or

(B) under a tariff or service contract that has been suspended or prohibited by the Federal Maritime Commission under chapter 407 or 423 of this title;

(3) retaliate against a shipper by refusing, or threatening to refuse, cargo space accommodations when available, or resort to other unfair or unjustly discriminatory methods because the shipper has patronized another carrier, or has filed a complaint, or for any other reason;

(4) for service pursuant to a tariff, engage in any unfair or unjustly discriminatory practice in the matter of--

(A) rates or charges;

(B) cargo classifications;

(C) cargo space accommodations or other facilities, with due regard being given to the proper loading of the vessel and the available tonnage;

(D) loading and landing of freight; or

(E) adjustment and settlement of claims;

(5) for service pursuant to a service contract, engage in any unfair or unjustly discriminatory practice in the matter of rates or charges with respect to any port;

(6) use a vessel in a particular trade for the purpose of excluding, preventing, or reducing competition by driving another ocean common carrier out of that trade;

(7) offer or pay any deferred rebates;

(8) for service pursuant to a tariff, give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage;

(9) for service pursuant to a service contract, give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage with respect to any port;

(10) unreasonably refuse to deal or negotiate;

(11) knowingly and willfully accept cargo from or transport cargo for the account of a non-vessel-operating common carrier that does not have a tariff as required by section 40501 of this title, or an ocean transportation intermediary that does not have a bond, insurance, or other surety as required by section 40902 of this title;

(12) knowingly and willfully enter into a service contract with an ocean transportation intermediary that does not have a tariff as required by section 40501 of this title and a bond, insurance, or other surety as required by section 40902 of this title, or with an affiliate of such an ocean transportation intermediary; or

(13) continue to participate simultaneously in a rate discussion agreement and an agreement to share vessels, in the same trade, if the interplay of the authorities exercised by the specified agreements is likely, by a reduction in competition, to produce an unreasonable reduction in transportation service or an unreasonable increase in transportation cost.

**(b) Rule of construction.--**Notwithstanding any other provision of law, there is no private right of action to enforce the prohibition under subsection (a)(13).

**(c) Agreement violation.--**Participants in an agreement found by the Commission to violate subsection (a)(13) shall have 90 days from the date of such Commission finding to withdraw from the agreement as necessary to comply with that subsection.

**Public Law 64-260 § 18(a) (Excerpt of 1916 Act)**

Whenever the board finds that any rate, fare, charge, classification, tariff, regulation, or practice, demanded, charged, collected or observed by such carrier is unjust or unreasonable, it may determine, prescribe, and order enforced a just and reasonable maximum rate, fare, or charge, or a just and reasonable classification, tariff, regulation, or practice.

**46 C.F.R. § 542.1 – Definition of unreasonable refusal of cargo space accommodations when available and unreasonable refusal to deal or negotiate with respect to vessel space provided by an ocean common carrier.**

**(a) Purpose.** This part establishes the elements and definitions necessary for the Federal Maritime Commission (Commission) to apply 46 U.S.C. 41104(a)(3) with respect to refusals of cargo space accommodations when available for containerized cargo and to apply 46 U.S.C. 41104(a)(10) with respect to refusals of vessel space accommodations provided by an ocean common carrier with respect to containerized cargo. This part applies to complaints brought before the Commission by a private party and enforcement cases brought by the Commission.

**(b) Definitions.** For the purposes of this section:

*Blank sailing* means a sailing skipping one or more specific port(s) while still traversing the rest of the scheduled route or the entire sailing being canceled.

*Cargo space accommodations* means space which has been negotiated for or confirmed aboard the vessel of an ocean common carrier for laden containers being imported to or exported from the United States. Cargo space accommodations includes the services necessary to access and load or unload cargo from a vessel calling at a U.S. port.

*Documented export policy* means a written report produced by an ocean common carrier that details the ocean common carrier's practices and procedures for U.S. outbound services.

*Sweeper vessel* means a vessel exclusively designated to load and move empty containers from a U.S. port for the purpose of transporting them to another designated location.

*Transportation factors* means factors that encompass the vessel operation considerations underlying an ocean common carrier's ability to accommodate laden cargo for import or export, which can include, but are not limited to, vessel safety and stability, weather-related scheduling considerations, and other factors related to vessel operation outside the vessel operator's control and not reasonably foreseeable.

*Unreasonable* means ocean common carrier conduct that unduly restricts the ability of shippers to meaningfully access ocean carriage services from that ocean common carrier.

*Vessel space accommodations* means space available aboard a vessel of an ocean common carrier for laden containers being imported to or exported from the United States. Vessel space accommodations also includes the services necessary to book or access vessel space accommodations.

**(c) Elements for claims.** The following elements are necessary to establish a successful private party or enforcement claim under 46 U.S.C. 41104(a)(3) with respect to refusals of cargo space accommodations when available:

(1) The respondent must be an ocean common carrier as defined in 46 U.S.C. 40102;

(2) The respondent refuses or refused cargo space accommodations when available; and

(3) The ocean common carrier's conduct is unreasonable.

**(d) Non-binding considerations when evaluating unreasonable conduct.** In evaluating the reasonableness of an ocean common carrier's refusal to provide cargo space accommodations, the Commission may consider the following factors:

(1) Whether the ocean common carrier followed a documented export policy that enables the timely and efficient movement of export cargo;

(2) Whether the ocean common carrier made a good faith effort to mitigate the impact of a refusal;

(3) Whether the refusal was based on legitimate transportation factors; and

(4) Any other relevant factors or conduct.

**(e) Non-binding examples of unreasonable conduct.** The following are examples of the kinds of conduct that may be considered unreasonable under 46 U.S.C. 41104(a)(3) when linked to a refusal to provide cargo space accommodations:

(1) Blank sailings or schedule changes with no advance notice or with insufficient advance notice;

(2) Vessel capacity limitations not justified by legitimate transportation factors;

(3) Failing to alert or notify shippers with confirmed bookings of any other changes to the sailing that will affect when their cargo arrives at its destination port;

(4) Scheduling insufficient time for cargo tendering or vessel loading so that cargo is constructively refused;

(5) Providing inaccurate or unreliable vessel information; or

(6) The de facto, absolute, or systematic exclusion of exports in providing cargo space accommodations.

**(f) Elements for claims.** The following elements are necessary to establish a successful private party or enforcement claim under 46 U.S.C. 41104(a)(10) with respect to refusals of vessel space accommodations provided by an ocean common carrier:

(1) The respondent must be an ocean common carrier as defined in 46 U.S.C. 40102;

(2) The respondent refuses or refused to deal or negotiate with respect to vessel space accommodations; and

(3) The ocean common carrier's conduct is unreasonable.

**(g) Non-binding considerations when evaluating unreasonable conduct.** In evaluating the reasonableness of an ocean common carrier's refusal to deal or negotiate with respect to vessel space accommodations, the Commission may consider the following factors:

(1) Whether the ocean common carrier followed a documented export policy that enables the timely and efficient movement of export cargo;

(2) Whether the ocean common carrier engaged in good faith negotiations;

(3) Whether the refusal was based on legitimate transportation factors; and

(4) Any other relevant factors or conduct.

**(h) Non-Binding examples of unreasonable conduct.** The following are examples of the kinds of conduct that may be considered unreasonable under 46 U.S.C. 41104(a)(10) when linked to a refusal to deal or negotiate:

(1) Quoting rates that are so far above current market rates they cannot be considered a good faith offer or an attempt at engaging in good faith negotiations; or

(2) The de facto, absolute, or systematic exclusion of exports in providing vessel space accommodations.

**(i) Use of sweeper vessels.** Ocean common carriers are not precluded from using sweeper vessels previously designated for that purpose to reposition empty containers; however, the designation of a vessel as a sweeper vessel is subject to Commission review to determine whether the designation results in an unreasonable refusal of ocean carriage services.

**(j) Documented export policy.** Ocean common carriers must file with the Federal Maritime Commission a documented export policy that enables the timely and efficient movement of export cargo.

(l) Each ocean common carrier must submit a documented export policy to the Commission once per calendar year and include, in a manner prescribed by the Commission, pricing strategies, services offered, strategies for equipment provision, and descriptions of markets served. Updates may be submitted more than once per year if the ocean common carrier chooses to do so. Other topics a documented export policy should also address, if applicable, include:

(i) The effect of blank sailings or other schedule disruptions on the ocean common carrier's ability to accept shipments;

(ii) The ocean common carrier's rules and practices for the designation and use of sweeper vessels; and

(iii) The alternative remedies or assistance the ocean common carrier would make available to a shipper to whom it refused vessel space accommodations.

(2) A documented export policy required to be filed by this part must be submitted to: Director, Bureau of Trade Analysis, Federal Maritime Commission, *exportpolicy@fmc.gov.*

(3) The documented export policies filed in accordance with this section shall not be circulated outside of the Federal Maritime Commission. These documents, and the information contained therein, shall not be publicly

disclosable, in whole or in part, including in response to requests under the Freedom of Information Act. The information may, however, be disclosed to the extent that it is relevant to an administrative or judicial action or proceeding; or to either House of Congress, or a duly authorized committee or subcommittee of Congress.

**(k) Shifting the burden of production.** In accordance with applicable laws, the following standard applies:

(1) The initial burden of production to establish a prima facie case of a violation of this part is with the complainant or the Commission's Bureau of Enforcement, Investigations, and Compliance.

(2) Once a complainant sets forth a prima facie case of a violation, the burden shifts to the ocean common carrier to justify that its actions were reasonable.

(3) The ultimate burden of persuading the Commission always remains with the complainant or the Commission's Bureau of Enforcement, Investigations, and Compliance

ORAL ARGUMENT NOT YET SCHEDULED
NO. 24-1298

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

WORLD SHIPPING COUNCIL,

PETITIONER,

v.

FEDERAL MARITIME COMMISSION
AND THE UNITED STATES OF AMERICA,

RESPONDENTS.

*On Petition for Review from an Order of the Federal Maritime Commission,*
*89 Fed. Reg. 59648*

---

RECORD SUPPLEMENT

---

## SUPPLEMENTAL TABLE OF CONTENTS

**Exhibit A:**    Declaration of Hapag-Lloyd AG Declaration of

**Exhibit B:**    Maersk A/S

# EXHIBIT A

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **World Shipping Council,** ) | |
| ) | |
| *Petitioner,* ) | |
| **v.** ) | |
| ) | **No. 24-1298** |
| **Federal Maritime Commission;** ) | |
| ) | |
| **and the** ) | |
| ) | |
| **United States of America,** ) | |
| ) | |
| *Respondents.* ) | |

## <u>DECLARATION OF HAPAG-LLOYD AG IN SUPPORT OF PETITIONER</u>

I, Thomas Mansfeld, hereby declare as follows:

1. I am over the age of 18. If called as a witness in this action, I could testify to the facts stated herein.

2. I am the General Counsel of Hapag-Lloyd AG. I am authorized to make this declaration on Hapag-Lloyd's behalf.

3. I have been working for Hapag-Lloyd AG as General Counsel since 2002, overseeing all legal, M&A, and insurance matters for the company.

4. Hapag-Lloyd AG is an "Ocean Common Carrier" as defined in the U.S. Shipping Act, 46 U.S.C. 40102(18) and engages in the provision of ocean transportation services in the U.S. foreign trade.

5. As an Ocean Common Carrier, Hapag-Lloyd AG is subject to the jurisdiction of the U.S. Shipping Act, as amended, including the prohibitions provided at 46 U.S.C. § 41104 and the final rule adopted by the Federal Maritime Commission's (FMC), "Definition of Unreasonable Refusal to Deal or Negotiate with Respect to Vessel Space Accommodations Provided by an Ocean Common Carrier," as set forth in 46 C.F.R. § 542.1.

6. Hapag-Lloyd AG is subject to private party complaints and administrative enforcement by the FMC pursuant to the Final Rule and the Shipping Act.

7. Hapag-Lloyd AG participated in the underlying administrative proceedings for the Final Rule through the submission of comments to the Supplemental Notice of Proposed Rulemaking.

8. The Final Rule has imposed immediate regulatory restrictions, costs, and burdens on Hapag-Lloyd AG's operations and practices, which currently include or will include:

- Costs associated with training personnel on the changes, in particular changes in pricing strategies as a result of the lack of business/commercial factors to be expressly considered in an unreasonableness analysis or the express factor considering whether carriers are "quoting rates that are so far above current market rates they cannot be considered a real offer or an attempt at engaging in good faith negotiations."
- Costs associated with obtaining legal advice regarding interpretation of or risk exposure under Final Rule.
- Costs associated with the preparation, submission, and required routine update of an export documentation policy pursuant to 46 C.F.R. 542.1(j).

- Costs associated with changes to business policies and practices, and/or third party formal or informal complaints, relating to negotiating, providing and potential refusal of cargo space accommodations to interested parties.
- Costs associated with changes to business policies and practices, and/or third party formal or informal complaints, regarding (1) notification of blank sailings or unscheduled service changes, (2) scheduling sufficient time for cargo tendering or vessel loading, or (3) providing accurate and reliable vessel information.
- Customer claims or formal/informal complaints regarding failure to engage in good faith negotiations for vessel space.
- Customer claims or formal/informal complaints that failure to provide vessel space accommodations was not based on a defined "transportation factor" in the FMC's rule.
- Communications with the FMC (i.e. in the VOCC audit process, meetings, emails, through public notices, etc.) regarding the need for compliance with the Final Rule and/or threat of enforcement.

9. Hapag-Lloyd AG is a member of the World Shipping Council (WSC), as identified in WSC's Agreement filed with the FMC and WSC's public-facing website.

10. WSC can and will adequately represent Hapag-Lloyd AG's interests in the instant appeal before the U.S. Court of Appeals for the D.C. Circuit without the need for Hapag-Lloyd AG itself to separately participate.

I declare under penalty of perjury that the foregoing is true and correct.

Thomas Mansfeld
General Counsel, Hapag-Lloyd AG

Dated: 03.03.2025

# EXHIBIT B

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **World Shipping Council,** | ) |
| | ) |
| *Petitioner,* | ) |
| **v.** | ) |
| | ) **No. 24-1298** |
| **Federal Maritime Commission;** | ) |
| | ) |
| **and the** | ) |
| | ) |
| **United States of America,** | ) |
| | ) |
| *Respondents.* | ) |

## <u>DECLARATION OF MAERSK A/S IN SUPPORT OF PETITIONER</u>

I, Dennis A. O'Brien, hereby declare as follows:

1. I am over the age of 18. If called as a witness in this action, I could testify to the facts stated herein.

2. I am the Secretary for Maersk Agency U.S.A. Inc., the agent for Maersk A/S. I am authorized to make this declaration on behalf of Maersk A/S.

3. Maersk A/S is an "Ocean Common Carrier" as defined in the U.S. Shipping Act, 46 U.S.C. 40102(18) and engages in the provision of ocean transportation services in the U.S. foreign trade.

4. As an Ocean Common Carrier, Maersk A/S is subject to the jurisdiction of the U.S. Shipping Act, as amended, including the prohibitions provided at 46

U.S.C. § 41104 and the final rule adopted by the Federal Maritime

Commission's (FMC), "Definition of Unreasonable Refusal to Deal or

Negotiate with Respect to Vessel Space Accommodations Provided by an

Ocean Common Carrier," as set forth in 46 C.F.R. § 542.1.

5. Maersk A/S is subject to private party complaints and administrative

enforcement by the FMC pursuant to the Final Rule and the Shipping Act.

6. Maersk A/S participated in the underlying administrative proceedings for the

Final Rule through the submission of comments to the Supplemental Notice

of Proposed Rulemaking.

7. The Final Rule has imposed immediate regulatory restrictions, costs, and

burdens on Maersk A/S' operations and practices, including through:

   a. Costs associated with obtaining legal advice regarding interpretation

   of or risk exposure under Final Rule.

   b. Costs associated with the preparation, submission, and required

   routine update of an export documentation policy pursuant to 46

   C.F.R. 542.1(j).

   c. Costs associated with changes to business policies and practices,

   and/or third party formal or informal complaints, relating to

   negotiating, providing and the potential refusal of cargo space

   accommodations to interested parties.

d. Costs associated with changes to business policies and practices, and/or third party formal or informal complaints, regarding: (1) notification of blank sailings or unscheduled service changes, (2) scheduling sufficient time for cargo tendering or vessel loading, or (3) providing accurate and reliable vessel information.

e. Third party claims or formal/informal complaints regarding failure to engage in good faith negotiations for vessel space.

f. Third party claims or formal/informal complaints that failure to provide vessel space accommodations was not based on a defined "transportation factor" in the FMC's rule.

8. Maersk A/S is a member of the World Shipping Council (WSC), as identified in WSC's Agreement filed with the FMC and WSC's public-facing website.

9. WSC can and will adequately represent Maersk A/S' interests in the instant appeal before the U.S. Court of Appeals for the D.C. Circuit without the need for Maersk A/S itself to separately participate.

Signed by _____

Name: Dennis O'Brien

Title: Secretary

Date: 3/3/2025

# NOTARIAL ACKNOWLEDGEMENT

STATE OF __New Jersey__ )
                          )     **ACKNOWLEDGMENT**

COUNTY OF __Morris__ )

      The foregoing instrument was acknowledged and signed by Dennis O'Brien before me this __3rd__ day of __March__, 2025.

LIANN TIRABASSI
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES 9/27/2027
COMMISSION: #50203299

_____
Notary Public

My Commission Expires:         [SEAL]

LIANN TIRABASSI
My Comm. Expires
NOTARY
PUBLIC
9/27/2027
NEW JERSEY